# 22-1202

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

DOUGLAS COX,

*Plaintiff - Appellant,*

v.

DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION,
DEPARTMENT OF DEFENSE, OFFICE OF THE DIRECTOR OF NATIONAL
INTELLIGENCE, DEPARTMENT OF STATE OF THE UNITED STATES,

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK, CASE NO. 17-CV-3329

## BRIEF FOR PLAINTIFF-APPELLANT
## & SPECIAL APPENDIX

Douglas Cox
City University of New York School of Law
Two Court Square
Long Island City, NY 11101
(718) 340-4241
douglas.cox@law.cuny.edu

*Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

STATEMENT OF JURISDICTION ..................................................................... 1

STATEMENT OF ISSUES PRESENTED ........................................................... 1

STATEMENT OF THE CASE ............................................................................. 1

   I.  Plaintiff's FOIA Requests ............................................................................ 1

   II.  Procedural History ...................................................................................... 2

   III. Factual Background...................................................................................... 4

       A.  Defendants Facilitate Torture & SSCI Begins Investigation................. 4

       B.  SSCI & CIA Negotiate SSCI's Review of CIA Records
           in CIA Reading Room ........................................................................ 5

       C.  SSCI Transmits Approved Versions of *Torture Study* to Defendants. . 8

       D.  DOJ Directs Agencies to Not Open *Torture Study* to
           Manufacture Factual Predicates in FOIA Litigation .......................... 12

       E.  Sen. Feinstein & Other Senators Repeatedly Confirm
           that Defendants' Copies of *Torture Study* are
           Agency Records Under FOIA. ........................................................... 15

       F.  Defendants Unlawfully Alienate & Dispose of Copies
           of the *Torture Study* ........................................................................ 16

STANDARDS OF REVIEW.............................................................................. 17

SUMMARY OF ARGUMENT .......................................................................... 18

ARGUMENT ....................................................................................... 22

I.   DEFENDANTS' COPIES OF *TORTURE STUDY* ARE
    AGENCY RECORDS UNDER FOIA ...................................................... 22

      A.   Defendants' Copies Are Agency Records Under
          Ordinary Meaning and Supreme Court Precedent ........................... 22

      B.   This Circuit Must Reject District Court's Intent Test ..................... 29

      C.   Even If Circuit Adopts Intent Test, Defendants'
          Copies of *Torture Study* Are Still Agency Records ........................ 39

            1.   Sen. Feinstein's Contemporaneous Letters
                Transmitting Copies of The *Torture Study*
                To Defendants Show No Intent to Control ............................. 39

            2.   Sen. Feinstein's Letters Telling Defendants'
                That Defendants' Copies of *Torture Study* Are
                Agency Records Under FOIA Illustrate Intent ....................... 44

            3.   *Torture Study* Itself Only Contains Executive
                Branch Restrictions .............................................................. 45

            4.   Sen. Feinstein's June 2009 Letter to CIA is Irrelevant ........... 46

II.   DISTRICT COURT IMPROPERLY DENIED DISCOVERY .................. 56

CONCLUSION ................................................................................... 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE & CM/ECF FILING

SPECIAL APPENDIX

# TABLE OF AUTHORITIES

**CASES**

*ACLU v. CIA,* 823 F.3d 655 (D.C. Cir. 2016).................................................. 12, 44

*ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015) ....................................................... 32

*ACLU v. DOD,* 827 F. Supp. 2d 217 (S.D.N.Y 2011).............................................. 4

*Armstrong v. Exec. Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993)...... 28, 38

*Cause of Action v. NARA*, 753 F.3d 210 (D.C. Cir. 2014)..................................... 32

*Cox v. Dep't of Justice*, 504 F. Supp. 3d 119 (E.D.N.Y. 2020) ............................... 3

*Critical Mass Energy Project v. NRC*, 931 F.2d 939 (D.C. Cir. 1991).......19, 23, 29

*Dep't of Justice v. Julian*, 486 U.S. 1 (1988) .................................................. 28, 33

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989) ...................................................................................... 22

*Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989)................................... passim

*Doyle v. DHS*, 959 F.3d 72, 77 (2d Cir. 2020)....................................................... 33

*Edelman v. SEC*, 172 F. Rupp. 3d 133 (D.D.C. 2016) ......................................... 33

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019).........19, 23, 29,31

*Forsham v. Harris*, 445 U.S. 169 (1980) ...........................................23, 24, 31, 33

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999)......................... 37

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999)....................................................... 18

*In re Application for an Order Permitting Metallgesellschaft AG
    to take Discovery*, 121 F.3d 77 (2d Cir. 1997) ................................................ 18

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013)........................................................18, 32, 35, 39

*Kissinger v. Reporters' Comm. for Freedom of the Press*
445 U.S. 136 ............................................................................................ 28

*Lindsey v. Bureau of Prisons*, 736 F.2d 1462 (11th Cir. 1984),
   *vacated* 469 U.S. 1082 (1984) ............................................................... 29

*Melogg v. N.Y. Life Ins. Co.*, 51 F.3d372 (2d Cir. 1995).................................... 57

*McGehee v. CIA*, 697 F.2d 1095 (D.C. Cir. 1983) ............................................. 38

*Nat. Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ........................ 22

*Paisley v. CIA*, 712 F.2d 686 (D.C. Cir. 1983) ............................................. 39, 45

*Perrin v. United States*, 444 U.S. 37 (1979) ................................................. 20, 23

*Ruotolo v. Dep't of Justice*, 53 F.3d 4 (2d Cir. 1995) ........................................ 56

*Tax Analysts v. Dep't of Justice*, 845 F.2d 1060 (D.C. Cir. 1988)........................ 29

*United States v. Pettus*, 303 F.3d480 (2d Cir. 2002) ........................................ 18

*United We Stand v. IRS*, 359 F.3d 595 (D.C. Cir. 2004) .................................... 39

## STATUTES

5 U.S.C. § 552................................................................................ passim

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1331 ............................................................................. 1

44 U.S.C. §3301 ............................................................................. 24

# REGULATIONS

22 C.F.R. §171.18 ............................................................... 17

28 C.F.R. § 16.9 ................................................................. 17

32 C.F.R. § 286.6 ............................................................... 17

36 C.F.R. § 1222.12 ........................................................... 28

# EXECUTIVE ORDERS

Exec. Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ......................................... 46

# COURT RULES

Fed. R. Civ. P 12(b)(1) ......................................................... 2

Fed. R. Civ. P. 12(b)(6) ....................................................... 3

Fed. R. Civ. P. 12(h)(3) ....................................................... 2

# OTHER AUTHORITIES

President's News Conference, 2014 Daily Comp. Pres. Doc. 9 (Aug. 1, 2014) ...... 1

160 Cong. Rec. S4105-06 (Mar. 11, 2014) (statement of Sen. Feinstein) .............. 4

160 Cong. Rec. S6407 (Dec. 9, 2014) (statement of Sen. Feinstein).................... 11

SSCI, *Additional Prehearing Questions for Mr. Christopher Sharpley* (2017) ..... 13

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Plaintiff's FOIA claims under 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). The district court entered final judgment on March 31, 2022 (Special Appendix ("SA__") SA90), and Plaintiff filed a timely notice of appeal on May 31, 2022 (Joint Appendix ("JA__") JA434). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

1.    Whether the district court properly held that copies of the *Torture Study*, including different versions or portions thereof, received or created by Defendants cannot be agency records subject to FOIA.

2.    Whether the district court properly held that Plaintiff could not utilize discovery unless Plaintiff presented evidence of bad faith by Defendants.

## STATEMENT OF THE CASE

### I.  Plaintiff's FOIA Requests

The Senate Select Committee on Intelligence's ("SSCI") *Study of the Central Intelligence Agency's Detention and Interrogation Program* ("*Torture Study*") documents the Defendants' role in the programmatic torture of Muslim men. *See* President's News Conference, 2014 DAILY COMP. PRES. DOC. 9 (Aug. 1, 2014 ("[W]e tortured some folks."). In December 2016, Plaintiff sent FOIA requests to Defendants for agency copies of the *Torture Study*, including different

versions or portions thereof.[1] Defendants never conducted searches for responsive records.[2] Instead, with full knowledge of Plaintiff's FOIA requests and the foreseeability of litigation, Defendants intentionally disposed of responsive records. ODNI Letter, JA181. Plaintiff learned of this through a *New York Times* article, Mark Mazzetti *et al.*, *Trump Administration Starts Returning Copies of C.I.A. Torture Report to Congress*, N.Y. TIMES, Jun. 2, 2017, and Plaintiff filed suit later that day.

## II.    Procedural History

Plaintiff filed suit in the U.S. District Court for the Eastern District of New York on June 2, 2017 and the case was assigned to Chief Judge Roslynn R. Mauskopf. ECF 1. Defendants moved to dismiss the suit pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction. ECF 52.[3]   Plaintiff opposed Defendants' motion and, to the extent the court

---

[1] The portions of Plaintiff's FOIA requests at issue in this appeal are Pl's DOJ FOIA Request, (1)-(4). JA10; Pl's FBI FOIA Request, (1)-(4). JA12; Pl's DOD FOIA Request, (1)-(4). JA14; Pl's ODNI FOIA Request (1)-(3). JA16.; Pl's State FOIA Request, (1)-(3). JA18.

[2] *See, e.g.*, DOJ, JA122 ¶16 ("DOJ has not searched" for documents "pertaining to Plaintiff's FOIA request"); State, JA283 ¶13 ("State did not conduct a search for Parts 1 through 3 of the request").

[3] Defendants also filed a summary judgment as to FOIA requests not at issue in this appeal, which the first district judge partially granted and partially denied. SA42-58. The second district judge subsequently granted summary judgment as to the records the first district judge denied summary judgment. SA78-88.

contemplated granting Defendants' motion, Plaintiff requested discovery "to develop the documentary record further." ECF 52-10, at 22.

On Nov. 30, 2020, the district court denied Defendants' motion to dismiss. SA1-42. The district court held that Defendants improperly sought dismissal based on a lack of subject matter jurisdiction because Defendants' motion, which was premised on the argument that the requested records were not subject to FOIA, did not properly "implicate the Court's *power* to order" relief, "but the merits of the action," SA31 (emphasis in original), and therefore converted Defendants' motion into a Rule 12(b)(6) motion, which it then denied. SA42; *Cox v. Dep't of Justice*, 504 F. Supp. 3d 119 (E.D.N.Y. 2020).

Defendants thereafter moved for summary judgment as to all remaining claims. ECF 60. Plaintiff opposed Defendants' motion, cross-moved for summary judgment, and, in the alternative, requested discovery. ECF 60-10. After the motions were fully briefed and filed, on July 6, 2021, the case was reassigned to Judge Rachel P. Kovner. On March 30, 2022, the second district court granted Defendants' motion for summary judgment, denied Plaintiff's cross-motion for summary judgment and denied his motion for discovery. SA60.

On March 31, 2022, the clerk of the district court entered judgment in this case. SA90. Plaintiff filed a Notice of Appeal on May 31, 2022, which was docketed in this Court as 22-2012. JA434.

## III. Factual Background

### A. *Defendants Facilitate Torture & SSCI Begins Investigation*

Defendants participated in CIA's program of torture and cruel, inhumane, and degrading treatment of detainees. *See generally Torture Study*. After SSCI learned that CIA destroyed videotapes documenting this torture in violation of FOIA court orders, *see ACLU v. DOD*, 827 F. Supp. 2d 217, 225 (S.D.N.Y. 2011), then SSCI Chairman Jay Rockefeller had SSCI staff review CIA cables describing CIA interrogations. The resulting staff report was "chilling" and found that CIA interrogations were "far more harsh than the way the CIA had described them" to Congress. 160 Cong. Rec. S4106 (Mar. 11, 2014) (statement of Sen. Feinstein). As a result, SSCI, then led by Chairman Dianne Feinstein, began an investigation of CIA's interrogation program. *Torture Study*, Foreward at 1.

SSCI "[i]mmediately sent a request for documents to all relevant executive branch agencies" 160 Cong. Rec. S4105 (Mar. 11, 2014) (statement of Sen. Feinstein). SSCI's "strong preference" was to have agencies "provide all information relevant to the Study to the Committee at its offices in the Hart Senate Office Building, as is standard procedure for Committee oversight work." Sen. Feinstein to CIA. JA 388. Defendants in this case complied and SSCI reviewed records of DOD, DOS, and DOJ. *See Torture Study* 9 n.3 (Dec. 2014).

**B.** *SSCI & CIA Negotiate Review of CIA Records at CIA Reading Room*

Contrary to this "standard procedure" for oversight work, CIA, unlike Defendants, refused to provide SSCI with copies of CIA records, which led to a lengthy exchange of letters, conference calls, and meetings between SSCI and CIA that are only partially documented in publicly available material and the record.

*1. CIA Memorandum of Understanding, May 28, 2009 ("MOU")* (JA24-27)

After CIA's refusal to provide records, SSCI threatened to issue a subpoena and CIA drafted a proposed MOU permitting SSCI *access* to copies of CIA records, but only within a CIA Reading Room within a CIA facility on CIA-owned computers, subject to additional CIA demands. JA24-27. The CIA MOU stated that it would make CIA records "available at a secure [CIA] electronic Reading Room facility which will permit SSCI personnel electronic search, filing, and print capability," but required:

> All notes, documents, draft and final recommendations, reports, and other materials generated by SSCI *must be prepared and stored in the Reading Room* on the CIA approved stand-alone computer system provided. A specially designed share-drive will be provided on the [CIA]'s stand-alone network. . . . CIA will also provide SSCI with lockable cabinets and safes, as required. *No outside computer systems or electronics will be authorized to be brought into the Reading Room.*
>
> CIA MOU, JA26 ¶ 3C (emphasis added)

Thus, SSCI would have to store any notes or work product produced during its review of CIA records on either (1) a CIA stand-alone computer, (2) a CIA network drive, or (3) if in print or hardcopy, in a CIA-owned safe.

*2. Chairman Feinstein's June 2, 2009 Response to CIA MOU* (JA28-JA32)

SSCI was "troubled" by CIA's demand that SSCI's review take place in a CIA facility because "CIA would have the potential ability to view materials related to the ongoing SSCI investigation of the CIA, including investigators' work product and investigators' communications." Sen. Rockefeller, JA403. SSCI Chairman Feinstein therefore would only agree to review materials at the CIA Reading Room if SSCI had "exclusive rights with regard to the network" within the CIA Reading Room and if CIA "assure[]d the Committee of the protections for SSCI information and materials at the CIA facility." Sen. Feinstein to CIA, JA388.

Chairman Feinstein's June 2, 2009, letter was a paragraph-by-paragraph response to CIA's proposed MOU following the same format, the same order, and liberally borrowing language from the CIA MOU and, in response to CIA's demand on the previous page, stated:

> 6. Any documents generated on the network drive referenced in paragraph 5, as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee and *will be kept at the Reading Room* solely for secure safekeeping and ease of reference. *These documents* remain congressional records in their entirety and disposition and control over *these records*, even after the completion of the Committee's review, lies exclusively with the Committee. . . .

> Chairman Feinstein Response to CIA, JA29 (emphasis added).

This paragraph "only covered materials that were kept at the SSCI's reading room." Sen. Rockefeller, JA 403-04; Sen. Feinstein, JA388 (stating SSCI sought

protection for SSCI "materials at the CIA facility"). The provision "was never intended to limit the SSCI's power to relinquish control over any final report going forward, or any other SSCI materials physically located outside of CIA-controlled spaces." Sen. Rockefeller, JA405.

According to the government's declarant, none of the versions of the *Torture Study* at issue in this case were ever contained in the CIA Reading Room. JA74-75 ¶¶ 13-14 (describing the subsequent transfer of SSCI work product from CIA Reading Room to SSCI's secure facilities to complete "the drafting process in [SSCI's] own workspace" and stating that approved versions of *Torture Study* "do not reside in the CIA facility").

The issue of SSCI reports created or maintained *outside* of the CIA Reading Room was separately addressed in mirroring paragraphs in both CIA's MOU and Chairman Feinstein's June 2, 2009 response, both of which simply provided that SSCI would store any "draft and final recommendations" outside the CIA Reading Room on classified systems. *Compare* CIA MOU, JA26 ¶ 3F ("Should SSCI prepare any documents, draft and final recommendations . . . outside of the secure Reading Room") *with* Chairman Feinstein Response , JA31 ¶ 10.

3.      *SSCI-CIA Negotiations Continue to an Uncertain End*

CIA's proposed MOU and Chairman Feinstein's June 2, 2009 response were just the beginning of a lengthy SSCI-CIA negotiation over such issues.  As late as

September 2009, SSCI and CIA continued to exchange letters back and forth and have meetings about specifics of agreements regarding SSCI's work at the CIA Reading Room. *See, e.g,* SSCI to CIA, JA38 (referencing SSCI - CIA meetings and nonpublic letters in August and September 2009). Records obtained by Plaintiff indicate that continuing negotiations and correspondence after Chairman Feinstein's June 2, 2009 letter specifically included further discussions related to the issue of SSCI work product in the CIA Reading Room. *See, e.g.*, JA36 ¶9 (CIA letter summarizing negotiations relating to SSCI's retention of ownership over material created on network drive in CIA Reading Room). What is publicly available of these continuing negotiations is limited. Plaintiff's request for discovery sought additional documentation of such negotiations, ECF 60-11 at 40-41, which the district court denied. SA88-89.

## C.     *SSCI Transmits Approved Versions of Torture Study to Defendants*

Beginning in 2011, "[d]raft sections" of the *Torture Study* were circulated *within* SSCI "and this process continued through to the Committee's vote to approve the full Committee Study on December 13, 2012." *Torture Study* viii. SSCI "did not provide a copy of the draft Study to the Intelligence Community." *Id.* at 526.

The versions of the *Torture Study* at issue in this case are official versions approved by SSCI that are described on the face of the *Study* itself.

*Torture Study*, Foreward at iii

### 1. SSCI Transmits 2012 Approved Version to Defendants

In December 2012, SSCI sent the approved *Torture Study* to Defendants. JA201. SSCI stated that it had "completed its study of the CIA former detention and interrogation program and has produced a 6,000 page report, complete with an executive summary, findings, and conclusions," that SSCI had "approved the report by a vote of 9-6," and that SSCI was "sending copies of the report to appropriate Executive Branch agencies." JA201.

Significant portions of the 2012 version of the *Torture Study* were subsequently publicly released by CIA in response to a FOIA request.[4] In particular, CIA drafted a response to the 2012 version of the *Torture Study*, which includes lengthy verbatim quotations from the 2012 *Torture Study* – including all of the 2012 *Study*'s top-level conclusions and direct quotations from the 2012

---

[4] *See* CIA, *Note to Readers of the Central Intelligence Agency's Response to the Senate Select Committee on Intelligence's Study of the CIA' Detention and Interrogation Program*, Aug. 1, 2014, at 1 (stating that CIA Response was being released "in compliance with a request under the Freedom of Information Act.").

*Study*'s Executive Summary and main volumes. CIA, Comments on the *Senate Select Committee on Intelligence's Study of the Central Intelligence Agency's Former Detention and Interrogation Program* (June 2013).

### 2. SSCI Transmits April 2014 Final Study to Defendants

In April 2014, SSCI updated the full *Torture Study* ("April 2014 Final *Study*") and sent copies of the *Study*, or portions thereof, to Defendants. JA20-21. The transmittal letter from SSCI stated:

> This full report should be considered as *the final and official report* from the Committee. I encourage and approve the dissemination of the updated report to all relevant Executive Branch agencies, especially those who were provided access to the previous version. This is the most comprehensive accounting of the CIA's Detention and Interrogation Program, and I believe it should be viewed within the U.S. Government as the authoritative report on the CIA's actions.
>
> SSCI Transmittal Letter, JA20-21 (emphasis added).

After SSCI transmitted copies of the Apr. 2014 version of the *Torture Study*, or portions thereof, to Defendants, DOJ lawyers asked SSCI about restrictions on agency copies and SSCI responded that decisions about agency copies was "[a]t the discretion of the officials in official receipt." SSCI to DOJ, JA37.

SSCI also affirmatively requested that the executive branch declassify the April 2014 *Study*'s Findings and Conclusions and Executive Summary. JA20. On Aug. 1, 2014, Defendant ODNI formally declassified those portions of the April 2014 *Study* with executive branch redactions. *See* ODNI Memo, JA387. On the

same day, CIA updated its Response to the *Study* to reflect the "final version of the Study." CIA, *Note to Readers of the Central Intelligence Agency's Response to the Senate Select Committee on Intelligence's Study of the CIA's Detention and Interrogation Program*, Aug. 1, 2014, at 1.

After SSCI received the executive branch's declassified, but heavily redacted, version of the April 2014 *Study*'s Executive Summary in August 2014, "[i]t was immediately apparent that the redactions to our report prevented a clear and understandable reading of the Study . . . so we obviously objected." 160 Cong. Rec. S6407 (Dec. 9, 2014) (statement of Sen. Feinstein). The SSCI then engaged in deliberations with CIA and the White House about the redactions. *Torture Study* 10 n.6. These negotiations took months and SSCI made a series of declassification revisions to the Executive Summary including replacing "specific dates with more general time frames" and replacing "the true names of some senior non-undercover CIA officials with pseudonyms" in order to "reach agreement on a publicly releasable version" that would still "ensure that the Committee's narrative . . . remained intact" despite the redactions. *Id.*

*3. SSCI Files Dec. 2014 Study with Senate and Sends Copies to Defendants*

On Dec. 9, 2014, Chairman Feinstein, on behalf of SSCI, filed the *Torture Study* with the Senate as an official Senate Report and notified the Senate that:

> The entire classified report will be provided to the Executive Branch
> for dissemination to all relevant agencies. The full report should be

used by the [CIA] and other components of the Executive Branch to help make sure that the system of detention and interrogation described in this report is never repeated.

                    SSCI to President Pro Tempore of Senate, JA364.

SSCI then transmitted copies of the *Torture Study* to the President and Defendants stating that "the full and final report is enclosed with this letter" and that "the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure this experience is never repeated" and to use it for other purposes "as you see fit." SSCI Transmittal Letter (Dec. 10, 2014), JA22-23.

**D.    DOJ Directs Agencies Not to Open Torture Study Due to FOIA**

After receiving SSCI's Dec. 2014 transmittal of the *Torture Study*, then President Barack Obama treated the copy of the *Torture Study* he received as a presidential record.[5]  In response to the identical transmittal, however, DOJ used the then ongoing *ACLU v. CIA* FOIA litigation, 823 F.3d 655 (D.C. Cir. 2016), as "an excuse to refuse to allow Executive Branch officials to review the full and final Study." Sen. Feinstein to DOJ, JA344 ("This DOJ decision prevents the FBI and other parts of the Executive Branch from reading the full 6,700-page Study"); *see also* SSCI, *Additional Prehearing Questions for Mr. Christopher Sharpley* 19 (2017) ("[W]e received guidance not to upload the [Torture Study] pending

---

[5] *See* Gov't's Br. in Opp., *ACLU v. CIA* (U.S. 16-629, Mar. 15, 2017), at 11 n.2.

ongoing Freedom of Information Act litigation"). Defendant State marked the *Torture Study* with "Do Not Open, Do Not Access." Frifield Decl., JA322 ¶ 8.

Defendants then drafted declarations stating they had not opened or read the December 2014 version of *Torture Study*, which DOJ used as purported factual predicates to argue that certain factors of the D.C. Circuit FOIA "agency record" test were not met. *See* Gov't Mot. to Dismiss, *ACLU v. CIA*, 13-cv-1870 (Jan. 21, 2015) at 22 ("Neither DOJ nor DOS, moreover, has even opened the package with the disc containing the full Report."). DOJ used the same argument in this litigation. *See* Def's Mem. at 22, ECF 52-1.

Consistent with DOJ's coordination with Defendants, an agency deputy general counsel "advised" Sen. Richard Burr to request the return copies of the Dec. 2014 version of the *Torture Study*.[6] On Jan. 14, 2015, Sen. Richard Burr, then SSCI Chairman wrote a letter requesting that the President and Defendants return their copies of the December 2014 *Torture Study* giving as a justification that he considered it a "highly classified" and "committee sensitive" document. JA184.[7]

---

[6] Jason Leopold, *The Watchdog, The Whistleblower, and the Secret CIA Torture Report*, VICE NEWS (May 19, 2015).

[7] The district court below characterized Sen. Burr's letter as requesting "all copies of the report in the Executive Branch's possession." SA63. That is simply not true. Sen. Burr only ever requested copies of the Dec. 2014 version of the *Torture Study*. In fact, Sen. Burr's subsequently clarified that he only sought the return of the CD that SSCI sent to Defendants in Dec. 2014. *See* SSCI email, ECF 45-1 (clarifying Sen. Burr's request was for a CD identified as SSCI # 2014-3514). Sen. Burr was not requesting earlier versions of the *Torture Study* nor other agency copies.

Shortly thereafter, SSCI staff stated to Defendants that Sen. Feinstein did "not believe that the Executive Branch should *relinquish* the full, classified version of Senate Report 113-288" back to the SSCI. SSCI to Defendants, Jan. 16, 2015, ECF 60-12 (Ex. BB) (emphasis added). Sen. Feinstein's letter response to Defendants further stated that the *Torture Study* could not be "committee sensitive" as it was "an official Senate Report" that "had the same legal status of any other official Senate report" and that "[a]t the December 2012 vote to approve the report and the April 2014 vote to send parts of the report for declassification, among other times, it was clear that the final, updated classified version of the report was the official version of the Study and it would be transmitted to appropriate Executive Branch agencies" and "[t]here was never any objection to providing the full, official report to the Executive Branch, consistent with appropriate limitations due to classification." Sen. Feinstein, JA374.

## E. *Sen. Feinstein & Other Senators Repeatedly Confirm that Records at Issue in this Case are Agency Records under FOIA*

Sen. Feinstein and other Senators repeatedly protested Defendants' coordinated actions in not opening the final version of the *Torture Study* as inconsistent with SSCI's intent, FOIA, and the Congressional oversight function. *See, e.g.,* Sens. Feinstein & Leahy to DOJ, JA341 ("We write to express our concern that, according to court filings in a FOIA case . . . [DOJ] officials have not opened the final copy of the [*Torture Study*] . . . which was submitted to executive

branch agencies in December."); Sens. Feinstein Leahy to DOJ, JA344-45 (stating that "FOIA litigation . . . in no way precludes appropriately cleared individuals in the Executive Branch from reading the Study.").

Sen. Feinstein also sought intervention from the Archivist of the United States to protect Defendants' copies of the *Torture Study*, but DOJ then directed the Archivist "not to confirm that the Senate Intelligence Committee Study of the CIA's Detention and Interrogation Program is a federal record because of the Department's position in ongoing Freedom of Information Act litigation." Sens. Feinstein & Leahy to DOJ, JA347; *see also* Sens. Feinstein & Leahy to DOJ, JA344 (describing "guidance" from DOJ to National Archives not to respond to questions about the *Torture Study*); Sen. Feinstein to Archivist Ferriero, JA349-51 (stating that Defendants' copies of the *Torture Study* are records of those agencies).

Sen. Feinstein and other Senators repeatedly urged that DOJ accept that agency copies of the *Torture Study* are agency records under FOIA. *See, e.g.*, Sen. Feinstein to DOJ, JA353 ("As we discussed, I am urging that you direct that the full 6,700-page Study be established as a federal record under the Federal Records Act and an agency record pursuant to the Freedom of Information Act."). Sen. Mark Warner, who is currently the SSCI Chairman, has also previously urged that DOJ finally accept that the transmitted copies of the *Torture Study* is an agency record subject to FOIA. *See* Senators to DOJ, JA355-56 ("[A]s we have repeatedly

requested, establish the [Torture] Study as an agency record pursuant to FOIA and as a federal record under the Federal Records Act, and disseminate it among appropriately cleared personnel within the U.S. government.").

**F.    *Defendants Unlawfully Dispose of Copies of the Torture Study***

Just days after Sen. Feinstein and other SSCI members again urged DOJ to acknowledge that the *Torture Study* was an agency record pursuant to FOIA, DOJ filed its opposition to ACLU's petition for *certiorari* to the Supreme Court in *ACLU v. CIA*. Br. for Resp'ts in Opp., *ACLU v. CIA* (U.S. No. 16-629 (Mar. 15, 2017). DOJ argued against granting cert, in part, on the basis that there was not (yet) a Circuit split on the issue of the *Torture Study*, stressing that "FOIA cases may be brought in every federal district court and may thus be reviewed by every court of appeals having territorial jurisdiction." *Id.* at 17. Yet scarcely was the ink dry on the cert. denial, that Defendants, with full knowledge of Plaintiff's active FOIA requests, disposed of almost every copy of the *Torture Study* in Defendants' possession by alienating them from agency possession. JA181 (ODNI's most senior attorney intentionally disposing of records in ODNIs possession while explicitly acknowledging both active FOIA requests and the foreseeability of litigation under FOIA and other statutes).

Defendants disposal of *Torture Study* copies violated Defendants' own FOIA regulations. *See, e.g.*, DOJ, 28 C.F.R. § 16.9 ("Records shall not be disposed

of . . . while they are subject of a pending request, appeal, or lawsuit under the FOIA."); DOD, 32 C.F.R. § 286.6 (same); DOS, 22 C.F.R. § 171.18 (same). The effect (and likely the motivation) of these actions is that they prevent additional FOIA challenges for copies of the *Torture Study* going forward on the basis that Defendants would no longer even have possession at the time of any future FOIA request. Thus, as to most Defendants, *this* case is the last case in which the legal status of their copy of the *Torture Study* can be meaningfully challenged.

## STANDARDS OF REVIEW

This Court reviews questions of law and a district court's grant of a motion for summary judgment *de novo*. *See, e.g.*, *United States v. Pettus*, 303 F.3d 480 (2d Cir. 2002); *Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999). On the question of agency record status under FOIA, 5 U.S.C. § 552, the "burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records,'" *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989), and any uncertainty as to whether a document is an agency record "redound[s] to the benefit of" the FOIA requester. *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 220 (D.C. Cir. 2013).

While generally the standard of review for discovery rulings is abuse of discretion, *see, e.g.*, *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77 (2d Cir. 1997), here there is a threshold issue of

whether the district court applied an erroneous legal standard for discovery in this FOIA case, which is a question of law for which the standard of review is *de novo*. *See, e.g.*, *Pettus*, 303 F.3d at 483.

## SUMMARY OF ARGUMENT

This Circuit must reverse the district court and hold that Defendants' copies of the *Torture Study*, significant portions of which are already publicly available, are "agency records" subject to FOIA. This fact is consistent with congressional intent in passing FOIA, Supreme Court FOIA jurisprudence, and the truth that "the legacy of this historic report cannot be buried in the back of a handful of Executive Branch safes, never to be reviewed by those who most need to learn from it." Sens. Feinstein & Leahy to DOJ, JA344-45. This narrow holding will not mean that the *Torture Study* will be fully released. Significant portions will be redacted, and properly so, pursuant to numerous applicable FOIA exemptions. Such a holding would simply mean that restrictions on nonpublic information in the *Torture Study* will be assessed based on FOIA's enumerated exemptions, as Congress intended and the Supreme Court mandates.

Instead of this straightforward application of FOIA, the district court below adopted a legal fiction that Defendants' copies of the *Torture Study* are not, and cannot under any circumstances become, agency records. In doing so, the district court made several crucial errors this Circuit must reverse.

First, the district court simply ignored the Supreme Court's holding in *Dep't of Justice v. Tax Analysts* that "mak[ing] the determination of 'agency record' turn on the intent of the creator of a document" was inconsistent with FOIA based on both FOIA's statutory text and prudential concerns. 492 U.S. 136, 147 (1989). Instead, the district court did the opposite and adopted a test for "agency record" that focuses *exclusively* on the "intent of a document creator." SA39; SA69. The district court's test is just the type of extra-textual FOIA test "fabricated. . . out of whole cloth" that the Supreme Court has repeatedly rejected, *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2365 (2019) (quoting *Critical Mass Energy Project v. NRC*, 931 F.2d 939, 947 (D.C. Cir. 1991)), as violating the Supreme Court's mandate that courts interpret terms in FOIA using their "common, contemporary, ordinary meaning." *Id.* at 2362-63 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979).

Second, Defendants' copies of the *Torture Study* are still "agency records" even under the district court's erroneous test, properly applied. In fact, the first district court found that Sen. Feinstein's 2014 letters transmitting copies of the *Torture Study* to Defendants were "compelling evidence" of SSCI's "intent" to relinquish control of those copies of the *Torture Study* to Defendants, which would therefore constitute agency records. SA41. If that were not enough, the author of those letters, Sen. Feinstein, has explicitly and repeatedly confirmed this intent

directly to Defendants, stating that their copies of the *Torture Study* are agency records under FOIA. Sen. Feinstein to DOJ, JA353 (DOJ's copy of *Torture Study* is an "agency record pursuant to the Freedom of Information Act"); JA356 (DOJ's copy of *Torture Study* is "an agency record pursuant to FOIA").

The second district court, however, ignored the first district court's finding regarding the "compelling evidence" of contemporaneous "intent" found in Sen. Feinstein's 2014 transmittals of the *Torture Study* to Defendants and rejected as irrelevant Sen. Feinstein's repeated confirmation of that intent. SA75. Instead, the second district court's analysis is based entirely on a letter the same Sen. Feinstein sent to CIA, a nonparty in this action, over 13 years ago, SA72, in an attempt (ultimately unsuccessful) to protect SSCI work product stored in a CIA facility from CIA's prying eyes and sticky fingers. This letter is irrelevant to Defendants by its own terms, taken out of context, and misconstrued by the district court.

Finally, the district court compounded these errors by basing its factual analysis on the incomplete record Defendants presented and by summarily denying any discovery to Plaintiff to remedy it. SA88. The district court did so by adopting a standard that has support in neither FOIA nor the Federal Rules of Civil Procedure – that a FOIA plaintiff is not entitled to any discovery unless he provides evidence that the Defendants have acted in bad faith. SA88-89. Even assuming for the sake of argument that such a test could be appropriate in a

"typical" FOIA case – in which the only factual question is the adequacy of an agency's internal FOIA search or its justifications for withholdings – it is not, and cannot be, the law in this case. If a court is going to create a legal standard that makes a FOIA case turn on a complicated, highly-contested, and fact-intensive question involving the subjective intent of a third party and then refuse to allow *any* discovery into this dispositive factual question, such a court's opinion consists of little more than cutting and pasting the government's self-serving declarations into a new document and applying its imprimatur.

In sum, the *Torture Study* – which documents the executive branch's torture program and its misleading statements to Congress, the courts, the public about torture's efficacy based on the executive branch's own records – is precisely the type of records FOIA is designed to reach "for citizens to know 'what their Government is up to'" a phrase that "should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." *Nat. Archives & Records Admin v. Favish*, 541 U.S. 157, 171-72 (2004) (quoting *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). This Circuit must reverse the district court.

**ARGUMENT**

## I.   DEFENDANTS' COPIES OF *TORTURE STUDY* ARE AGENCY RECORDS

The text of FOIA and controlling Supreme Court precedent lead directly to the conclusion that copies of the *Torture* Study whether obtained, or created, by Defendants are "agency records." Instead of applying the text of FOIA and straightforward Supreme Court jurisprudence, the district court erroneously adopted a form of the D.C. Circuit's "intent" test which this Court should not allow to spread to this Circuit. Yet even assuming for the sake of argument that the district court adopted the correct test, Defendants' copies of the *Torture Study* are still agency records under any reasonable version of that test properly applied.

## A.   DEFENDANTS' COPIES OF *TORTURE STUDY* ARE AGENCY RECORDS UNDER ORDINARY MEANING & SUPREME COURT PRECEDENT

In the course of this litigation, the Supreme Court repeated its mandate that lower courts must interpret terms in FOIA using their "ordinary, contemporary, common meaning." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362-63 (2019) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). In doing so, the Supreme Court rejected yet another longstanding, extra-textual FOIA policy test that the D.C. Circuit "fabricated . . . out of whole cloth." *Id.* at 2365 (quoting *Critical Mass Energy Project v. NRC*, 931 F.2d 939, 947 (D.C. Cir. 1991)).

Supreme Court precedent on the specific issue of "agency record" under FOIA is consistent with the ordinary, contemporary, and common meaning of the statutory language. *Argus Leader*, 139 S. Ct. at 2362-63. The Supreme Court's "agency record" jurisprudence has two straightforward requirements "for requested materials to qualify as 'agency records.'" *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144 (1989):

> First, an agency must "either create or obtain" the requested materials . . . Second, the agency must be in control of the requested materials at the time the FOIA request is made. By control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties.
>
> *Id.* at 144-45 (quoting *Forsham v. Harris*, 445 U.S. 169, 182 (1980))

In establishing the first "create or obtain" requirement, the Supreme Court has repeatedly consulted the contemporary, pre-existing definition under the federal records laws that defines records of agencies, in part, as material "made or received by a federal agency." 44 U.S.C. § 3301. The Supreme Court noted not only that this definition or record was "in effect at the time Congress enacted [FOIA]," but also that contemporaneous with the passage of FOIA, DOJ "concluded that Congress intended this aspect of the Records Act definition to apply to [FOIA]." *Forsham*, 445 U.S. at 183 (citing *Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act* 23-24 (1967), S. Doc. No. 93-82, pp. 222-223 (1974)).

On the second requirement that an "agency must be in control of the requested materials at the time the FOIA request is made," the Supreme Court defines "control" simply to mean "that the materials have come into the agency's possession in the legitimate conduct of its official duties." *Tax Analysts*, 492 U.S. at 145. The Supreme Court also tied this factor to the recordkeeping definition at 44 U.S.C. § 3301, which states that agency records are material "received by an agency of the United States Government *under Federal law or in connection with the transaction of public business*." *Tax Analysts* 492 U.S. at 145 (emphasis original). Also consistent with the statutory definitions of federal records, the Supreme Court held that its use of "control" in defining "agency records" focuses "on an agency's *possession* of the requested materials" and not its power over "the content of the materials it receives." *Id.* at 147 (emphasis added).

Defendants' copies of the *Torture Study* at issue in this appeal easily satisfy these two requirements. It is undisputed that Defendants both "obtained" (from SSCI) and created copies of the *Torture Study*. And if copies of the *Torture Study* – which SSCI prepared as part of its oversight of Defendants and then sent to Defendants to use as they "see fit" in the hopes that that Defendants would never again facilitate torture – were not received "in the legitimate conduct of [Defendant's] official duties" – then the Supreme Court's words have little meaning. The Court need not take Plaintiff's word for it. Sen. Feinstein, who sent

the copies of the *Torture Study* at issue in this appeal to Defendants, applied the contemporaneous federal records law definition for agency records specifically to Defendants' copies of the *Torture Study* in a letter to the Archivist of the United States concluding that the *Torture Study* "clearly satisfies" the test, stating:

> the federal agencies 'received' the report, because it was accepted by personnel at each agency where it was transmitted and the agencies have acknowledged doing so (what they did after they received it is another matter). That receipt took place 'under Federal law or in connection with the transaction of public business,' as the Senate Report's transmittal to the executive branch was pursuant to formal Committee action connected with the Committee's constitutionally-based oversight and investigatory powers.

Sen. Feinstein to Archivist Ferriero, JA350

Consistent with this analysis, Sen. Feinstein has also repeatedly confirmed her intent that the copies of the *Torture Study* she sent to Defendants are agency records of those Defendants subject to FOIA. Sen. Feinstein to DOJ, JA353 (stating that agency copy of *Torture Study* is "agency record pursuant to the [FOIA]"); JA356 (same).

In fact, because Defendants received their copies of the *Torture Study* as referenced enclosures or attachments to correspondence from SSCI Chairman Feinstein, they are not merely agency records under the common understanding of the term, but *permanent* records of the agency Defendants that cannot be lawfully disposed of under mandatory agency records schedules. *See, e.g.*, DOJ Records

Schedule, DAA-0060-2017-0025, Item 1, "Congressional Committee Chairman Correspondence" (defining "letters and attachments transmitted by" Congressional committee chairmen as "permanent" DOJ records); ODNI Records Schedule N1-576-09-1, Items 1, 1a (defining "communications with the Congress" and incoming documents "with associated attachments" as permanent ODNI records). Such records schedules also require the eventual transfer of these records to the National Archives to later be opened to historical researchers. Defendants' denial that agency copies of the *Torture Study* are agency records – and their later unlawful disposal of them – are intentional acts that literally undermine the historical record.

Certain Defendant copies of the *Torture Study* at issue in this appeal are particularly low hanging fruit as "agency records" under any reasonable meaning of the term. Defendant DOD, for example, received a copy as congressional correspondence to the Secretary of Defense, which is a permanent DOD agency record under DOD records schedule NC1-330-79-1, Item 102-18(b) (defining "Congressional Correspondence" of "a substantial nature with historical significance" as permanent DOD records). DOD also *created* a new electronic copy of the Dec. 2014 *Torture Study* and uploaded it to a DOD network within a component of the Office of the Undersecretary of Defense (Intelligence). 4th Herrington Decl., JA271 ¶6. This is thus a new DOD electronic record created by

DOD personnel, on a DOD network, containing unique DOD metadata, and created so that a different DOD office, the Deputy General Counsel (Intelligence) could use the *Torture Study* to "address/advise on litigation and other related matters as necessary," Herrington Decl., JA394, and the first 683 pages of this record is available, with minimal redactions, on the internet. If that is not an "agency record" of DOD, then the concept is meaningless.

The district court nevertheless summarily rejected the significance of this DOD copy (and other unique copies) by asserting, without any citation to authority, that an agency cannot create a new agency record with different legal status by copying a record. SA77. This illustrates just how unmoored the district court's analysis is from the common meaning, or any reasonable understanding, of "agency record" and binding Supreme Court precedent. That different copies of an identical record can have different legal status is black-letter law and a central underpinning of the Supreme Court's FOIA "agency record" jurisprudence. *See, e.g., Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) (judicial copies of judicial records are not subject to FOIA, but DOJ copies of identical records are agency records subject to FOIA); *Dep't of Justice v. Julian*, 486 U.S. 1, 7 (1988) (judicial copies of presentence reports are judicial records not subject to FOIA, but DOJ copies of same reports are agency records subject to FOIA); *Cf. Kissinger v. Reporters' Comm. for Freedom of the Press*, 445 U.S. 136, 157 (1980)

(Kissinger's *personal* copies of records from previous government employment are not subject to FOIA); *see also* 36 C.F.R. § 1222.12(d) ("Multiple copies of the same document . . . may each have record status depending on how they are used in conducting agency business."); *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1284 (D.C. Cir. 1993) (print and electronic versions of the "same" record "cannot accurately be termed 'copies' – identical twins – but are, at most 'kissing cousins'").

Finally, Defendants have hard copy versions of the *Torture Study*, or portions thereof, which are likely to contain unique agency information, such as underlining, notes, marginalia, etc. that make them distinctive agency records. *See, e.g.*, ODNI (JA252) ¶30; DOS (JA282) ¶11; DOD (ECF 42-1) ¶¶5-6. Notes on copies of the *Torture Study* from officials at agencies involved in the torture program would be of unquestionable historical significance. *Cf.* Dagmar H. Perman, *Microfilming of German Records in the National Archives*, 22 AM. ARCHIVIST 433, 443 (1959) (describing the archival and historical significance of "penciled notations" by German officials in captured enemy records). To pretend that such documents are not agency records is an insult to FOIA and the historical record.

## B. THIS CIRCUIT MUST REJECT THE DISTRICT COURT'S ERRONEOUS "INTENT" TEST

Instead of applying FOIA in the straightforward manner Congress intended and the Supreme Court mandates, the district court adopted a special test for "agency record" status that centers upon the "intent of a document creator" that is precisely the type of extra-textual, policy-based FOIA test "fabricated . . . out of whole cloth" by the D.C. Circuit that the Supreme Court has repeatedly rejected and that this Court should refuse to adopt in this Circuit. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2365 (2019) (quoting *Critical Mass Energy Project v. NRC*, 931 F.2d 939, 947 (D.C. Cir. 1991)).

In fact, the Supreme Court already rejected the argument that "agency record" under FOIA "turn[s] on the intent of the creator of a document" in *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 147 (1989). The D.C. Circuit opinion on appeal in *Tax Analysts* applied the D.C. Circuit's "agency record" test based on "the intent of the document's creator." *Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1069 (D.C. Cir. 1988) (quoting *Lindsey v. Bureau of Prisons*, 736 F.2d 1462, 1465 (11th Cir. 1984), *vacated* 469 U.S. 1082 (1984)). Using nearly the exact phrasing of the D.C. Circuit opinion under review, the Supreme Court in *Tax Analysts* held that making "the determination of 'agency records' turn on the intent of the creator of a document" was inconsistent with FOIA. 492 U.S. at 147.

Plaintiff clearly identified to the district court this Supreme Court analysis in *Tax Analysts*, which is neither *dicta* nor surplusage. *See, e.g.*, Pl's Opp, Dkt. 52-10, at 14, 16; Pl.'s Reply, Dkt. 52-37, at 2. The district court literally ignored it.

In examining *Tax Analysts*, the first district court focused exclusively on a *different* portion of the opinion that related to a DOJ "authorship-control" argument – namely, that "agency record" status should turn on whether an agency can alter the content of a document it receives – which the Supreme Court also appropriately rejected. SA36-37. The court then purported to distinguish *Tax Analysts* from *this* case on the irrelevant basis that DOJ did not advance an "authorship-control" argument in this case. SA37.

Yet the court simply ignored the Supreme Court's separate analysis in *Tax Analysts* that DOJ's attempt to "make[] the determination of 'agency record' turn on the intent of the creator of a document" was inconsistent with FOIA. 492 U.S. at 147. Instead, the court proceeded immediately to adopt in this case an "agency record" test almost *exclusively* based on "the intent of the document's creator." SA39. The second district court simply adopts the reasoning of the first court, SA69 and cites *Tax Analysts* once, in passing, in a parenthetical. SA70.

The Supreme Court's rejection of the use of document creator intent for determining "agency record" was based on both statutory analysis and prudential

concerns, all of which are highly relevant to this case and illustrate why this Circuit should reject the district court's test.

First, the *Tax Analysts* Court relied upon statutory interpretation and rejected the creation of an extra-textual intent factor because "[s]uch a *mens rea* requirement is nowhere to be found in the [FOIA]." 492 U.S. at 147. This statutory analysis holds regardless of any grounds on which a court would purport to distinguish the facts of *Tax Analysts* from this case. Indeed, the D.C. Circuit FOIA "intent" test that the district court adopted in this case is just like the D.C. Circuit FOIA "test" in *Argus Leader* that the Supreme Court rejected, even more recently, on the same basis: that the D.C. Circuit was again judicially altering FOIA's text "to create a phrase that does not appear in the statute." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2365 (2019).

The *Tax Analysts* Court's rejection of incorporating "intent" into the meaning of "agency record" under FOIA is also consistent with the fact that no such intent requirement exists in the contemporary, pre-existing definition of records of agencies at 44 U.S.C. § 3301, which the Supreme Court has repeatedly consulted in interpreting the common meaning of "agency records" under FOIA. *See Forsham v. Harris*, 445 U.S. 169, 183 (1980); *Tax Analysts*, 492 U.S. at 145. Adding an "intent" test on top of either statute fundamentally undermines their joint purposes of documenting agency activity and ignores the reality that

significant quantities of agency records are records created by individuals or entities not subject to FOIA that agencies obtain without their consent. Indeed, even records agencies obtain unlawfully, or in violation of the Constitution, such as the National Security Agency's collection of telephony metadata that this Circuit found to be unlawful, are not only agency records, but crucially important agency records that document the extent of an agency's wrongdoing. *ACLU v. Clapper*, 785 F.3d 787, 821 (2d Cir. 2015).

Second, in rejecting the use of "intent of the document creator" for determining "agency record," the Supreme Court in *Tax Analysts* also highlighted the complexity, uncertainty, and inconsistency that results from grafting such a test onto FOIA. *Id.* at 147-48. The Supreme Court noted that "discerning the intent of the drafters of a document may often prove an elusive endeavor, particularly if the document was created years earlier or by a large number of people for who it is difficult to divine a common intent." *Id.* The D.C. Circuit's jurisprudence is itself a case study in the accuracy of the Supreme Court's concerns. Even certain panels of the D.C. Circuit, handcuffed by the law of the Circuit, have called the D.C. Circuit's various "agency record" tests that rely on "intent" to be "problematic," *Cause of Action v. NARA*, 753 F.3d 210, 215 (D.C. Cir. 2014), and lamented their "considerable indeterminacy," *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d

208, 220; *see also Edelman v. SEC*, 172 F. Supp. 3d 133, 149 (D.D.C. 2016) (questioning the "continuing vitality" of the tests and collecting cases).

Third, neither is there any reason to fabricate a special "agency record" test based on "intent" simply because Congress sent the documents. As the Supreme Court stated in *Tax Analysts*, that agencies receive records from many entities not subject to FOIA is a "truism [that] is beside the point." 492 U.S. at 146. "The relevant issue is whether an agency covered by the FOIA has 'create[d] or obtaine[d]' "the materials sought" and "not whether the organization from which the documents originated is itself covered by the FOIA" *Id.* (citing *Forsham v. Harris*, 445 U.S. 169, 182 (1980)).

The Supreme Court has also applied FOIA in the context of one branch of government (the judiciary) providing copies of records (in the form of judicial presentence reports) to agencies in the course of performing constitutional duties while also imposing restrictions on the use of such records, in *Dep't of Justice v. Julian*, 486 U.S. 1 (1988). In *Julian*, the Supreme Court did not create any special intent-based test, nor did it adopt a legal fiction that agency copies of the judicial presentence reports were not under agency "control" because of judicial restrictions in order to deny them "agency record" status under FOIA. Instead, the Supreme Court applied its straightforward analysis that agency copies of the judicial reports were "agency records" under FOIA and applied judicial restrictions

on the content of the reports in accordance with the enumerated FOIA exemptions. *Id.* at 8-9 (examining judicial restrictions on agency copies of judicial presentence reports under FOIA exemptions (b)(3) and (b)(5)).

Indeed, vast quantities of agency records are subject to a variety of restrictions from different sources, including Congress. All FOIA (b)(3) cases, for example, relate to congressional restrictions on agency records, but the fact that Congress intended to impose such restrictions does "not bear on whether the materials are in the agency's control" as agency records, "but rather on the subsequent question of whether they are exempted from disclosure" under FOIA's exclusive and enumerated exemptions. *Tax Analysts*, 492 U.S. at 147 n.8.

The district court's remaining "constitutional" concerns are illusory and amount to little more than a paternalistic belief, supported by no evidence, that Congress inadequately protected its own rights in drafting FOIA. Nowhere do Defendants ever argue, nor is there any evidence in the record, that the application of FOIA's exemptions to Defendants' copies of the *Torture Study* would be inadequate to protect any purported congressional equities in the remaining non-public portions of the *Torture Study*.

Nor is a "constitutional" issue raised in the theoretical scenario the district court imagines of Congress "want[ing] to share documents with an agency while restricting public access to portions of those documents that would not fall within

FOIA exemptions." SA38. As an initial matter, unlike the President, the Judiciary, or private citizens, "[i]f Congress had wished to codify" a special carve-out for itself whereby it could send records to an agency without them becoming agency records subject to FOIA, Congress "knew perfectly well how to do so" and it chose not to. *Tax Analysts*, 492 U.S. at 152-53. The D.C. Circuit in *Judicial Watch* made the same point in explaining why Congress passing laws effecting records of Congress does not raise the constitutional issues that might arise with records related to the President. *Judicial Watch*, 726 F.3d at 224 ("[I]t was Congress that passed the Act and Congress that can amend it").[8]

Moreover, on the rare occasion a congressional oversight committee were to determine it needs to share a sensitive document with agency officials without providing the agency with a copy, there is a preexisting, customary practice that

---

[8] Oddly, the second district court in adopting the first court's "intent" test, SA69, terms it the "*Judicial Watch* test," describes it as relating to "congressionally created document[s]," and suggests that "constitutional avoidance" is the rationale. SA69-70 (citing *Judicial Watch v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013) and *Doyle v. DHS*, 959 F.3d 72, 76 (2d Cir. 2020)). Of course, neither *Judicial Watch* nor *Doyle* involve records from Congress and the "constitutional avoidance" analysis centers on Congress passing laws affecting White House visitor logs. While Plaintiff believes the court's references are mistaken, to avoid any suggestion he is waiving any argument on appeal, the *Doyle* panel's analysis is incorrect even as to the irrelevant issue before it. Among other things, the *Doyle* panel fails to engage with, distinguish, or even cite to, the landmark case in this area, *Nixon v. GSA*, 433 U.S. 425 (1977), in which the Supreme Court had no difficulty upholding the constitutionality of just such a law. Nor has there ever been a serious constitutional challenge to the Presidential Records Act.

accomplishes that result in a narrowly drawn manner consistent with both FOIA and the federal records laws. Namely, Congress can make congressional documents available for review by agency officials in congressional spaces which allows limited "sharing" without Congress relinquishing control or the agency taking possession. The same procedure works vice versa.

While there is a lengthy history of this practice, *see, e.g.*, Frank J. Smist, *Congress Oversees the United States Intelligence Community 1947-1994* 8 (2d ed. 1994), the Court need only look to the record in this case. Part of CIA's justification for refusing to send copies of CIA records to the Senate was that CIA did not want copies to become SSCI records. *See* CIA Memo, ECF 60-12 (Ex. AA) at 5 (describing "contention" between CIA and SSCI over "ultimate ownership of the [CIA] documents being provided to the SSCI"). In fulfilling its oversight duties, SSCI thus undertook the extremely inconvenient task of sending staff to a CIA facility to review 6 million records, complicating and delaying the process, but done to accommodate executive branch concerns regarding CIA records. Under the district court's simplistic analysis of the law of records, the SSCI's multi-year review at a CIA facility could have been avoided simply by CIA sending the records to the Senate with a cover letter saying "We do not intend these to become SSCI records."

Finally, the district court's "constitutional" analysis never evidences any awareness that it is adopting the D.C. Circuit's "agency record" test in this case supposedly in order to protect SSCI's constitutional oversight function while ignoring the fact that Defendants refused to open or read, and then disposed of, the final version of the SSCI *Torture Study* – arguably the most important congressional oversight report ever produced – in order to fabricate factual predicates to satisfy the same D.C. Circuit "agency record" test. *See* Sens. Feinstein & Leahy to DOJ, JA344 ("We are gravely disappointed that" DOJ is using FOIA litigation "as an excuse to refuse to allow Executive Branch officials to review the full and final Study"). Defendants' performative refusals and unlawful acts, which directly and fundamentally undermined SSCI's constitutional oversight about which the district court claims to be so concerned, are both capable of repetition and further encouraged by the district court's decision below.

Finally, FOIA is fundamentally threatened by an "intent of the document creator" test because agencies can manipulate it. If agencies can *possess* documents that are responsive to FOIA requests, but can internally determine that they are nevertheless not "agency records" subject to FOIA, because the agency decides that the document creator did not intend for them to become so, it creates a loophole the size of Mar-a-Lago that calls into question the integrity of every agency assertion that "no responsive *records* were found." *Cf. Grand Cent. P'ship,*

*Inc. v. Cuomo*, 166 F.3d 473, 479 (2d Cir. 1999) (warning that a D.C. Circuit FOIA test created "the potential for encouraging the creative segregation" of records to avoid FOIA); *McGehee v. CIA*, 697 F.2d 1095, 1109 (D.C. Cir. 1983) (warning that a FOIA "control" test for records could result in agencies shielding documents from public by transferring them to other agencies for "safekeeping").

And unlike the illusory and paternalistic concern that Congress inadequately protected its own documents in drafting FOIA, the problem of *agencies* manipulating the term "record" to avoid FOIA's requirements is well-documented. Historically, a National Archives Task Force found, for example, that "[f]ollowing passage of [FOIA]" there began a "trend" in which "a number of agencies attempted to exclude certain types of information from disclosure by labelling the materials containing such information" as not records. *NARA and Federal Records: Laws and Authorities and Their Implementation* 6 (1988). In fact, SSCI's torture investigation was initiated after learning that CIA had destroyed interrogation tapes after CIA attorneys internally decided – contrary to all evidence – that the tapes were not "agency records" under FOIA. Opp. Mot. for Contempt, *ACLU v. DOD*, 04-cv-4151 (S.D.N.Y Jan. 10, 2008), at 17 n.8.[9]

---

[9] The court had little difficulty holding that the CIA tapes were clearly agency records that were subject to both FOIA requests and a FOIA court order and stopped just short of holding the CIA in contempt after imposing extensive remedial measures. *See ACLU v. DOD*, 827 F. Supp. 2d 217, 225 (S.D.N.Y. 2011).

### C. EVEN IF CIRCUIT ADOPTS "INTENT" TEST, DEFENDANTS' COPIES OF TORTURE STUDY ARE STILL AGENCY RECORDS

If, despite all of this, this Circuit nevertheless adopts some form of the D.C. Circuit's "intent" test, Defendants' copies of the *Torture Study* still constitute FOIA "agency records" under any reasonable version of that test.

As an initial matter, the burden is on Defendants to prove intent. Even under the D.C. Circuit's version of this test, documents transferred from Congress to agencies are presumptively "agency records," unless Congress has clearly asserted specific control over them. *See, e.g.*, *United We Stand v. IRS*, 359 F.3d 595, 602 (D.C. Cir. 2004) (describing agencies' burden to show "the clear assertion of congressional control that our case law requires"); *Paisley v. CIA*, 712 F.2d 686, 692-93 (D.C. Cir. 1983) ("In the absence of any manifest indications that Congress intended to exert control over documents in an agency's possession, the court will conclude that such records are not congressional records."). Further, any uncertainty as to whether a document is an agency record "redound[s] to the benefit of" the FOIA requester. *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 220 (D.C. Cir. 2013).

### 1. Sen. Feinstein's Contemporaneous Letters Transmitting Copies of the Torture Show No Intent to Control

As the first district court below found, Sen. Feinstein's transmittal letters to Defendants provide "compelling evidence" that SSCI intended to relinquish

control over the Dec. 2014 and Apr. 2014 versions of the *Torture Study*. SA4. Neither of these letters contain assertions of congressional control, nor do they contain any incorporation of, or reference to, any preexisting agreements or assertions of control, because there were none. See *Paisley v. CIA*, 712 F.2d 686, 694-95 (D.C. Cir. 1983) (holding SSCI lacked intent to control records where there was no "contemporaneous and specific instructions" from the SSCI asserting restrictions on use or disclosure).

*Defendants Copies of Dec. 2014 Full and Final Version*

The Dec. 2014 SSCI transmittal letter states in relevant part that the "full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated" and "encourage[d] use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit." SSCI to Defendants, Dec. 10, 2014, JA22.

In addition to the plain words of the Dec. 2014 transmittal letter, there is also significant additional support for the conclusion that the SSCI was relinquishing control and was not asserting any control over these copies. First, the *Torture Study* reprints SSCI's separate "Letter of Transmittal to Senate" formally filing the

*Torture Study* with the Senate President Pro Tempore as an official Senate report, which openly stated the intent that:

> The entire classified report will be provided to the Executive Branch for dissemination to all relevant agencies. The full report should be used by the Central Intelligence Agency and other component of the Executive Branch to help make sure that the system of detention and interrogation described in this report is never repeated.

> SSCI to Senate President Pro Tempore (Dec. 9, 2014), JA364.

Sen. Feinstein has also described the earlier approvals of the SSCI leading up to its formal filing with the Senate, stating:

> The full, 6,963-page classified report transmitted on December 10, 2014, is an official Senate report (S. Rep. 113-288). The report has the same legal status of any other official Senate report from this Committee or any other Senate committee. At the December 2012 vote to approve the report and the April 2014 vote to send parts of the report for declassification, among other times, it was clear that the final, updated classified version of the report was the official version of the Study and that it would be transmitted to appropriate Executive Branch agencies. There was never any objection to providing the full, official report to the Executive Branch, consistent with appropriate limitations due to classification.

> Sen. Feinstein Letter (SSCI# 2015-0374), JA384

Thus, the "transmittal to the executive branch was pursuant to formal Committee action connected with the Committee's constitutionally-based oversight and investigatory powers." Sen. Feinstein, JA350.

The *Torture Study* itself states the *Study* "is now final and represents the official views of the Committee. This and future Administrations should use this

Study to guide future programs, correct past mistakes, increase oversight of CIA representations to policymakers, and ensure coercive interrogation practices are not used by our government again. *Torture Study*, Foreward, at 5.

*Defendants' Copies of April 2014 Final Study*

Similarly, at the time SSCI sent the earlier April 2014 Final *Study* to the Defendants it was, as Sen. Feinstein's transmittal letter states, "the final and official report from the Committee." SSCI transmittal letter, Apr. 7, 2014, JA20-21. The explanation for this is that there was not at the time an expectation that there would be another version of the *Study* and in fact, the Apr. 2014 version is actually the most complete and accurate version of the *Torture Study*. As described in the *Torture Study* itself, the later changes were "declassification revisions" that essentially "dumbed down" portions of the *Torture Study*'s Executive Summary to maximize public disclosure in the face of excessive executive branch redactions. *Torture Study* 10 n.6.

The intent to relinquish the April 2014 copy to Defendants with no assertion of control is just as complete as the later Dec. 2014 version. This is reflected in the transmittal letter's language in which the SSCI "encourage[d] and approve[d] the dissemination of the updated report to all relevant Executive branch agencies" and that "it should be viewed within the U.S. Government as the authoritative report on the CIA's actions." JA20-21. Moreover, after SSCI transmitted copies of the Apr.

2014 version of the *Torture Study*, or portions thereof, to Defendants, DOJ lawyers expressly asked SSCI about restrictions on agency copies and SSCI responded that decisions about agency copies was "[a]t the discretion of the officials in official receipt." SSCI to DOJ, JA37.

Finally, one particular copy of portions of the April 2014 Final *Study* has to constitute an "agency record" subject to FOIA even by Defendants unjustifiably narrow standards. On Aug. 1, 2014, Defendant ODNI created and formally declassified a redacted copy of the April 2014 Findings and Conclusions and Executive Summary. Not even Defendants can contest that SSCI approved this portion of the *Torture Study* for declassification and public release. This is thus an unclassified, ODNI "agency record" under *any* test, it is responsive to Plaintiff's FOIA requests, and Defendants are unlawfully withholding it.

*Defendants' Copies of Dec. 2012 Approved Study*

Similarly, nowhere in the Dec. 2012 transmittal letter does the SSCI indicate that the copies transmitted to Defendants would not become agency records. JA201. In fact, CIA has already publicly released significant portions of the Dec. 2012 version in response to a FOIA request in the form of extensive verbatim quotations from the Dec. 2012 Torture Study contained within CIA's response to the *Torture Study*. CIA, Comments on the *Senate Select Committee on*

*Intelligence's Study of the Central Intelligence Agency's Former Detention and Interrogation Program* (June 2013).

## 2. Sen. Feinstein's Letters Telling Defendants' That Defendants' Copies of Torture Study Are Agency Records Subject to FOIA Illustrate Intent

Defendants' refusals to open the *Torture Study* and DOJ's FOIA arguments had the, presumably unintended, effect of spurring former Chairman Feinstein and other SSCI members to repeatedly confirm that there was, in fact, no intent to retain control over the copies of the *Torture Study* and that Defendants were free to use them, including to expressly confirm that Defendants copies are agency records under FOIA. *See, e.g.*, Sen. Feinstein to DOD, JA338 (stating SSCI had "transmitted the full and final document in its entirety to the Executive Branch" including to DOD and it is "clear that the [DOD] can use the full report in its possession for the purposes of fulfilling its discovery requirements in the ongoing military commissions cases or for other appropriate purposes"); Sens. Feinstein & Leahy to DOJ, JA341 (expressing concern that DOJ officials "have not opened" the *Torture Study* "which was submitted to executive branch agencies in December"); Sen. Feinstein to DOJ, JA347 (urging DOJ "to revise the Justice Department's previous position and allow NARA to determine that the Senate Report is a federal record that must be preserved"); Sen. Feinstein to DOJ, JA353 (urging DOJ to accept that *Torture Study* was "a federal record under the Federal Records Act and an agency record pursuant to [FOIA]"); Sen. Feinstein to DOD,

JA390 (urging DOD to transmit a copy of *Torture Study* to military commissions because "[a]ccess" by the military court is "critical to the prospects for successful trials" and DOD's failure to use or preserve its copies of the *Torture Study* could "crippl[e] the effort to bring to justice those responsible for the terrorist attacks of Sept. 11, 2001"); Sens. Warner, Feinstein, Wyden & Heinrich to DOJ, JA355-56 ("[A]s we have repeatedly requested, establish the [Torture] Study as an agency record pursuant to FOIA and as a federal record under the Federal Records Act, and disseminate it among appropriately cleared personnel within the U.S. government.").

3.    *Torture Study* **Itself Contains Only Executive Branch Restrictions**

Additional factors also illustrate there was no intent to control Defendants' copies of the *Torture Study*. First, the *Torture Study* is not marked with *any* Congressional indications of control. In fact, the Senate-specific markings affirmatively support the fact that control was being relinquished, such as "Approved December 13, 2012," "Updated for Release April 3, 2014," and "Declassification Revisions December 3, 2014." Even under D.C. Circuit precedent, therefore, the required intent from *Congress* to "control" the *Torture Study* copies that SSCI sent to Defendants is lacking altogether. *See Paisley v. CIA*, 712 F.2d 686, 694-95 (D.C. Cir. 1983).

Second, the portions of the *Torture Study* that have already been publicly released (*e.g.*, Foreword, Findings and Conclusions, Executive Summary) contain only *executive branch* classification markings such as "TOP SECRET" and "NOFORN." The classification of the *Torture Study* is entirely an executive branch judgment as Congress is not an "original classification authority" under Exec. Order 13526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009).

**4. Chairman Feinstein's June 2009 Letter to CIA is Irrelevant**

The second district court's opinion simply ignored the first district court's conclusion that multiple letters from SSCI Chairman Feinstein in 2014 to Defendants transmitting copies of approved versions of the *Torture Study* for Defendants to use as they "see fit" are "compelling evidence" that Defendants copies became "agency records" upon receipt. SA41. The second district judge also rejected as irrelevant Sen. Feinstein's letters confirming her intent that Defendants copies were agency records subject to FOIA. SA75. Instead, the second district judge's entire opinion is premised on its interpretation of a letter the same Sen. Feinstein sent 13 years ago to the CIA, a nonparty in this action, that is irrelevant to Defendants by its own terms, taken out of context, and completely misconstrued.

Sen. Feinstein's June 2, 2009 letter was a response to the CIA's MOU and was designed to protect SSCI's constitutional oversight function by protecting

SSCI work product in a CIA Reading Room from CIA's prying eyes. Instead, Defendants, and now the district court, have repurposed this letter into a purported manifestation of intent to limit in perpetuity SSCI's own ability to successfully relinquish control of the final *Torture Study* to Defendants, thereby preventing them from using, reading, and learning from arguably the most important oversight investigation in SSCI's history. Nothing in the record supports such a result.

*A. No Nexus Between Chairman Feinstein's June 2, 2009 Letter to CIA and Approved Versions of Torture Study at Issue*

First, the record contains no factual nexus between Chairman Feinstein's June 2, 2009 letter to CIA and the approved copies of the *Torture Study* that Chairman Feinstein sent to Defendants that are at issue in this case. None of the Defendants' declarants reference Chairman Feinstein's June 2009 letter to CIA much less assert that they understand it to relate to the approved copies of the *Torture Study* at issue in this case. Not even Sen. Burr's belated demand for the return of the Dec. 2014 copies of the *Torture Study* – which even the D.C. Circuit rejected as a pretextual "post-hoc" attempt to assert control over the *Torture Study* that was entitled to "no weight." *ACLU v. CIA*, 823 F.3d 655, 664 (D.C. Cir. 2016) – makes any reference to Sen. Feinstein's June 2009 letter to CIA. Nor does Sen.

Burr anywhere suggest that the approved versions of the *Torture Study* were subject to any earlier understandings or restrictions.[10]

Second, neither do any of SSCI's transmittal letters sending the approved copies of the *Torture Study* to Defendants mention any 2009 SSCI correspondence with CIA or any preexisting restrictions. Given that Defendants were not parties to SSCI's back-and-forth negotiations with CIA in 2009, if it were Congress's intent that the *Torture Study* sent to Defendants were subject to some earlier agreement that restricted its use or legal status it strains credulity that there would be no reference at all in any of the correspondence with Defendants. It is all the more incredible if the pre-existing "agreement" is supposedly inconsistent with the transmittal letters themselves, which instruct the Defendants to use the *Torture Study* as they "see fit." JA22.

Third, Sen. Feinstein's subsequent letters trying to counteract DOJ's FOIA litigation ruse and decrying Defendants' refusal to read a comprehensive report from its oversight committee, removes any remaining doubt. There is no way to read Sen. Feinstein's letters to DOJ demanding that DOJ accept that the *Torture Study* is an agency record subject to FOIA as consistent with the idea that the same

---

[10] Sen. Burr's only justification is his personal belief that "I consider that report to be a highly classified and committee sensitive document." However, Executive classification is irrelevant to congressional control and the *Torture Study*, an official Senate report, cannot be "committee sensitive." *See* Sen. Feinstein, JA384.

Sen. Feinstein intended that those same copies were somehow secretly controlled by a paragraph in a letter she wrote to CIA years earlier.

*B. Chairman Feinstein's 2009 Letter to CIA Only Sought to Protect SSCI Work Product in CIA Reading Room*

If this Court reviews even the limited context of the SSCI-CIA negotiations in 2009 (which remains incomplete on the record below), the language in Chairman Feinstein's June 2, 2009 letter to CIA, on which the district court's entire opinion relies, was Chairman Feinstein trying to protect (ultimately unsuccessfully) SSCI's work product in a CIA Reading Room from CIA's nefarious intrusions.

This is the only reading that makes sense. Because CIA insisted SSCI work in a CIA Reading Room during its review of CIA records, it was crucial for SSCI to ensure that SSCI work product in the CIA Reading Room be treated as inviolable SSCI property. It was not necessary, in contrast, for SSCI to negotiate with CIA, or make assertions about, the legal status of SSCI work product *outside* of CIA-controlled spaces, because there could be no question about SSCI's legal authority over its own records in its own spaces.

Nor was it necessary, or even plausible, that at the beginning of its investigation SSCI would have intended to bind or limit itself from relinquishing control of the final *Torture Study* to the agencies it oversees in a way that would prevent them from using, reading, and learning from it. *See* Sen. Rockefeller,

JA375 (stating that June 2009 letter "was never intended to limit the SSCI's power to relinquish control over any final report going forward, or any other SSCI materials physically located outside of CIA-controlled spaces").

There is no evidence in the record to the contrary. In fact, the *only* reference to Chairman Feinstein's June 2, 2009, letter to CIA in *any* of the government declarations in the record, is in a 2015 declaration from Neil Higgins from CIA, a nonparty in this action. *See* Higgins Decl., JA68. Mr. Higgins in fact confirms that the letter was only referring to SSCI work product in the CIA Reading Room. Mr. Higgins quotes the letter as an example of SSCI protecting its work product *in the Reading Room* and never asserts it relates to SSCI work product *outside* of the Reading Room. JA72-73 ¶¶10-12.

Mr. Higgins also confirms that the approved versions of the *Torture Study* that SSCI later transmitted to CIA and Defendants did "*not* reside in the CIA facility" or Reading Room, but states that "*[n]onetheless*, the restrictions governing the SSCI's initial work product *have informed* how CIA has treated" the approved versions of the *Torture Study*. JA75 ¶ 14. (emphasis added). This is nothing more than another example of a FOIA litigation position being laundered through a declaration and is entitled to no weight.

All of this is consistent with the actual language of Sen. Feinstein's June 2, 2009, letter when it is put in its proper context. Sen. Feinstein's June 2, 2009

response to the May 28, 2009 proposed CIA MOU follows the same format, the

same order, and liberally borrows language from the CIA's MOU. Both the CIA's

MOU and Chairman Feinstein's response have separate sections related to (1)

SSCI's work *within* the Reading Room while reviewing CIA records and (2) SSCI

work product created *outside* the Reading Room. The central paragraph at issue in

Chairman Feinstein's June 2, 2009 letter, paragraph 6, is directly responding to

CIA's earlier paragraph 3C, as is clear if they are placed side by side:

| *CIA Proposed MOU May 28, 2009* | *Sen. Feinstein June 2, 2009 Response* |
|---|---|
| All notes, documents, draft and final recommendations, reports, and other materials generated by SSCI *must be prepared and stored in the Reading Room* on the CIA approved stand-alone computer system provided. A specially designed share-drive will be provided on the [CIA]'s stand-alone network. . . CIA will also provide SSCI with lockable cabinets and safes, as required.<br><br>JA26 ¶ 3C (emphasis added) | Any documents generated on the network drive ... as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff … are the property of the Committee and *will be kept at the Reading Room* solely for secure safekeeping and ease of reference. *These documents* remain congressional records in their entirety and disposition and control over *these records*, . . .<br><br>JA29 ¶ 6 (emphasis added) |

Here CIA is demanding that SSCI notes and work product created during its

CIA document review must be prepared and stored on either (1) the SSCI side of a

share drive (2) a "standalone computer" or (3), if in print form, in safes or cabinets

"in the Reading Room." CIA MOU, JA26, ¶ 3C. SSCI responds directly that any

documents "generated on the network drive" and any other notes or work product

there (such as on (1) the approved stand-alone computer system or, (2) if in print, in cabinets and safes) will be kept "at the Reading Room solely for secure safekeeping. *These* documents . . ." June 2, 2009, JA29 ¶ 6 (emphasis added). As Sen. Rockefeller explained the reference to "these documents" stresses that they are referring to the records at the CIA Reading Room "rather than to any document or all future documents related to the [SSCI] investigation." JA375.

Thus, the text of Paragraph 6 of the June 2, 2009, letter, as former SSCI Chairman Rockefeller explained (contradicted by no other evidence in the record) "only covered materials that were kept at the SSCI's reading room, a CIA-controlled space" and "was never intended to limit the SSCI's power to relinquish control over any final report going forward." JA375.

This is also consistent with the placement of the paragraph within the portion of Chairman Feinstein's response that was dealing with SSCI's work *within* the Reading Room which mirrors the CIA MOU to which it was responding. SSCI work *outside* the CIA Reading Room is treated as a separate issue in both the CIA MOU and Sen. Feinstein's June 2, 2009 response letter which again becomes even clearer after seeing the language to which Chairman Feinstein was replying side by side:

| CIA Proposed MOU May 28, 2009 | Sen. Feinstein Response June 2, 2009 |
|---|---|
| Should SSCI prepare any notes, documents, draft and final recommendations, reports, or other materials *outside of the secure Reading Room* based on information accessed in the Reading Room, all such materials must be prepared and stored on CIA approved TS//SCI systems and carry the highest classifications of any of the underlying source materials. | Any notes, documents, draft and final recommendations, reports or other materials prepared by Committee Members or Staff based on information accessed in the Reading Room will be prepared and stored on TS//SCI systems. Such materials will carry the highest classification of any of the underlying source materials. |
| JA26 ¶3F (emphasis added) | JA31 ¶10. |

In paragraph 10, Chairman Feinstein's letter makes no similar assertions about material being SSCI property or congressional records, because such assertions were unnecessary as there was no risk that CIA would attempt to access or assert authority over SSCI work product in Senate spaces. And as Mr. Higgins' declaration confirms, the approved versions of the *Torture Study* that are at issue in this case were never in the CIA Reading Room. *See* JA75.

Finally, this interpretation of the text is further supported by the limited, public record of the negotiations between Chairman Feinstein and CIA on this issue that continued after the June 2, 2009 letter. In particular, a subsequent CIA letter referring to continuing negotiations related to the earlier exchange of letters, stated that the parties were apparently "in agreement on the computer issue. In a

nutshell, you will have a walled off hard drive on our network. No CIA personnel with the exception of IT support will have access to the hard drive" and "The SSCI retains ownership of anything created *on this drive*. It is SSCI property and will be handled accordingly *vis-à-vis the FOIA*. JA36. This is yet more evidence that what was being discussed in this lengthy negotiation was SSCI seeking protection for its work product in the CIA Reading Room from CIA intrusions.

*C. Even if Chairman Feinstein's 2009 Letter to CIA Were Relevant to Approved Torture Study, By Its Own Terms It Only Applies to CIA*

Chairman Feinstein's June 2, 2009, letter is not an "agreement" – as the D.C. Circuit in *ACLU v. CIA* was led to believe. It is an initial response to the CIA's proposed MOU early on in a lengthy back and forth negotiation. Yet even assuming arguendo that Chairman Feinstein's June 2009 letter to CIA is relevant and that it should be read as if were a contract, the letter by its very terms only applies to CIA. JA29-30 (stating "these records are not CIA records," "the CIA may not . . . disseminate or copy them"). If the Court is going to parse this language as though this is a contract to which the parole evidence rule applies, then all the words matter. As the *Torture Study* confirms, SSCI also reviewed records of Defendants DOD, DOJ and DOS, and there is no evidence of any similar "agreement" or demand from SSCI to Defendants. *See Torture Study* 9 n.3.

Further, if treated as akin to a contractual provision, paragraph 6 is clearly a provision intended for the benefit of SSCI in order to protect *its* oversight function

and one that it could later voluntarily waive. Yet here Defendants, with district court approval, have disingenuously turned it on its head and invoke this provision for *Defendants'* protection to the detriment of SSCI's ability to effectuate its oversight. Indeed, no one seriously believes that the issue here is protecting *congressional* equities in copies of the *Torture Study* that Congress sent to the Defendants in the hope they would not facilitate torture again.

> *D. Even if Chairman Feinstein's 2009 Letter Were Relevant to Defendants' Copies of Approved Torture Study, SSCI Relinquished Control in 2014*

Finally, even assuming further for the sake of argument that the letter could be read broadly enough to be relevant to Defendants' copies of later approved versions of the *Torture Study* at issue in this case, then the subsequent actions by the SSCI and SSCI's contemporaneous 2014 transmittal letters nevertheless remain "compelling evidence" of a later relinquishing of control over them. Chairman Feinstein's 2009 letter to CIA surely cannot be read as intending to bind SSCI forever, forbidding it from ever relinquishing control over the *Torture Study* to the agencies over which it has oversight authority. In fact, paragraph 6 says CIA may not use SSCI work product at issue "without the prior written authorization of the Committee." JA29. SSCI's transmittal letter *is* the "prior written authorization of the Committee" for CIA to use the *Torture Study* "as they see fit" and hopefully to learn from it and never again resort to torture.

## II. DISTRICT COURT IMPROPERLY DENIED DISCOVERY

The district court below summarily denied Plaintiff's request for discovery with a two paragraph, boilerplate, back of the hand. SA88. The district court does so by adopting an erroneous and nearly insurmountable standard that, simply because this is a FOIA case, Plaintiff "must make a showing of bad faith on the part of the agency" in order to justify any discovery. SA88. This is not the law. First, nothing in FOIA nor the Federal Rules of Civil Procedure create any special restrictions on the use of discovery in FOIA cases. Second, even assuming for the sake of argument that such a standard could be appropriate in a typical FOIA case, in which the only factual issues are the sufficiency of an agency's search for responsive records or the justifications for any withholdings, that cannot be the standard in this case.

The Second Circuit has been clear that discovery should be permitted in FOIA cases in appropriate cases. *See, e.g.*, *Ruotolo v. Dep't of Justic*e, 53, F.3d. 4, 11 (2d Cir. 1995). This is such a case. Here, the district court adopted as the dispositive legal standard in this case a test that rests on "a complex, and ultimately decisive" factual question, SA34, related to the subjective intent of a "document creator," which in this case is a third party. SA39; SA69. The complexity of adjudicating such a complex factual question given that "discerning the intent of the drafters of a document may often prove an elusive endeavor" was part of the

reason the Supreme Court stated FOIA cases should not turn on such issues. *Tax Analysts*, 492 U.S. at 147. Having ignored the Supreme Court's warning, and adopted such a fact-intensive test, the court cannot pretend to impartially apply the law by relying solely on Defendants heavily lawyered declarations and cherry-picked documents and denying Plaintiff discovery.

Moreover, the district court's conclusory statement that Plaintiff presented no "contrary evidence" justifying discovery is inaccurate, even assuming that such a test were necessary to justify discovery. Among other things, Plaintiff presented letters to Defendants from Sen. Feinstein directly contradicting the district court's purported interpretation of Sen. Feinstein's own intent in drafting the June 2, 2009 letter on which the district court's entire opinion relies. JA353; JA356; JA350. Similarly, Plaintiff identified records from research of public sources and other FOIA requesters that not only are highly relevant to this case, but also directly reference other relevant, nonpublic evidence very likely in the possession of Defendants. JA36. Given the central factual issues, as defined by the district court, the fact that this case happens to arise under FOIA is irrelevant and Plaintiff must be able to utilize the mechanisms of discovery to develop the record. *See Melogg v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) (Rule 56 discovery permitted where facts are material and unavailable except via discovery).

**CONCLUSION**

For all the foregoing reasons, the Court must reverse the district court below

and hold that Defendants' copies of the *Torture Study* are agency records subject to

FOIA or, in the alternative, the Court should reverse and remand this case to allow

Plaintiff to conduct discovery to develop the record further.

Respectfully submitted,

Douglas Cox
City University of New York School of Law
Two Court Square
Long Island City, NY 11101
(718) 340-4241
douglas.cox@law.cuny.edu

*Plaintiff-Appellant*

Dated: Sept. 13, 2022

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by Local Rule 32.1(a)(4)(A), because this brief, excluding items identified in Fed. R. App. P 32(f) contains 13,865 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief is written using a proportionally spaced typeface, Times New Roman, using Microsoft Word.

Douglas Cox
City University of New York School of Law
Two Court Square
Long Island City, NY 11101
(718) 340-4241
douglas.cox@law.cuny.edu

*Plaintiff-Appellant*

Dated: Sept. 13, 2022

**CERTIFICATE OF FILING AND SERVICE**

I certify that on Sept. 13, 2022, I filed Appellant's Brief, the Special Appendix, and the Joint Appendix electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

I further certify that I have submitted the required number of physical copies of Appellant's Brief, the Special Appendix, and the Joint Appendix to be sent to the Clerk's Office via U.S. Mail.

Douglas Cox
City University of New York School of Law
Two Court Square
Long Island City, NY 11101
(718) 340-4241
douglas.cox@law.cuny.edu

*Plaintiff-Appellant*

Dated: Sept. 13, 2022

# SPECIAL APPENDIX

Memorandum and Order of Chief Judge Roslynn R. Mauskopf
(Nov. 30, 2020), ECF 53. .................................................................... SA1

Memorandum and Order of Judge Rachel P. Kovner (Mar. 30, 2022),
ECF 61 .............................................................................................. SA60

Judgment of Clerk of Court (Mar. 31 2022), ECF 62. .................................. SA90

5 U.S.C. § 552............................................................................................ SA91

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
DOUGLAS COX,

                      Plaintiff,

                -against-

DEPARTMENT OF JUSTICE, *et al.*,

                    Defendants.
--------------------------------------------------------------------X

                            **MEMORANDUM AND ORDER**
                            17-CV-3329 (RRM) (RLM)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

       Plaintiff Douglas Cox brings this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, claiming that defendants Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Department of Defense ("DOD"), Office of the Director of National Intelligence ("ODNI"), and Department of State ("State" or "State Department"), (collectively, "the Agencies"), are improperly withholding records responsive to Cox's FOIA requests for records relating to the Senate Select Committee on Intelligence's ("SSCI") *Study of the Central Intelligence Agency's Detention and Interrogation Program* ("SSCI Report"). The Agencies now move to dismiss Cox's complaint with respect to his requests for versions of the SSCI Report, arguing that the report is not an agency record subject to FOIA. The Agencies also move for summary judgment with respect to Cox's remaining requests, arguing that they have, among other things, properly withheld documents pursuant to FOIA exemptions. For the reasons set forth below, the Agencies' motion to dismiss is denied and the Agencies' motion for summary judgment is granted in part and denied in part.

# BACKGROUND

## I.  FOIA

FOIA requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . , shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  Under this provision,

> the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, . . .  has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.

5 U.S.C. § 552(a)(4)(B).

In any FOIA case, the Court must bear in mind that FOIA was drafted to promote disclosure of governmental information.  *See Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 508 (2d Cir. 1992) ("In interpreting FOIA, it must be remembered that the statute seeks to permit access to official information long shielded unnecessarily from public view, and was intended to establish a general philosophy of full agency disclosure." (internal quotation marks and citations omitted)).  At the same time, the statute enumerates exemptions, which serve "to protect specified confidentiality and privacy interests."  *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 220–21 (1978).  These exemptions are the primary means by which an agency may avoid production of records subject to FOIA; "unless the requested material falls within one of these nine statutory exemptions, FOIA requires that records and material in the possession of federal agencies be made available on demand to any member of the general public."  *Id.* at 221.  If a requestor believes an agency improperly withheld records subject to disclosure under FOIA, the requestor "may seek an order of production from a district court, which will review the matter *de novo*, placing the burden on

the agency to defend its non-disclosure decisions." *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 544 (2d Cir. 2016) (citing 5 U.S.C. § 552(a)(4)(B)).

### A. Relevant Exemptions

FOIA exemption one exempts from disclosure matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 551(b)(1).

FOIA exemption five exempts from disclosure matters that are "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "The exemption incorporates all normal civil discovery privileges, including the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege." *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 734–35 (S.D.N.Y. 2011) (quotation marks omitted), *amended on reconsideration* (Aug. 8, 2011).

### B. Vaughn index

In *Vaughn v. Rosen*, the D.C. Circuit held that agencies must provide more than "conclusory and generalized allegations of exemptions," but rather "relatively detailed analysis in manageable segments" explaining the basis for their claimed exemptions. 484 F.2d 820, 826 (D.C. Cir. 1973). Consistent with this obligation, an agency will use a "*Vaughn* index" and/or a "*Vaughn* affidavit" to outline its claimed exemptions. A district court may grant summary judgment to an agency based on its affidavits only if they provide a "*reasonable specificity* of detail rather than merely conclusory statements" supporting the agency's withholding of records. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999). "While there is no set

3

form for a *Vaughn* index, the agency should describe the documents with as much information as possible without thwarting the exemption's purpose" and "provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Navigators Ins. Co. v. Dep't of Justice*, 155 F. Supp. 3d 157, 171 n.13 (D. Conn. 2016). Given its purpose, the Second Circuit has explained that a *Vaughn* affidavit should provide a "fact-specific justification that either (a) would permit appellant to contest the affidavit in adversarial fashion, or (b) would permit a reviewing court to engage in effective *de novo* review of the [withheld] information." *Halpern v. F.B.I.*, 181 F.3d 279, 293 (2d Cir. 1999). The level of specificity required also depends in part on the exemption claimed. For instance, "[u]nder Exemption 1, it makes sense to require itemized descriptions of documents and/or redactions in the government's *Vaughn* affidavits since these descriptions are likely to have a direct bearing on the types of information contained in the document that are subject to redaction." *Halpern*, 181 F.3d at 297.

### C. Partial Disclosures

Finally, FOIA provides, "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). "This provision requires agencies and courts to differentiate among the contents of a document rather than to treat it as an indivisible 'record' for FOIA purposes." *F.B.I. v. Abramson*, 456 U.S. 615, 626 (1982). That said, agencies need not disclose non-exempt information that is "inextricably intertwined" with exempt information. *See Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1991). Information is "inextricably intertwined" where "disclosure would compromise the confidentiality of [exempt]

information that is entitled to protection." *Id.* (citation and internal quotation marks omitted); *see also Am. Civil Liberties Union v. United States Dep't of Justice*, 252 F. Supp. 3d 217, 227 (S.D.N.Y. 2017). A district court is required to "make specific findings of segregability regarding the documents to be withheld." *Color of Change v. United States Dep't of Homeland Sec.*, 325 F. Supp. 3d 447, 455 (S.D.N.Y. 2018) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)); *see also Hopkins*, 929 F.2d at 85 (remanding for district court to make specific findings as to whether factual data could be segregated in record withheld pursuant to exemption five deliberative process privilege). Although it is the agencies' burden to establish that they properly segregated information, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117; *see also Navigators Ins. Co.*, 155 F. Supp. 3d at 174.

## II.    Relevant Facts

The facts below are drawn from Cox's complaint, as well as documents and declarations submitted by the parties. Unless otherwise noted, the facts are undisputed.

### A.    The SSCI Report

In March 2009, the SSCI informed the Central Intelligence Agency ("CIA") that it planned to review the CIA's former detention and interrogation program. (Declaration of Antoinette B. Shiner ("Shiner Decl.") (Doc. No. 52-2), Attachment 1 ("Higgins Decl.") ¶ 10.) To this end, the SSCI requested access to CIA documents regarding the program. (Higgins Decl. ¶ 10.) According to former CIA Director of Congressional Affairs Neal Higgins, "Due to the volume and the highly sensitive and compartmented nature of the classified information at issue, the CIA determined that in order to properly safeguard classified equities, the SSCI's review of Agency records would need to take place at CIA facilities." (*Id.*)

### 1.    June 2009 Letter

In a June 2, 2009, letter, the SSCI wrote to then-CIA Director Leon Panetta regarding the planned review of records at the CIA.  (Higgins Decl., Ex. D ("June 2009 Letter"); *see also* Plaintiff's Brief in Opposition ("Opp.") (Doc. No. 52-10), Ex. N (same).)  The letter outlined "procedures and understandings" under which the SSCI and its staff would conduct its review. (June 2009 Letter at 1.)  The letter discussed the documents that would be provided, protections for computers used by SSCI staff, and – most significantly, for the purposes of the instant action – SSCI's control over notes, documents, reports, and other materials generated by SSCI staff. Quoting the relevant portion in full:

> Any documents generated on the network drive referenced in paragraph 5, as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee and will be kept at the Reading Room solely for secure safekeeping and ease of reference.  These documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee.  As such, these records are not CIA records under the Freedom of Information Act or any other law.  The CIA may not integrate these records into its records filing systems, and may not disseminate or copy them, or use them for any purpose without the prior written authorization of the Committee.  The CIA will return the records to the Committee immediately upon request in a manner consistent with paragraph 9.  If the CIA receives any request or demand for access to these records from outside the CIA under the Freedom of Information Act or any other authority, the CIA will immediately notify the Committee and will respond to the request or demand based upon the understanding that these are congressional, not CIA, records.

(June 2009 Letter at 2–3.)

The parties disagree about the meaning and effect of this letter.  According to the Agencies, "Before the review commenced, the Senate Committee and officials at the CIA negotiated arrangements to deal with access to classified materials by Senators and their staff, and agreed on rules regarding the Committee's control over its work product."  (Mem. of Law in

Sup. of Defs' Mot. to Dismiss and for Summ. J. ("Mot.") (Doc. No. 52-1) at 12.)[1]  The Agencies

maintain that the June 2009 letter "memorialized" these "arrangements." (*Id.*)  Cox, on the other

hand, denies that the June 2009 Letter memorialized any agreement between the SSCI and the

CIA.  (Opp. at 24.)  According to Cox, the June 2009 Letter was "superseded by subsequent

negotiations back and forth between the CIA and SSCI that apparently came to an uncertain

end." (*Id.*)  Cox also argues that the above-quoted paragraph of the June 2009 Letter applied

only to SSCI records "on hard drives within a CIA Reading Room," and not to versions of the

SSCI Report transmitted to the CIA, versions of the SSCI Report transmitted to other agencies,

or to the SSCI's review of other agencies' records.  (Opp. at 23–25.)

### 2.     December 2012 Letter and Report

On December 13, 2012, the SSCI voted to approve an initial version of its full report,

including an executive summary.  (*See* Declaration of Vanessa R. Brinkmann ("Brinkmann

Decl.") (Doc. No. 52-3), Ex. N ("December 2012 Letter"); *see also* Compl. ¶¶ 13–14; Opp., Ex.

F (same).)  In a December 14, 2012, letter to President Obama, SSCI Chairman Senator Dianne

Feinstein explained that the "6,000 page report, complete with executive summary, findings, and

conclusions" would be provided to the President and "appropriate Executive Branch agencies."

(December 2012 Letter at 1.)  Senator Feinstein requested "that the White House coordinate any

response from these agencies, and present any suggested edits or comments to the Committee by

February 15, 2012 [sic]." (*Id.*)  "After consideration of these views," Senator Feinstein added, "I

intend to present this report with any accepted changes again to the Committee to consider how

to handle any public release of the report, in full or otherwise." (*Id.*)  The parties agree that at

---

[1] Page numbers for the parties' briefs correspond to pagination assigned by the Court's Electronic Case Filing system.

least some of the Agencies first received copies of the SSCI Report in December 2012.  (Mot. at 13; Opp. at 10; Compl. ¶¶ 14–15 (DOJ), 60–61 (FBI), 87 (ODNI), 102 (State Department).)

The parties disagree about how to characterize the 6,000-page report, including executive summary, that was approved and transmitted to the Executive Branch in December 2012 (the "December 2012 SSCI Report").  The Agencies describe the December 2012 SSCI Report and its executive summary as two distinct "drafts," sent to the Executive Branch "for review, soliciting suggested edits or comments but limiting dissemination to specific individuals identified in advance to the Chairman."  (Mot. at 13.)  According to Cox, the December 2012 SSCI Report was "the *approved* Dec. 2012 version of the full *Study*" and "[w]hile the term 'draft' might be useful shorthand," it is "factually inaccurate and inconsistent with how Congress and the agencies . . . treated" the December 2012 SSCI Report.  (Opp. at 9–10.)  Cox further disputes that the executive summary constituted a "stand-alone" document as the Agencies contend, arguing instead that it was part of "a cohesive whole."  (Mot. at 13; Opp. at 10 n.6.)

### 3.    April 2014 Letter and Report

The parties agree that in April 2014, the SSCI approved an updated version of its report, (the "April 2014 SSCI Report") and transmitted it to at least some of the Agencies.  (Mot. at 13–14; Opp. at 13; Compl ¶¶ 17–18 (DOJ), 62 (FBI), 89–90 (ODNI).)  In an April 7, 2014, letter to President Obama, Senator Feinstein stated that the SSCI had "voted to send for declassification the Findings and Conclusions and Executive Summary of an updated version of the Committee's Study of the CIA's Detention and Interrogation Program."  (Brinkmann Decl., Ex. L ("April 2014 Letter") at 1; *see also* Compl. ¶ 16; Opp., Ex. G (same).)  Feinstein explained, "This full report should be considered as the final and official report from the Committee," adding that she "encourage[d] and approve[d] the dissemination of the updated report to all relevant Executive

Branch agencies, especially those who were provided with access to the previous version."
(April 2014 Letter at 1–2.)

### 4.     December 2014 Letter and Report

The parties agree that in December 2014, the SSCI sent another version of the SSCI Report, ("December 2014 SSCI Report"), to the Agencies.  (Mot. at 14; Opp. at 12; Compl. ¶¶ 24 (DOJ), 63–64 (FBI), 73 (DOD), 92–93 (ODNI), 104–05 (State Department).)  In a December 10, 2014, letter to President Obama, Senator Feinstein wrote that, the day prior, the SSCI "formally filed the full version of its Study of the Central Intelligence Agency's Detention and Interrogation Program with the Senate and publicly released the declassified Executive Summary and Findings and Conclusions, as well as the declassified additional and minority views." (Brinkmann Decl., Ex. M ("December 2014 Letter"); Opp., Ex. J (same).)  According to the Agencies, this report was based on the SSCI's review of "comments and proposed edits from the Executive Branch" following the April 2014 SSCI Report.  (Mot. at 14.)  Cox characterizes the December 2014 differently, contending that the December 2014 SSCI Report incorporated "'declassification revisions' that essentially 'dumbed down' portions of the *Torture Study's* Executive Summary in order to maximize public disclosure" and preserve the Committee's narrative and conclusions following the executive branch's redactions.  (Opp. at 13.)

At the end of the December 2014 Letter, Senator Feinstein wrote,

[T]he full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated.  To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit.

December 2014 Letter at 1.

After the transmittal of the December 2014 SSCI Report, Yahoo News reported that the CIA had deleted and destroyed copies of the SSCI Report it had received.  (*See* Opp., Ex. S.)  In emails to DOJ, SSCI staff stated that they had reason to believe the CIA had deleted and destroyed its copies of the SSCI Report in response to guidance from DOJ to the CIA Inspector General.  (*Id.*)  Cox includes with his motion partially redacted emails that appear to discuss the CIA's loss of the SSCI Report and that suggest that the CIA Inspector General's office was involved in events leading up to the loss of the report.  (*See* Opp., Exs. T, U, V (Doc. Nos. 30–32).)

### 5.    January 2015 Letters

In January 2015, Senator Richard Burr took over as chairman of the SSCI.  In a January 14, 2015, letter to President Obama, Senator Burr wrote that he considered the December 2014 SSCI Report "to be a highly classified and committee sensitive document" and "request[ed] that all of copies of the full and final report in the possession of the Executive Branch be returned immediately to the Committee."  (Brinkmann Decl., Ex. J ("January 2015 Senator Burr Letter").)  In a January 16, 2015, letter to President Obama, Senator Feinstein, then Vice Chairman of the SSCI, wrote that she "d[id] not support this request" in Senator Burr's letter and that she "believe[d] it is important for appropriately cleared individuals in the Executive Branch to have access to the Committee's full, classified report."  (Mot., Ex. 7 ("January 2015 Senator Feinstein Letter") (Doc. No. 52-8) at 1.)

### 6.    May 2017 Letter

On May 30, 2017, Senator Burr again requested that the Agencies return their copies of the December 2014 Report.  (Opp., Ex. X (Doc. No. 52-34).)  The parties agree that in response to this request at least some of the Agencies returned copies of the SSCI Report to the SSCI.

(Opp. at 35–37; Reply at 34; Compl. ¶ 3.)  Cox includes with his motion an email response to

Senator Burr's request from ODNI Director of Legislative Affairs Dierdre Walsh that suggests

DOJ was potentially consulted on the Agencies' obligations to retain records before the decision

to return the SSCI Report copies was made.  (Opp., Ex. X.)  Although they do not specifically

deny that DOJ was consulted, the Agencies state that Cox is merely "speculat[ing]" in his claim,

described in more detail below, that the Agencies may have returned copies of the SSCI Report

based on DOJ guidance.  (Reply at 34.)

### B.      Cox's FOIA Requests and the Agencies' Responses

On December 21, 2016, Cox submitted FOIA requests to the Department of Justice

("DOJ"), the Federal Bureau of Investigation ("FBI"), the Department of Defense ("DOD"), the

Office of the Director of National Intelligence ("ODNI"), and the Department of State ("State"

or "State Department"), seeking copies of the SSCI Report and related documents.  (Compl. ¶¶

45, 66, 81, 95, 107; Brinkmann Decl., Ex. A ("DOJ FOIA Request"); Declaration of David M.

Hardy ("Hardy Decl.") (Doc. No. 52-4), Ex. A ("FBI FOIA Request"); Declaration of Deirdre

Walsh ("Walsh Decl.") (Doc. No. 52-5), Ex. A ("ODNI FOIA Request"); Declaration of Mark

H. Herrington ("Herrington Decl.") (Doc. No. 52-6), Ex. A ("DOD FOIA Request"); Declaration

of Eric F. Stein ("Stein Decl.") (Doc. No. 52-7), Ex. B ("State Department FOIA Request").)

### 1.      DOJ

In his request to DOJ, Cox sought specific final copies of the SSCI Report (Request Nos.

1–2); any other copies of the SSCI Report, including "portions . . . that have been cut and pasted

into, or quoted in, other Department of Justice documents," (Request No. 3); draft copies of the

SSCI Report, (Request No. 4); "records, documents, or non-record material discussing or

referencing any copies of the final or draft *SSCI Report on Torture*," (Request No. 5);

communications between various agencies, government officials, and members of Congress "regarding how the Department of Justice or these other entities should handle or treat copies of either the draft or final *SSCI Report on Torture*," (Request No. 6); "records, documents, or non-record material that discuss or describe when, why and/or under what circumstances the 'DOJ copy of the Full Report' was marked 'Congressional Record,'" (Request No. 7); and a "copy of the letter from Senator Feinstein to the President that was 'assigned an agency tracking number' and references the SCSI Report on Torture 'as a classified attachment to the letter'" (Request No. 8). On February 24, 2017, DOJ denied requests one through four of Cox's FOIA request, stating that the SSCI Report was not an "agency record," that it would need more time to search for records responsive to requests five through seven, and that it had located documents responsive to request eight. (*See* Brinkmann Decl. ¶ 4, Ex. B.) Cox appealed DOJ's response to his requests, but the decisions with respect to requests one through seven were affirmed, and DOJ deferred ruling on the eighth request because its search was ongoing. (*See* Brinkmann Decl. ¶¶ 7–8, Exs. E, F.)

In a February 2, 2018, letter, DOJ's Office of Information Privacy ("OIP") informed Cox that it had located 368 pages containing records responsive to his request, withheld 333 pages pursuant to FOIA exemption five, and produced 35 pages with redactions pursuant to exemptions three, five and six.[2] (Brinkmann Decl., Ex. G.) In her declaration filed with this motion, Senior Counsel at the DOJ's Office of Information Privacy Vanessa R. Brinkmann states that upon further review OIP released 10 more pages of the withheld documents with some redactions pursuant to exemptions five and six, and identified some duplicate pages, reducing the total pages withheld in full to 320. (Brinkmann Decl. ¶ 10.)

---

[2] The letter noted that portions of the 333 pages withheld in full were also exempt pursuant to exemptions three and six. (Brinkmann Decl., Ex. G.)

Regarding the exemption five withholdings, Brinkmann organizes the documents withheld into categories and in subsequent paragraphs describes the basis for withholding each of these categories pursuant to exemption five.  (*Id.* ¶¶ 39–82.)  DOJ's exemption five withholdings were made based on the deliberative process privilege, attorney-client privilege, and attorney work product doctrine.  (Brinkmann Decl.  ¶¶ 42, 51, 56.)  These withholdings are further supported by a *Vaughn* index included with Brinkmann's declaration describing the documents for which DOJ asserts exemptions.  (Brinkmann Decl., Ex. P.)  Finally, Brinkmann describes OIP's efforts to release segregable information in withheld and redacted records.  (*Id.* ¶¶ 83–87.)

DOJ performed a supplemental search and, during the pendency of this motion, provided Cox with additional records responsive to his request.  (*See* Second Declaration of Vanessa R. Brinkmann ("Second Brinkmann Decl.") (Doc. No. 52-36) ¶ 5.)  DOJ identified 448 additional pages of responsive records, and released 150 pages in full or in part.  (Second Brinkmann Decl. ¶¶ 9, 15.)  DOJ withheld records from this supplemental search pursuant to exemptions three, five, six, and seven.  (*Id.* ¶ 5.)  With respect to its exemption five withholdings, DOJ withholds records as attorney work product, attorney-client privileged, and as subject to the deliberative process privilege.  (*Id.* ¶¶ 15–39.)  The Second Brinkmann Declaration, like the first, organizes the records withheld into logical categories and describes the basis of each claimed exemption, (*id.*), includes *Vaughn* index providing more detail about each record subject to the exemption, (*id.*, Ex. B), and describes DOJ's efforts to release all segregable information, (*id.* ¶¶ 40–44).

## 2.    DOD

Cox requested two specific versions of the SSCI Report in his requests to DOD (Request Nos. 1–2); made requests that mirrored requests three through six of the DOJ FOIA Request

(Request Nos. 3–6); and also requested "[a]ny records, documents, or non-record material that discuss or describe or document when, under what circumstances, and/or how many times the Department of Defense Deputy General Counsel (Intelligence) has accessed the SSCI Report on Torture or any portion thereof 'so that she may address/advise on litigation and other legal related matters, as necessary' or for other reasons" (Request No. 7).  (DOD FOIA Request.)

DOD determined that records responsive to Cox's FOIA requests one through four did not constitute agency records, but began a search for documents responsive to Cox's requests five through seven in April 2017.  (Herrington Decl. ¶ 5.)  DOD did not locate documents responsive to Cox's requests five or seven, but did locate records responsive to Cox's sixth request, and produced some while withholding five email chains.  (*Id.* ¶¶ 5–7, 13.)  DOD Associate Deputy General Counsel in the Office of General Counsel explains in his declaration that DOD withheld the five email chains in full pursuant to exemption five, (Herrington Decl., ¶ 18), identified personal information in those documents pertaining to other agencies' employees that those agencies stated was subject to exemption six, (Herrington Decl., ¶ 18), and separately made four redactions of DOD email addresses in documents produced by DOJ pursuant to exemption six, (Herrington Decl. ¶ 16).

Describing the emails withheld in full further, Herrington explains they are subject to exemption five as attorney-client privileged because they contain "communications between DOJ counsel defending DoD in *ACLU v. CIA* with [Herrington], as agency counsel, and communications with [Herrington] and other attorneys with DoD OGC concerning the status of whether DoD had any copies of the final SSCI report and how those copies were being stored and treated."  (*Id.* ¶ 13.)  Herrington explains that the same documents are also subject to exemption five based on the work-product doctrine because the "communications were prepared

in relation to the then-ongoing *ACLU v. CIA* FOIA litigation, and disclosure would reveal the mental impressions and strategies of counsel." (*Id.* ¶ 14.)  Finally, Herrington explains that the same documents are subject to the exemption five deliberative process privilege because "they are predecisional discussions about how to respond to the Complaint or litigation strategy at different stages of the proceedings in *ACLU v. CIA*" and that disclosure would "harm the ability to have frank and candid discussions between agency counsel and DOJ attorneys in the future." (*Id.*)  These documents were withheld in full, Herrington adds, because after "conduct[ing] a document-by-document and line-by-line review," he "determined that no segregable, non-exempt portions of documents could be released without potentially compromising information protected by FOIA." (*Id.* ¶ 15.)

### 3.    FBI

Cox's request to the FBI mirrored his DOJ FOIA Request, but it did not include Cox's seventh and eighth requests to DOJ.  (FBI FOIA Request.)

In January 9, 2017, letter, the FBI told Cox that it had located no documents responsive to his requests.  (*See* Hardy Decl. ¶ 6, Ex. B.)  Cox appealed, but the FBI's response was affirmed on May 2, 2017.  (*See id.* ¶¶ 7–9, Exs. C, E.)  After Cox filed this action, the FBI conducted an additional search and located 181 pages of responsive records.  (*Id.* ¶ 11.)  The FBI released nine pages in full, 143 pages in part, and withheld 29 pages in full.  (*Id.*)  The FBI withheld information pursuant to exemptions one, three, five, six, and seven.  (*Id.* ¶ 27.) In his declaration, David M. Hardy, FBI Section Chief of the Record/Information Dissemination Section of the Information Management Division, states that the FBI redacted a single page of records, Cox-123, pursuant to FOIA exemption one.  (Hardy Decl. ¶ 36 n.13.)  According to Hardy, the FBI redacted this information

> to protect from disclosure information that would reveal the actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; or disclose the intelligence gathering capabilities of the activities or methods directed at specific targets.

(*Id.* ¶ 34.)  Hardy explains that the withheld information is subject to exemption one because it is protected from disclosure under Executive Order 13526, § 1.4.  Classified National Security Information, Exec. Order No. 13,526 § 1.4, 75 Fed. Reg. 707 (Dec. 29, 2009).  Hardy describes the harm that could arise from disclosure of this information and declines to provide further information about the document, stating that "the disclosure of the specific and detailed information describing the intelligence activities or methods withheld in these pages . . . could reasonably be expected to cause damage to national security."  (Hardy Decl. ¶¶ 34–36.)

Hardy also discusses the records withheld pursuant to exemption five under the deliberative process privilege and attorney-client privilege.  (*Id.* ¶¶ 48–49.)  Regarding the FBI's withholdings pursuant to the exemption five deliberative process privilege, Hardy states,

> The FBI relied on Exemption 5 and the deliberative process privilege to protect deliberations between FBI employees concerning information that was in draft form (working copies of the SSCI report), and handwritten notes and communications between FBI employees discussing these drafts and discussions, recommendations, and proposals for how FBI equities should be presented and/or protected within the final report.

(*Id.* ¶ 49.)  Then, after describing the harm he claims might will result from disclosing this information, Hardy includes a footnote to the pages withheld pursuant to this exemption.  (*Id.* ¶ 49 n.19.)  Regarding the FBI's withholdings pursuant to the exemption five attorney-client privilege, Hardy states,

> The FBI has protected communications between and among FBI counsel and their FBI client employees reflecting the seeking and/or providing of legal advice with respect to aspects of the FBI information contained within the report.  Specifically, the FBI withheld information from emails between FBI's attorneys and other FBI personnel discussing matters pertaining to the application of an investigative

technique, and a report containing information discussing legal issues regarding detainees.

(*Id.* ¶ 51.)  After describing the harm that he expects would come from disclosing agency legal advice, Hardy identifies in a footnote the records withheld pursuant to this exemption.  (*Id.* ¶ 51 n.20.)  Finally, Hardy writes, "During the processing of Plaintiff's request, each responsive page was individually examined to identify non-exempt information which could be reasonably segregated and released.  All segregable information has been released to Plaintiff."  (*Id.* ¶ 70.)

The FBI withheld some information in these documents at the request of the CIA.  On October 4, 2017, the FBI sent the CIA 39 documents totaling 132 pages that it determined might be responsive to Cox's request, but that might contain CIA information.  (Shiner Decl. ¶ 9; Hardy Decl. ¶ 69.)  In response, the CIA requested that the FBI assert FOIA exemptions with respect to 29 records.  (*Id.*)  The CIA claimed FOIA exemptions with respect to documents responsive to Cox's DOJ FOIA Request as well, and provided a single declaration stating that it requested that DOJ records be withheld pursuant to exemptions three and six, but not stating the exemptions based upon which it requested FBI records be withheld.  (Shiner Decl. ¶ 9.)  Instead, the CIA cites particular FBI records as examples of records withheld pursuant exemptions one, (*id.* ¶¶ 19, 25, 32), three, (*id.* ¶¶ 35, 37), and five, (*id.* ¶¶ 38–39).[3]

In summarizing the FBI's withholdings at the end of his declaration, Hardy states that the 29 pages the FBI withheld in full were withheld by the FBI pursuant to exemptions five, six, and seven and by the CIA pursuant to exemption three.  (Hardy Decl. ¶ 71.)  Hardy notes that the FBI redacted information on 143 pages and does not state whether the CIA made any request for withholding with respect to these pages.  (*Id.*)

---

[3] Given that the CIA withheld identifying information of personnel pursuant to exemption six, it appears likely that it withheld information in FBI records, in addition to DOJ records pursuant to this exemption – though the declaration does not make this clear.  (Shiner Decl. ¶ 41.)

Although Hardy's declaration for the FBI does not mention the CIA withholding records pursuant to exemptions one or five, Shiner's declaration for the CIA describes withholding FBI records pursuant to these exemptions.  In her declaration, CIA Information Review Officer Antoinette B. Shiner explains that the CIA withheld pursuant to exemption one information related to one of six categories:

> (i) personnel associated with the former detention and interrogation program; (ii) the locations of covert Agency facilities, including former detention centers located abroad; (iii) information pertaining to specific intelligence activities, methods, and operations, including certain counterterrorism techniques; (iv) code words and pseudonyms; (v) classification and dissemination control markings; and (vi) relationships with foreign liaison partners.

(Shiner Decl. ¶ 15.)  According to the CIA, it recommended that these documents be withheld pursuant to FOIA exemption one because they "satisf[y] the procedural and substantive requirements of Executive Order 13526, which governs classification."  (Shiner Decl. ¶ 13.)

Shiner goes on to provide general justifications for withholding information related to each of the six identified categories of confidential information pursuant to exemption one and Executive Order 13526.  (Shiner Decl. ¶¶ 16–31.)  For some of the categories, she also identifies a particular record withheld pursuant to exemption one that contained that category of information.  For instance, Shiner cites a set of handwritten notes, Cox-110–122, as an example of a document that "contain[s] details related to the current locations of covert CIA installations and former detention centers located abroad, and goes on to explain that the CIA "withheld references to the location of a former Agency detention facility."  (*Id.* ¶¶ 19–20.)  According to Shiner, the disclosure of detention facilities could "endanger the physical safety of covert CIA officers who work at those locations" and is "likely to cause complications for the host country," negatively impacting CIA intelligence efforts.  (*Id.* ¶¶ 19–20.)

18

According to Shiner, the CIA also withheld information pursuant to exemption five based on attorney-client privilege and the deliberative process privilege.  (Shiner Decl. ¶¶ 38–39.) Regarding attorney-client privilege, Shiner states that two FBI documents responsive to Cox's request, Cox-123–138 and Cox-139–153, were attorney-client privileged because they were emails between DOJ and CIA attorneys "arising from a request made by CIA to DOJ for legal advice concerning the SSCI [] Report" to which "FBI attorneys were subsequently added."  (*Id.* ¶ 38.)  As the basis for asserting the deliberative process privilege, Shiner writes,

> Here, the CIA invoked the deliberative process privilege and Exemption 5 to protect certain inter-agency communications related to the process by which the CIA and other Executive Branch agencies agreed to declassify certain national security information for inclusion in the Executive Summary of the SSCI [] Report that was released to the public on 8 December 2014.  This includes the above-referenced legal consolations with DOJ attorneys (Cox-123 to Cox-138 and Cox-139 to Cox-153) as well as deliberations between national security professionals at CIA and FBI (e.g., Cox-161 to Cox-165).  Further, I have examined all of the documents withheld pursuant to the deliberative process privilege and have determined that, to the extent there is any factual material, it is part and parcel of the deliberations and cannot be further segregated.

(*Id.* ¶¶ 39–40.)  Although the CIA does not specifically identify all of the documents over which it asserts the deliberative process privilege, Shiner does state earlier in her affidavit that 27 of the 29 FBI records the CIA requested be withheld are emails that "reflect CIA communications with FBI and DOJ regarding the deliberations over the eventual public release of certain information in the Executive Summary of the SSCI Report," and that contain "requests . . . for legal advice concerning the potential release of certain information, as well as deliberations between national security professionals at CIA and FBI related to the national security implications of the release of certain information."   (*Id.* ¶ 11.)  Shiner states that the two other documents withheld relate to the same deliberations, one of which is a letter from the FBI to the CIA, and the other the set of handwritten notes, Cox-110–122, which arose "from the review of a draft version of the

19

Executive Summary." (*Id.*)  Shiner adds that she had "examined all of the documents withheld

pursuant to the deliberative process privilege and have determined that, to the extent there is any

factual material, it is part and parcel of the deliberations and cannot be further segregated." (*Id.* ¶

40.)

### 4.    ODNI

Cox made five requests to ODNI, which closely mirrored the language of requests one

through six of the DOJ FOIA Request.  Cox sought "the copy of the final version of the SSCI

Report sent to the ODNI in December 2014" (Request No. 1); any other copies of the final SSCI

Report including "portions… that have been cut and pasted into, or quoted in, other ODNI

documents" (Request No. 2); draft copies of the SSCI report (Request No. 3); "records,

documents, or non-record material discussing or referencing any copes of the final or draft SSCI

Report that were previously in ODNI possession that were removed, transferred, destroyed, or

otherwise disposed of" (Request No. 4); and communications or documentation of

communications between ODNI and various agencies, government officials, and members of

Congress regarding "how ODNI or other entities should handle or treat copies of either the draft

or final SSCI Report" (Request No. 5).  (ODNI FOIA Request.)

ODNI acknowledged receipt of Cox's FOIA request but had not processed the requests

before Cox filed this action on June 2, 2017.  (Walsh Decl. ¶¶ 13–14, Ex. B.)  ODNI later

released 65 pages of records responsive to Cox's FOIA request, redacting portions of the

documents pursuant to exemptions three, five, and six.  (*Id.* ¶¶ 15, 18.)  Regarding its exemption

five redactions, Diedre Walsh, ODNI's Chief Operating Officer and Chief Freedom of

Information Act Officer, explained that the agency withheld portions of two sets of email

exchanges pursuant to the exemption five deliberative process privilege.  (*Id.* ¶¶ 39–40.)  Walsh

explains these emails contain predecisional, back-and-forth deliberations related to (1) proposed

responses to media inquiries and (2) the response to Senator Burr's request that copies of the

SSCI Report be returned to the SSCI.  (*Id.* ¶ 40.)  Walsh goes on to describe the email exchanges

further, explain the harm that could arise from their disclosure, and state that "[a]ll reasonably

segregable, non-exempt information was released to Plaintiff."  (*Id.* ¶¶ 40, 42.)

### 5.    State Department

Cox's requests to the State Department mirrored his requests to ODNI, except he

included an additional request for "records, documents, or non-record material that discuss or

describe when, why, and/or under what circumstances the Department of State 'marked the outer

envelope "Congressional Record – Do Not Open, Do Not Access,"'" (Request No. 5).  (State

Department FOIA Request.)  The State Department did not search for records responsive to

Cox's first through third requests, as it determined that draft and final copies of the SSCI Report

were not agency records.  (Stein Dec. ¶¶ 10–13.)  The State Department conducted searches for

Cox's remaining requests, and located a number of documents, some of which it released to Cox

on a rolling basis beginning in 2018.  (*Id.* ¶¶ 7–9, 14–77; *see also* Compl. ¶ 111.)

In his declaration, Director of the State Department's Office of Information Programs and

Services Eric F. Stein explains that, as of April 19, 2019, the State Department had located 374

records responsive to Cox's request, releasing 29 in full, 53 in part, and withholding 292 in full.

(Stein Decl. ¶¶ 7–9, 77, Exs. D, E, F.)  The State Department withheld records pursuant to FOIA

exemptions three, five, and six.  (*Id.* ¶¶ 64–76.)  A *Vaughn* index included with Stein's

declaration describes each record withheld pursuant to an exemption and the basis for that

withholding.  (*Id.*, Ex. A.)  Describing the withholdings pursuant to exemption five, Stein

explains that the State Department withheld records based on the deliberative process privilege,

including inter- and intra-agency discussions related to communicating with Congress in response to Senator Burr's request that copies of the SSCI Report be returned; based on the attorney-client privilege, for records containing communications with attorneys at the State Department and DOJ; and based on the attorney work-product doctrine, including documents related to the American Civil Liberties Union's FOIA litigation related to the SSCI Report.  (*Id.* ¶¶ 70–72.)  As Stein notes in his affidavit, the basis for withholding each document pursuant to exemption five is detailed in the accompanying *Vaughn* index.  (*Id.*; *id.*, Ex. A.)  Stein further states that the State Department "conducted a line-by-line review of all the documents released in part or withheld in full, . . . segregated and released all reasonably segregable, non-exempt information," and "otherwise determined that no segregation of meaningful information in the documents could be made without disclosing information warranting protection under law."  (*Id.* ¶ 77.)

## III.   Complaint

Cox filed this action on June 2, 2017.  (Doc. No. 1.)  Cox has since twice amended his complaint and the Second Amended Complaint is now the operative pleading.  (Second Amended Compl. ("Compl.") (Doc. No. 26).)  Cox brings claims under FOIA, claiming that the Agencies are improperly withholding records responsive to his FOIA requests, and requesting that the Court order the Agencies to produce the responsive records and award him costs pursuant to 5 U.S.C. § 552(a)(4)(E).  (*Id.* ¶¶ 58, 71, 85, 101, 111, 112.)  Appended to Cox's complaint are the December 2012 Letter, the April 2014 Letter, the December 2014 Letter, and Cox's FOIA requests to the Agencies.  (Compl., Exs. A–H (Doc. Nos. 26-1–8.).)

IV.     **Motion to Dismiss and Motion for Summary Judgment**

On November 22, 2019, the Agencies moved to dismiss the complaint with respect to

Cox's FOIA requests for draft and final copies of the SSCI Report, and for summary judgment

with respect to Cox's remaining FOIA requests.  (Notice of Motion to Dismiss and for Summary

Judgment (Doc. No. 52).)  These motions, along with Cox's arguments in opposition, are

outlined below.

A.      **Motion to Dismiss**

The Agencies move to dismiss Cox's claims that the Agencies are improperly

withholding copies of the SSCI Report, portions of the SSCI Report quoted in other documents,

and drafts of the SSCI Report responsive to Cox's FOIA requests.  (Mot. at 21–22.)  This motion

to dismiss "applies to items 1-4 of the requests to DOJ[,] . . . FBI," and DOD, "and to items 1-3

of the requests to ODNI and State."  (Mot. at 22; DOD FOIA Request; DOJ FOIA Request; FBI

FOIA Request; ODNI FOIA Request; State Department FOIA Request.)  The Agencies move to

dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3).

The Agencies contend that the draft and final copies of the SSCI Report Cox seeks are

not "agency records," but rather "congressional records" not subject to FOIA.[4]  (Mot. at 21–22.)

The Agencies first argue that the Court should adopt the D.C. Circuit's test for when records

constitute "agency records" subject to FOIA.  (*Id.* at 24.)  If the Court were to apply this test, the

Agencies contend, it would conclude that the SSCI intended to retain exclusive control over the

draft and final reports, and that they are therefore not subject to FOIA.  (*Id.* at 25–26.)  In support

of this view, the Agencies rely on the D.C. Circuit's decision in *American Civil Liberties Union*

---

[4] The Agencies characterize the December 2014 SSCI Report as the "final" Report and the prior versions from April
2014 and December 2012 as "drafts."  (Mot. at 11.)  For ease of reference, the Court will at times refer to the
December 2012 and April 2014 reports as "drafts," but this should not be construed as a finding about the status of
those reports.

*v. C.I.A.*, 823 F.3d 655 (D.C. Cir. 2016), *reh'g en banc denied* (July 13, 2016), *cert. denied*, 137 S.Ct. 1837 (2017), the June 2009 Letter's directions to the CIA regarding SSCI-created records and reports, as well as the SSCI's treatment of the reports and communications with the executive branch.  (Mot. at 25–31.)  The Agencies also argue that the Agencies' own treatment of the reports and other policy considerations counsel in favor of finding that the reports are not "agency records" subject to FOIA.  (*Id.* at 32–34.)

In his opposition brief, Cox argues that the December 2012 SSCI Report, the April 2014 SSCI Report, the December 2014 SSCI Report, and agency memoranda quoting these reports constitute "agency records" based on the "plain meaning of that term."  (Opp. at 14.)  Cox contends that the Agencies have uploaded versions of the SSCI Report to their systems, and annotated hard-copy versions of the SSCI Report, thus creating unique agency records.  (*Id.* at 15.)

Cox urges the Court not to adopt the D.C. Circuit's test to determine what constitutes an "agency record," but rather to look to the Supreme Court's decision in *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989).  According to Cox, under the standard articulated in *Tax Analysts*, the SSCI Report, and memoranda quoting the reports, are agency records.  (Opp. at 16–20.)  But even if the Court adopts the D.C. Circuit's test, Cox argues, Congress did not express an intent to control the SSCI Report when it transferred copies to the Agencies, making the report copies and documents quoting the reports "agency records" under the D.C. Circuit's test.  (Opp. at 21–23.)  Cox cites to the December 2014 Letter from Senator Feinstein to argue that the SSCI did not intend to retain control over copies of the SSCI Report.  (*Id.* at 21.)  Cox also disputes that the June 2009 Letter was an expression of the SSCI's intent with respect to the SSCI Report generally; instead, he argues, the letter only applied to the SSCI's dealings with the

CIA, did not represent a final agreement between the SSCI and the CIA, and was only intended
to address treatment of documents kept in the CIA reading room where SSCI staffers worked,
not the copies of the SSCI Report later transmitted to the CIA.  (*Id.* at 23–26.)

In their reply brief, the Agencies argue that the Supreme Court's decision in *Tax Analysts*
did not provide a conclusive "agency record" test, and that the D.C. Circuit's jurisprudence since
*Tax Analysts* enables "Congress to retain control of its documents when Congress sees fit to do
so."  (Reply Memorandum in Support of Defendants' Motion to Dismiss and for Summary
Judgment ("Reply") (Doc No. 52-35) at 15–16.)  The Agencies go on to argue that the SSCI
evinced its intent to retain control of the SSCI Report, disputing Cox's characterizations of the
June 2009 Letter and the December 2014 Letter from Senator Feinstein.  (Reply at 16–18.)  The
Agencies argue that Congress's intent to retain control of the SSCI Report is further supported
by the classification of copies of the reports.  (*Id.* at 17.)  Finally, responding to Cox's argument
that the Agencies have uploaded separate copies of the SSCI Report, and that those are therefore
agency records, the Agencies argue that they are not obligated to process duplicate records in
response to a FOIA request, and that even if some hard copies of the SSCI Report include agency
annotations, those documents remain congressional records not subject to FOIA.  (*Id.* at 20–21.)
In his sur-reply brief, Cox argues once again against this Court adopting the D.C. Circuit's
"agency record" test.  (Plaintiff's Sur-Reply ("Sur-Reply") (Doc. No. 52-37) at 2–4.)  Cox goes
on to argue that if the Court adopts the D.C. Circuit's test, the Agencies have not met their
burden of establishing that Congress intended to retain control over copies of the SSCI Report
transmitted to the Agencies.  (*Id.* at 5–6.)  He contends that the Agencies have not presented any
evidence of the SSCI's intent to retain control over copies of the SSCI Report that is
contemporaneous with the SSCI's transmittal of those copies to the Agencies.  (*Id.* at 5.)  Finally,

Cox once again argues that the June 2009 Letter is not evidence of the SSCI's intent with respect to the copies of the SSCI Report transmitted to the Agencies. (*Id.* at 6–8.**)**

### B.      Motion for Summary Judgment

The Agencies' motion for summary judgment relates to Cox's FOIA requests for documents other than the final versions, draft versions, or portions of the SSCI Report. (Mot. at 34–54.) Specifically, the Agencies seek summary judgment that they are not improperly withholding records with respect to Cox's request numbers five through eight to DOJ, five and six to FBI, five through seven to DOD, four and five to ODNI, and four through six to the State Department. (Mot. at 35–37; DOD FOIA Request; DOJ FOIA Request; FBI FOIA Request; ODNI FOIA Request; State Department FOIA Request.) Cox describes these as the requests "seeking communications related to Defendants' treatment" of the SSCI Report. (Opp. at 27.) The Agencies seek to establish that (1) they conducted adequate searches for the requested records, (Mot. at 34–38), and (2) they properly withheld responsive records or portions of responsive records pursuant to the FOIA exemptions one, three, five, six, and seven, and released all reasonably segregable non-exempt portions of records, (Mot. at 38–55). *See* 5 U.S.C. § 552(b).

The scope of the motion has narrowed since it was filed. The Agencies produced documents in response to the FOIA requests after Cox filed this action, and continued to do so during briefing on the instant motions. (*See* Stein Decl. ¶¶ 7–9 (explaining that State Department informed Cox it had located and released responsive documents by letters dated March 23, 2018, April 27, 2018, and April 19, 2019); Second Brinkmann Decl. ¶¶ 1–11 (describing DOJ's supplemental search); Sur-Reply at 8 (noting that DOJ "supplemented its earlier search in response to Plaintiff's Opposition").) In light of these subsequent productions, Cox withdraws

his challenges to the adequacy of the searches conducted by the Agencies. (*See* Opp. at 28 (withdrawing challenges to adequacy of searches performed by the Department of State, the FBI, and the ODNI); Sur-Reply at 8–9 (withdrawing his challenges to the adequacy of searches performed by DOJ and DOD).) Furthermore, in his opposition and sur-reply, Cox withdraws any challenges to the Agencies' withholdings pursuant to exemptions three, six, and seven. (*See* Opp. at 31 (withdrawing general challenge to redactions made pursuant to exemption three); Opp. at 39 (withdrawing challenge to redactions regarding law enforcement techniques made pursuant to exemption seven); Sur-Reply at 11 (withdrawing challenge to information withheld pursuant to exemption six).)

Cox thus only argues that the Agencies' withholding of records pursuant to FOIA exemptions one and five was improper. *See* 5 U.S.C. §§ 552(b)(1), 552(b)(5). Regarding the exemption one withholdings – only made by the FBI – Cox argues that the FBI and CIA declarations in support of these withholdings "fail to provide sufficient detail to justify withholdings under (b)(1)." (Opp. at 29.) Cox specifically calls into question the FBI's withholding of "handwritten notes from the review of a draft version of the Executive Summary" (Bates numbers Cox-110–122) pursuant to exemption one based on the CIA's claim that they "contain details related to the current locations of covert CIA installations and former detention centers located abroad." (Shiner Decl. ¶ 11, 19.) Cox casts doubt on this explanation, arguing that "even in the *classified* version of the *Torture Study* the 'names of the countries that hosted CIA detention sites' are identified only by pseudonyms." (Opp. at 30.)

Cox makes a "limited request" that the Court review *in camera* the FBI record bearing the Bates number Cox-30 "[a]s a check" on the claims made by the FBI and CIA in the Shiner and Hardy Declarations. (Opp. at 31.) The brief email in question was produced with

substantial redaction pursuant to, among other exemptions, exemption one.  (*Id.*)  Cox argues

that it is "implausible," given the email's brevity, that it contains one of the categories of

classified information identified by the CIA in the Shiner Declaration or that it does not

otherwise contain segregable information.  (*Id.*)

In response, the Agencies contend that the Court should not grant Cox's request for *in*

*camera* review because the Shiner and Hardy Declarations are sufficiently detailed and entitled

to deference that outweighs Cox's "paper thin speculation."  (Reply at 27–28.)  With respect to

the specific records Cox discusses in his opposition – Bates numbers Cox-30 and Cox-110–122 –

the Agencies argue that Cox's speculative arguments fail to acknowledge that information was

withheld in these records based on the fact that they contained multiple types of classified

information (in the case of Cox-110–122) and fell under multiple FOIA exemptions (in the case

of Cox-30).  (Reply at 28–29.)  In further support of withholding the record, the Agencies note

that Cox-30 "contains the name of a covert officer."  (*Id.* at 29.)

With respect to the exemption five withholdings, Cox contends that the Agencies'

*Vaughn* affidavits and indexes fail "to provide sufficient detail to justify withholdings under

(b)(5)."  (Opp. at 32.)  Cox objects once again to the FBI's decision to withhold the handwritten

notes, Cox-110–122, arguing that the broad assertion of the exemption five deliberative process

privilege to these notes is unsupported because the notes "likely contain 'factual matter'" which

could be segregated from the deliberative material.  (*Id.*)

Next, Cox challenges the agencies' exemption five claims based on attorney-client

privilege, arguing that there is reason to believe attorneys' advice "led to . . . unlawful disposal

of records."  (Opp. at 32.)  Cox cites to documents that he claims suggest that in December 2014,

DOJ provided guidance to the CIA that "resulted in CIA attorneys directing CIA personnel to

intentionally delete an electronic copy of the *Torture Study*" while separate FOIA litigation regarding a request for that document was pending.  (*Id.* at 33.)  Cox also argues that agencies improperly surrendered copies of the SSCI Report in response to a request for copies of the Report from Senator Richard Burr, and suggests that DOJ guidance played a role in this decision as well.  (*Id.* at 35.)  According to Cox, the disposal of these copies of the SSCI Report violated FOIA preservation obligations as well as other federal records laws.  (*Id.* at 36–37.)  Just as the crime-fraud exception may prevent a party from asserting that communications with an attorney are subject to attorney-client privilege, Cox argues that the attorneys involved in the guidance described above "may have been involved in . . . the unlawful disposal of records," and that a crime-fraud exception to exemption five may apply.  (*Id.* at 32.)  For this reason, Cox requests that the Court conduct an *in camera* review of "a sample" of records withheld by the Agencies pursuant to exemption five, and specifically identifies particular documents withheld by the DOD and the State Department.  (*Id.* at 39.)

        In response, the Agencies first argue that the handwritten notes bearing Bates numbers Cox-110–122 were properly excluded under exemption five because they were part of "ongoing internal deliberations regarding the accuracy and protection of FBI equities in the [SSCI] Report."  (Reply at 30.)  Next, the Agencies address Cox's arguments related to the alleged DOJ guidance to dispose of documents.  The Agencies first note that it is "an open question" whether the crime-fraud exception applies to assertions of exemption five attorney-client privilege, and argue that it should not.  (Reply at 30–31.)  The Agencies then go on argue that DOJ's preservation guidance was "correct" and Cox has not shown the existence of a crime or fraud.  (*Id.* at 32–35.)  In his sur-reply, Cox largely stands on his prior briefing, but disputes the Agencies' characterization of their legal obligations to preserve records.  (Sur-Reply at 9–11.)

**STANDARD OF REVIEW**

The standards of review applicable to the Agencies' motion to dismiss and motion for summary judgment are discussed separately below.  However, the Court briefly notes one aspect of its review applicable to both motions: although Cox is proceeding *pro se*, he is also a lawyer, and therefore not entitled to the liberal construction of his pleadings normally afforded to *pro se* litigants.  (*See, e.g.*, Opp. at 30 (noting that Cox "represent[ed] Guantanamo detainees in *habeas* proceedings").)  *See Jaffe v. Capital One Bank*, No. 09-CV-4106 (PGG), 2010 WL 691639, at *2 (S.D.N.Y. Mar. 1, 2010) ("A lawyer proceeding *pro se* is not entitled to the special consideration that courts customarily grant to pro se parties." (citing *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)).

**DISCUSSION**

**I.      Motion to Dismiss**

The Agencies move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3) to dismiss Cox's claims that the Agencies are improperly withholding copies of the SSCI Report, portions of the SSCI Report quoted in other documents, and drafts of the SSCI Report, arguing that this Court lacks subject-matter jurisdiction because the request documents are not "agency records."  (Mot. 21–22.)  For the reasons below, this motion is denied.

**A.      Construing the Agencies' Motion as a Rule 12(b)(6) Motion**

First, a motion to dismiss on the basis that the requested documents are not agency records is properly brought on the merits – under Federal Rule of Civil Procedure 12(b)(6) or as a motion for summary judgment under Rule 56 – not Rules 12(b)(1) or 12(h)(3).  The Second Circuit has construed the mention of "jurisdiction" in § 552(a)(4)(B) "to reference remedial power, not subject-matter jurisdiction."  *Main Street Legal Servs, Inc. v. NSC*, 811 F.3d 542,

30

566–67 (2d Cir. 2016).  An agency's motion to dismiss based on the fact that the requested

documents are not "agency records" thus does not implicate the Court's *power* to order that

relief, but the merits of the action, and is therefore properly brought as a motion to dismiss for

failure to state a claim under Rule 12(b)(6).  As a district court in the D.C. Circuit recently

explained:

> Thus, notwithstanding section 552(a)(4)(B)'s reference to "jurisdiction[,]" Courts
> have long considered FOIA disputes that pertain to the nature of the defendant
> entity (i.e., is it an "agency"?) or the nature of the records at issue (i.e., are they
> "agency records"?) to relate to the merits of a plaintiff's claim that the defendant
> has violated the FOIA, rather than a court's authority to adjudicate the case. This
> means that a Rule 12(b)(1) motion to dismiss brought solely on the grounds that the
> court lacks subject-matter jurisdiction because the records are not "agency records"
> necessarily fails.

*Cause of Action Inst. v. Internal Revenue Serv.*, 390 F. Supp. 3d 84, 96 (D.D.C. 2019); *see also*

*Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 566 F.3d 219, 225 (D.C.

Cir. 2009) (explaining that the district court erred in dismissing the complaint under Rule

12(b)(1) based on the fact that the Office of Administration was not an agency subject to FOIA

but affirming the district court's dismissal pursuant to Rule 12(b)(6)).

The Agencies thus improperly seek dismissal for lack of subject-matter jurisdiction,

instead of bringing their motion on the merits.  However, where a motion is brought under

Federal Rule of Civil Procedure 12(b)(1) in error, a court "may 'construe [the] motion as one to

dismiss under 12(b)(6) (failure to state a claim upon which relief can be granted) or, in that both

parties have proffered and relied upon matters outside the pleadings, a motion for summary

judgment under Rule 56.'"  *Basile v. Levittown United Teachers*, 17 F. Supp. 3d 195, 206

(E.D.N.Y. 2014) (quoting *Newsom-Lang v. Warren Int'l*, 129 F. Supp. 2d 662, 666 (S.D.N.Y.

2001)).

Because the Agencies moved to dismiss pursuant to Rule 12(b)(1) and 12(h)(3), both the Agencies and Cox "relied upon matters outside the pleadings" in briefing this motion to dismiss. *Basile*, 17 F. Supp. 3d at 206. Still, the Court finds that the parties' briefing is not appropriate for conversion to summary judgment. In opposing the motion to dismiss for lack of jurisdiction, Cox argued that he should be entitled to discovery before the Court dismisses the action based on Congress's intent to control the SSCI Report. (Opp. at 26.) Furthermore, Cox expressed an interest in potentially cross-moving for summary judgment, and conversion of the motion would deprive him of the opportunity to do so. (Plaintiff's Response to Motion for Pre-Motion Conference (Doc. No. 32) at 2.) Ultimately, the Court cannot say, as is necessary to convert a Rule 12 motion to a motion for summary judgment, that the "parties should reasonably have recognized the possibility of conversion," so the Court declines to convert the Agencies' motion to dismiss into a motion for summary judgment. *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 357 (S.D.N.Y. 2016). Instead, the Court construes the Agencies' motion to dismiss as brought pursuant to Rule 12(b)(6). *See Basile*, 17 F. Supp. 3d at 206.

## B.     Standard of Review and Judicial Notice

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

In adjudicating a motion to dismiss pursuant to Rule 12(b)(6), the Court may "consider those documents submitted by the parties which are matters of public record or which are deemed included in the Complaint." *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 140 n.5 (E.D.N.Y. 2010) (citing *Pani, M.D. v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998)).  Cox appended to his second amended complaint the December 2012 Letter, the April 2014 Letter, the December 2014 Letter, and his FOIA requests to the Agencies.  (Compl., Exs. A–H.)  The Court may therefore consider these documents in adjudicating this motion to dismiss.  *See LaFlamme*, 702 F. Supp. 2d at 140 n.5.

The Court cannot take judicial notice of the June 2009 Letter for the purpose of this motion to dismiss.  This letter was not appended to or incorporated by reference in Cox's complaint.  (*See generally* Compl.)  Even if the Court could take judicial notice of this based on its (arguable) status as a public record, the Court could consider the document only for the fact of its existence, "not for the truth of the facts asserted" within the letter.  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).  It would therefore be improper for the Court to evaluate the June 2009 Letter for the purpose of determining the SSCI's intent regarding copies of the SSCI Report as it would not be using "the extraneous documents . . . to establish their existence, but rather to provide the reasoned basis for the court's conclusion."  *Id.*

### C.    "Agency Record" Test

FOIA does not define "agency record."  *See Forsham v. Harris*, 445 U.S. 169, 187 (1980) (Brennan, J., dissenting) ("The Court concedes, of course, that the statute itself does not define 'agency records.'").  However, FOIA explicitly excludes Congress from its definition of "agency."  *See* 5 U.S.C. § 551(1).  Accordingly, congressional documents are not agency records.  *See United We Stand Am., Inc. v. I.R.S.*, 359 F.3d 595, 597 (D.C. Cir. 2004) ("Because

Congress is not an agency, congressional documents are not subject to FOIA's disclosure requirement."). Yet, in its role overseeing executive branch agencies, Congress shares records with agencies. *See Goland v. Central Intelligence Agency*, 607 F.2d 339, 346 (D.C. Cir. 1978) (explaining that "Congress has undoubted authority to keep its records secret" but also "exercises oversight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress' originating intent"). As a result, the determination of whether the requested documents are agency or congressional records can be a complex, and ultimately decisive, inquiry in FOIA actions.

In *U.S. Dep't of Justice v. Tax Analysts*, the Supreme Court articulated a two-part test for whether a document constituted an "agency record" for the purposes of a FOIA request: (1) the agency must "create or obtain" the document and (2) the agency must have been "in control of the requested materials at the time the FOIA request is made." 492 U.S. at 144–45. The Court affirmed the judgment of the D.C. Circuit below, but in that decision, the D.C. Circuit had applied for the first time a four-factor test for determining whether an agency was "in control" of a document:

> [1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

*Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1069 (D.C. Cir. 1988); *see also Judicial Watch*, 726 F.3d 208, 218 (D.C. Cir. 2013) (stating that the D.C. Circuit "first announced this test in our own decision" in *Tax Analysts*). The Supreme Court did not discuss the D.C. Circuit's four-part control test in its *Tax Analysts* decision. However, in rejecting the Department of

Justice's argument that it was not "in control" of district court opinions because it lacked the power to alter the decisions' content, the Court explained, "By control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties." *Tax Analysts*, 492 U.S. at 145; *see also id.* at 147 ("The control inquiry focuses on an agency's possession of the requested materials, not on its power to alter the content of the materials it receives.").

Since *Tax Analysts*, the D.C. Circuit has continued to apply the four-part test for "control" of documents when determining if a requested document is an "agency record." *See Judicial Watch*, 726 F.3d at 218 (explaining that the Circuit applies the four-part test "in the usual case"). The D.C. Circuit has further held that the first two factors are dispositive with respect to documents "an agency has either obtained from, or prepared in response to a request from . . . the United States Congress." *Judicial Watch*, 726 F.3d at 221. This is because due deference to Congress requires focusing on Congress's intent to control the documents, "render[ing] the first two factors of the standard test effectively dispositive." *Id.*

Cox contends that the D.C. Circuit's approach to determining whether an agency is "in control" of a document is inconsistent with the "straightforward" test the Supreme Court applied in *Tax Analysts*. (Opp. at 19.) In support of his view that the Court announced a "straightforward" test for agency "control," Cox calls attention footnote six from the Supreme Court's opinion: "Because requested materials ordinarily will be in the agency's possession at the time the FOIA request is made, disputes over control should be infrequent." *Tax Analysts*, 492 U.S. at 146 n.6. (Opp. at 17.) According to Cox, this footnote is evidence that Supreme Court believed "control" should be a straightforward inquiry subject to no further limitation or analysis.

Cox's insistence that *Tax Analysts* announced an exhaustive "control" test precluding further doctrinal development is belied by a closer reading of that case. In his argument, Cox omits the remainder of the above footnote, which goes on to read: "In some circumstances, however, requested materials might be on loan to another agency, 'purposefully routed ... out of agency possession in order to circumvent [an impending] FOIA request,' or 'wrongfully removed by an individual after a request is filed.' We leave consideration of these issues to another day." *Tax Analysts*, 492 U.S. at 146 n.6 (citation omitted) (quoting *Kissinger v. Reporters Committee for Freedom of Press*, 445 U.S. 136, 155, n. 9 (1980)). The Supreme Court plainly recognized that "control" of agency records would not always be the straightforward inquiry that disposed of the case in *Tax Analysts* – in fact, it explicitly left the "control" inquiry open to further doctrinal development, particularly in circumstances where records are shared between government entities. *Id.*

Cox nevertheless insists that *Tax Analysts* is dispositive of the case before the Court. He likens the Agencies' position in the instant action to an argument advanced by the DOJ and rejected by the Supreme Court in *Tax Analysts*: that because the DOJ did not control the content of district court opinions, they were not agency records. (Opp. at 18 ("Each Defendant here, like the defendant in *Tax Analysts*, argues that it nevertheless 'does not control' the material at issue and that it is controlled by an entity not subject to FOIA. The Supreme Court rejected that argument, as this Court should here, as 'beside the point' on the basis that the 'control inquiry focuses on an agency's *possession* of the requested materials' not on whether it controls 'the content of the materials it receives.'" (citations omitted))). This analogy is specious. In *Tax Analysts*, the Supreme Court understood the DOJ to be advancing an "authorship-control" requirement – that an agency's control of a document would turn on the agency's "power to alter

the content of the materials it receives." *Tax Analysts*, 492 U.S. at 147.  The Court reasonably

rejected that argument, explaining that it would limit FOIA "essentially to documents generated

by the agencies themselves."  *Id.*  Here, the Agencies argue that they do not control the

documents because Congress retained control of them when transferring them to the Agencies.

This argument has little relation to "authorship-control" test the Supreme Court rejected in *Tax

Analysts*.

The Court need not resolve the dispute between Cox and the Agencies as to whether the

Supreme Court's holding in *Tax Analysts* was inconsistent with the D.C. Circuit's four-part test

for agency "control" of a record.  Before the Court is the narrow question of the proper test for

agency "control" of documents obtained from Congress.  This is a question with its own unique

constitutional considerations – and a question not before the Court in *Tax Analysts*.  *Cf. United

We Stand Am., Inc.*, 359 F.3d at 599 (explaining that "the connection between Congress and the

requested records implicates considerations not at issue in *Tax Analysts*, where a non-profit

organization sought disclosure of judicial opinions possessed by the Department of Justice").

In *Goland v. Central Intelligence Agency*, the D.C. Circuit explained the unique problems

that arise when congressional documents are treated as "agency records" merely by their transfer

to an agency subject to FOIA:

> Congress has undoubted authority to keep its records secret, authority rooted in the
> Constitution, longstanding practice, and current congressional rules. Yet Congress
> exercises oversight authority over the various federal agencies, and thus has an
> undoubted interest in exchanging documents with those agencies to facilitate their
> proper functioning in accordance with Congress' originating intent. If plaintiffs'
> argument were accepted, Congress would be forced either to surrender its
> constitutional prerogative of maintaining secrecy, or to suffer an impairment of its
> oversight role.

*Goland*, 607 F.2d at 346.  Cox refers to *Goland* as the D.C. Circuit's "original sin," arguing it

created an unduly restrictive definition of "agency record" for the purpose of protecting

37

congressional documents that were already subject to protection from disclosure under the FOIA exemptions.  (Sur-Reply at 4.)  Yet this view of the FOIA's exemptions as a self-contained mechanism for sorting documents to be disclosed from those properly withheld is inconsistent with long-established Supreme Court jurisprudence.  For instance, the Supreme Court previously held that, despite the absence of an on-point FOIA exemption, agencies did not improperly withhold documents enjoined from disclosure by a district court.  *See GTE Sylvania, Inc. v. Consumers Union of U. S., Inc.*, 445 U.S. 375, 387 (1980).  The *GTE Sylvania* Court reasoned that in passing FOIA Congress "was largely concerned with the unjustified suppression of information by agency officials."  *GTE Sylvania*, 445 U.S. at 385.  FOIA exemptions aside, there was no reason to read FOIA "to require an agency to commit contempt of court in order to release documents."  *Id.* at 387.

The disclosure of congressional documents also raises concerns separate from FOIA's primary goal of preventing "unjustified suppression of information by agency officials."  *GTE Sylvania*, 445 U.S. at 385.  Specifically, the disclosure of congressional documents raises unique constitutional concerns that Cox fails to adequately address.  Cox notes that "Defendants nowhere assert that the application of FOIA's exemptions to Defendants' copies of the *Torture Study* would be inadequate to protect any purported congressional restrictions," but does not address the question of why our constitutional system should leave it to the agencies to make this determination in the first place.  (Sur-Reply at 4.)  What if, as part of its oversight role, Congress wants to share documents with an agency while restricting public access to portions of those documents that would not fall within FOIA's exemptions?  Or what if Congress wants certainty as to the information that will be subject to public access *before* it releases them to agencies, as opposed to relying on agencies' and courts' subsequent assessments of whether particular

38

information falls within one of FOIA's enumerated exemptions?  Cox presents no answer to these concerns.  Far from hypothetical, these questions implicate the delicate separation of powers that underlies our constitutional system.  If Congress were forced to rely on predictions about agencies' and courts' assessments of applicable FOIA exemptions before sharing documents, its essential role as an oversight body would be severely inhibited.

Although they dispute the proper test to apply, the parties to this action agree that the Second Circuit has not adopted the D.C. Circuit's four-part test for agency control.[5]  (Mot. at 24; Opp. at 19.)  The Court concludes that FOIA is not best read as a statute that forces a choice between congressional oversight and the very congressional secrecy the statute protects by exempting Congress from its coverage.  Accordingly, the Court's inquiry into whether the documents at issue constitute agency records "turns on whether Congress manifested a clear intent to control the document[s]."  *Judicial Watch*, 726 F.3d at 221 (quoting *United We Stand America, Inc.*, 359 F.3d at 596); *see also Am. Civil Liberties Union*, 823 F.3d at 663.  As the D.C. Circuit explained in *Judicial Watch*, this inquiry focuses on the first two prongs of the four-part "control" test the Circuit has articulated.  *See Judicial Watch*, 726 F.3d at 221 (explaining that the focus on Congressional intent "renders the first two factors of the standard test effectively dispositive").  These two factors are: "[1] the intent of the document's creator to retain or relinquish control over the records; [and] [2] the ability of the agency to use and dispose of the record as it sees fit."  *Id.* at 218 (quoting *Tax Analysts*, 845 F.2d at 1069).  Finally, it is the Agencies' burden to establish that these records are not "agency records."  *See Tax Analysts*, 492 U.S. at 142 n.3 ("The burden is on the agency to demonstrate, not the requester to disprove, that

---

[5] Defendants do note that a district court within this Circuit appeared to apply an early variation of the four-part test in its decision in *Navasky v. Cent. Intelligence Agency*, 499 F. Supp. 269, 278 (S.D.N.Y. 1980).  However, as this decision, already not binding on this Court, predated the Supreme Court's decision in *Tax Analysts*, it is of little value in determining the legal question at issue here.

the materials sought are not 'agency records.'"); *see also Grand Cent. P'ship, Inc.*, 166 F.3d at 478.

### D.    Copies of the SSCI Report as Agency Records

The Agencies rely to a large extent on the SSCI's June 2009 Letter to the CIA to argue that the SSCI intended to retain control over copies of the SSCI Report.  However, as explained above, the Court cannot take judicial notice of this letter for the purposes of the instant motion to dismiss.  On the other hand, documents of which the Court can take judicial notice – including the December 2012 Letter, the April 2014 Letter, and the December 2014 Letter appended to Cox's complaint – provide mixed evidence of the SSCI's intent to relinquish control over the SSCI Report.  (December 2012 Letter; April 2014 Letter; December 2014 Letter; *see also* Compl., Exs. A–C (same).)

The Agencies accurately note the December 2012 Letter provides some support for the conclusion that the SSCI intended to retain control over the December 2012 SSCI Report.  In the December 2012 Letter, Senator Feinstein invited agency responses and noted, "After consideration of these views, I intend to present this report with any accepted changes again to the Committee to consider how to handle any public release of the report, in full or otherwise." (December 2012 Letter at 1.)  The Agencies cite the D.C. Circuit's analysis of this letter in *ACLU v. CIA*, arguing that the court found "the transmission of the 2012 draft made clear that the 'Committee intended to retain control over the Full Report.'"  (Mot. at 27 (quoting *Am. Civil Liberties Union*, 823 F.3d at 667)).  However, the D.C. Circuit's analysis of this letter appears to be largely premised on its prior examination of the June 2009 Letter, as is evident in the court's

statement that the December 2012 Letter "reinforced what had already been made clear in the June 2009 Letter."[6]  *Am. Civil Liberties Union*, 823 F.3d at 667.

If the December 2012 Letter contains indicia of the SSCI's intent to control the SSCI Report, it is difficult to ignore the absence of similar language in two subsequent letters from Senator Feinstein regarding the April 2014 SSCI Report and the December 2014 SSCI Report. In the April 2014 Letter, Senator Feinstein stated that she "encourage[d] and approve[d] the dissemination of the updated report to all relevant Executive Branch agencies."  (April 2014 Letter at 1–2.)  Then, in the December 2014 Letter, Senator Feinstein used language even more indicative of an intent to relinquish control:

> [T]he full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated.  To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit.

(December 2014 Letter at 1.)  Both of these letters provide compelling evidence that SSCI intended to "relinquish control" over the SSCI Report upon transmittal.  *Judicial Watch*, 726 F.3d at 218.  Looking at the second factor of the test, the letters – particularly the above-quoted lines from the December 2014 Letter – also provide substantial evidence that the SSCI granted the Agencies "the ability . . . to use and dispose of the record[s] as [they] s[aw] fit."  *Id.*

The Agencies separately argue that the fact that the SSCI sought declassification review of only the Executive Summary, and subsequently released only the Executive Summary publicly, supports the conclusion that it intended to retain control over the full versions of the SSCI Report.  (Mot. at 26.)  While this provides some evidence that the SSCI *did not* intend to

---

[6] The Agencies also point to an email from the SSCI Staff Director regarding the December 2012 SSCI Report. (Mot. at 28; Higgins Decl. ¶ 15 & Ex. E.)  However, as explained above, the Court cannot consider extrinsic evidence of this sort on a motion to dismiss pursuant to Rule 12(b)(6).

control the Executive Summary, the Court finds little support in this action alone for the conclusion that the SSCI intended to retain control over the non-Executive Summary portions of the SSCI Report.

The Agencies' remaining arguments in support of the conclusion that Congress intended to retain control over these records are not sufficient to justify dismissal here.  The Agencies point to the fact that the SSCI's proceedings during the creation of the report were in closed session, and that SSCI information is by default confidential, but these facts provide little insight into what the SSCI intended with the reports once the SSCI transmitted them to the Agencies.  (Mot. at 26.)  The Agencies' note that copies of the SSCI Report were marked "top secret" is even less instructive.  (*Id.*)  As Cox rightly argues, these restrictions on dissemination imposed by classification authorities *in the Executive Branch* provide no insight into the relevant congressional intent here.  (Opp. at 22.)  Finally, the Agencies argue that the Agencies' own treatment of the SSCI Report supports the conclusion that Congress intended to retain control over the reports.  (Mot. at 32.)  As the Agencies acknowledge, however, this evidence – even if the Court could consider it on the instant motion – is largely irrelevant to determining *congressional* intent under the "agency record" test applied in this case.  (*Id.*)

Based on the record before the Court, and drawing all inferences in Cox's favor, the Court cannot say that Congress "manifested a clear intent to control" the SSCI Report.  *Judicial Watch*, 726 F.3d at 221.  Accordingly, the Agencies' motion to dismiss is denied.

## II.    Motion for Summary Judgment

The Agencies move for summary judgment with respect to Cox's challenges to records withheld pursuant to FOIA exemptions one and five.  *See* 5 U.S.C. § 551(b)(1), (b)(5).  As noted

above, Cox has withdrawn any challenge to the Agencies withholdings under other exemptions or to the adequacy of the Agencies' searches.

### A.      Standard of Review and Applicable Law

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004).

"In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that . . . any withheld documents fall within an exemption to the FOIA."  *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citing 5 U.S.C. § 552(a)(4)(B)); *see also New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) ("For an agency to prevail on a summary judgment motion in a FOIA case, it 'must demonstrate that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements.'" (quoting *Ruotolo v. Dep't of Justice, Tax Div.*, 53 F.3d 4, 9 (2d Cir. 1995)).  In making this showing, agencies normally rely on affidavits that "describe the justifications for nondisclosure with reasonably specific detail, [and] demonstrate that the information withheld logically falls

43

within the claimed exemption." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."  *Id.*

    If the agencies have satisfied their burden, "the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate."  *Carney*, 19 F.3d at 812 (citation omitted); *see also Flores v. United States Dep't of Justice*, No. 15-CV-2627 (JMA), 2016 WL 7856423, at *9 (E.D.N.Y. Oct. 4, 2016), *report and recommendation adopted*, No. 15-CV-2627 (JMA) (RLM), 2017 WL 238425 (E.D.N.Y. Jan. 18, 2017), *aff'd*, 712 F. App'x 107 (2d Cir. 2018).  Agencies' affidavits in support of their withholdings are entitled to a presumption of good faith.  *See Carney*, 19 F.3d at 812; *Estate of Ghais Abduljaami v. U.S. Dep't of State*, No. 14-CV-7902 (RLE), 2016 WL 94140, at *2 (S.D.N.Y. Jan. 7, 2016) (same).  In addition to this presumption of good faith, "[c]ourts are to give deference 'to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review.'"  *Am. Civil Liberties Union v. Dep't of Def.*, 435 F. Supp. 3d 539, 554 (S.D.N.Y. 2020) (quoting *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 70 (2d Cir. 2012)).

    Courts may conduct *in camera* review of documents to evaluate an agency's claimed exemptions.  However, "[a] district court should not undertake *in camera* review of withheld documents as a substitute for requiring an agency's explanation of its claimed exemptions in accordance with *Vaughn*."  *Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 630 (S.D.N.Y. 2018) (quoting *Spirko v. U.S. Postal Service*, 147 F.3d 992, 997 (D.C. Cir. 1998)).  In adjudicating FOIA actions, "*[i]n camera* review is considered the exception, not the rule, and the

propriety of such review is a matter entrusted to the district court's discretion." *Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir. 1988) (citing *Donovan v. F.B.I.*, 806 F.2d 55, 59 (2d Cir. 1986)); *see also Am. Civil Liberties Union v. Office of the Dir. of Nat. Intelligence*, No. 10-CV-4419 (RJS), 2011 WL 5563520, at *12 n.9 (S.D.N.Y. Nov. 15, 2011) (same). The Second Circuit has described its approach to ordering *in camera* FOIA review as follows:

> With respect to *in camera* review, we adopted a restrained approach permitting such review where the record showed the reasons for withholding were vague or where the claims to withhold were too sweeping or suggestive of bad faith, or where it might be possible that the agency had exempted whole documents simply because there was some exempt material in them. By the same token, where the affidavit is sufficiently detailed to place the documents within the claimed exemptions, and where the government's assertions are not challenged by contrary evidence or a showing of agency bad faith, we have held that the district court should restrain its discretion to order *in camera* review.

*Halpern*, 181 F.3d at 292 (citations omitted). In general, a "district court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions." *Seife*, 298 F. Supp. 3d at 630.

### B.     Exemption One Withholdings

FOIA exemption one exempts from disclosure matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 551(b)(1). Executive Order 13,526 sections 1.4(c) and 1.4(d), the basis for the FBI and CIA's assertions that records are properly withheld under exemption one, establishes that information

> shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national

security in accordance with section 1.2 of this order, and it pertains to [among other categories] . . . (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; [or] (d) foreign relations or foreign activities of the United States, including confidential sources.

Classified National Security Information, Exec. Order No. 13,526 § 1.4, 75 Fed. Reg. 707 (Dec. 29, 2009).

Cox contends that the FBI and CIA *Vaughn* affidavits submitted in support of the FBI's exemption one withholdings lack sufficient detail. (Opp. at 29.) The Court agrees. The FBI and CIA's *Vaughn* affidavits are contradictory, vague, and ultimately insufficiently detailed for the Court to conduct meaningful review – or for Cox to meaningfully challenge – the FBI's exemption one withholdings.

In his *Vaughn* affidavit in support of the FBI's withholdings, Hardy states that the FBI withheld 29 pages in full. (Hardy Decl. ¶ 71.) Hardy explains that an unspecified number of the documents were withheld pursuant to exemption three by the CIA and that the remainder were withheld by the FBI pursuant to exemptions five, six, and seven. (*Id.*) This is at odds with the CIA's affidavit submitted with this case. Shiner's declaration includes extensive discussion of the CIA's withholdings pursuant to exemption one. (Shiner Decl. ¶¶ 13–32.) Because the FBI specifically identifies the single document it withholds pursuant to exemption one, Cox-123, Hardy's oversight would not, on its own, prevent the Court from conducting the required *de novo* review of the exemption one withholdings, so long as the CIA provided an adequate accounting of the documents it withheld pursuant to this exemption. (Hardy Decl. ¶ 34.) However, nowhere in the CIA's *Vaughn* affidavit does it specifically list the documents it is withholding pursuant to exemption one.

Instead, the CIA's *Vaughn* affidavit states that pursuant to exemption one it withheld classified information related to:

> (i) personnel associated with the former detention and interrogation program; (ii) the locations of covert Agency facilities, including former detention centers located abroad; (iii) information pertaining to specific intelligence activities, methods, and operations, including certain counterterrorism techniques; (iv) code words and pseudonyms; (v) classification and dissemination control markings; and (vi) relationships with foreign liaison partners.

(Shiner Decl. ¶ 15.)  Shiner goes on to describe each of these categories in detail, and in some cases, cite, apparently as an example, a document from which information was withheld pursuant to that category.  (*See, e.g.*, *id.* ¶ 19 (explaining the basis for withholding information relating to field installations and citing Cox-110–122 as an example of such withholding).)  But Shiner cites no documents withheld as related to other categories of classified information, such as "code words and pseudonyms," despite the fact that, according the Agencies' briefs, the CIA withheld documents pursuant to exemption one because they contained information related to these topics.  (Shiner Decl. ¶¶ 26–27 (explaining the basis for withholding unspecified "information . . . consist[ing] of code words and pseudonyms"); Reply at 28 (noting that Cox-110–122 "includes information about . . . codewords").)  In addition to not identifying the bases upon which each record was withheld, the CIA's *Vaughn* affidavit omits discussion of some records withheld pursuant to exemption one altogether.  Cox notes, for instance, that the CIA's affidavit fails to even mention Cox-30 in its affidavit, despite the fact it withheld information on this document pursuant to exemption one (as well as other exemptions).  (Opp. at 31, Ex. R; Shiner Decl.)

The problem with the FBI and CIA *Vaughn* affidavits is apparent from the Agencies' briefing.  In response to Cox's challenges, the Agencies provide additional information in their reply brief to support these withholdings pursuant to exemption one.  For instance, after Cox notes that the CIA fails to discuss its withholding of information in Cox-30, the Agencies inform the Court that Cox-30 contains the name of a covert officer.  (Reply at 29.)  Then, as part of their response to Cox's argument that it is implausible that Cox-110–122 in fact contained information

about the location of CIA detention facilities, the agencies state that the document in fact contains information related to *four* categories of classified information – "location of covert facilities[,] codewords[,] relationships with foreign liaison partners, and information regarding specific intelligence activities" –  and that Cox only identifies one category as questionable. (Reply at 28–29; Opp. at 30.)  While the Agencies present a reasonable explanation as to why Cox-110–122 *would* contain information about the location of detention facilities, (Reply at 29), this explanation is largely beside the point.  The information necessary for Cox to challenge the agencies' withholdings or for the Court to perform *de novo* review of those withholdings must present in an agency's *Vaughn* affidavit – not provided by counsel in an agency's reply brief. *Halpern*, 181 F.3d at 293.

While agency affidavits are entitled to a presumption of good faith – especially so in the national security context – these presumptions do not require a court to give the benefit of the doubt to attestations never made.  *See Carney*, 19 F.3d at 812; *Am. Civil Liberties Union*, 435 F. Supp. 3d at 554.  It is the FBI's burden to provide "fact-specific justification[s]" for its withholdings "that either (a) would permit [the FOIA litigant] to contest the affidavit in adversarial fashion, or (b) would permit a reviewing court to engage in effective *de novo* review of the [withheld] information."  *Halpern*, 181 F.3d at 293.  So long as the FBI and CIA *Vaughn* affidavits fail to identify all of the records the FBI withheld, and the CIA only vaguely states that it withheld documents because they contained information related to one (or more) of six specified topics, (Shiner Decl. ¶ 15), Cox cannot meaningfully challenge the FBI's exemption one withholdings and the Court cannot meaningfully review them.  In *Halpern*, the Second Circuit advised that the government may use "generalized justifications for certain types of redactions" under exemption one, but those "generalized descriptions must accompany, and not

substitute for, particularized descriptions of the context surrounding each of the individual redactions and/or documents." *Halpern*, 181 F.3d at 294. Here, the *Vaughn* affidavits supporting the FBI's withholdings under exemption one fall short of this standard. The CIA and FBI's omission of "fact-specific justification[s]" for the withheld information prevents Cox from "contest[ing] the affidavit in adversarial fashion" and prevents the Court from "engag[ing] in effective *de novo* review." *Halpern*, 181 F.3d at 293. Accordingly, the Court denies summary judgment with respect to the FBI's exemption one withholdings without prejudice.

Although the Court denies summary judgment with respect to the FBI's exemption one withholdings at this time, the Court also declines Cox's request to engage in *in camera* review of Cox-30, or any other documents withheld pursuant to exemption one. Instead, the CIA and FBI are directed to supplement their *Vaughn* submissions regarding the FBI's withholding pursuant to exemption one of documents responsive to Cox's FOIA request. *See Seife*, 298 F. Supp. 3d at 630 (explaining that a "court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions."). The FBI may renew its motion for summary judgment based on these supplemental *Vaughn* submissions if it chooses to do so.

### C.   Exemption Five Withholdings

FOIA exemption five exempts from disclosure matters that are "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "The exemption incorporates all normal civil discovery privileges, including the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege." *Nat'l Day Laborer Org. Network v. U.S.*

*Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 734–35 (S.D.N.Y. 2011) (quotation marks omitted), *amended on reconsideration* (Aug. 8, 2011).

All of the agencies withheld records pursuant to exemption five.  Cox argues that the Agencies' declarations fail to provide adequate justification for the records withheld pursuant to this exemption.  (Opp. at 32.)  With respect to only the FBI's exemption five withholdings, the Court agrees.

### 1.   Exemption Five Withholdings by the FBI

As an example of his objection to the Agencies' justifications for their exemption five withholdings, Cox cites the handwritten notes discussed above: Cox-110–122.  It appears that both the FBI and CIA claim that these notes can be withheld pursuant to exemption five based on the deliberative process privilege, (Hardy Decl. ¶ 49; Shiner Decl. ¶ 11), but, Cox argues, the FBI makes "no attempt at meaningfully connecting these records" to the standard for such a withholding and also appears to have failed to segregate and release factual material contained within the notes.  (Opp. at 32.)

The "deliberative process privilege" is a "sub-species of work-product privilege that covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002) (internal quotation marks and citations omitted). The purpose of the privilege is to protect candid intra-agency and inter-agency communication that might be stifled if communications were subject to public disclosure.  *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) ("The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is

50

to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government." (citations omitted) (quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975))).

Although it appears that both the CIA and the FBI sought to withhold Cox-110–122 pursuant to the exemption five deliberative process privilege, (Hardy Decl. ¶ 49; Shiner Decl. ¶ 11), the Court is left to infer this fact. In describing the basis for the CIA's withholdings pursuant to the exemption five deliberative process privilege, Shiner does not identify Cox-110–122 specifically as a document withheld. (Shiner Decl. ¶¶ 39–40.) Instead, after explaining that the CIA withheld documents "regarding the deliberations over the eventual public release of certain information in the Executive Summary of the SSCI Report," Shiner briefly mentions the withholding of "two non-email documents . . . related to these deliberations," one of which she identifies as Cox-110–122 and describes as "handwritten notes from the review of a draft version of the Executive Summary." (Shiner Decl. ¶ 11.)

The FBI's affidavit adds little to the justification for withholding these notes. The FBI's *Vaughn* affidavit includes a single paragraph to justify its withholdings pursuant to the exemption five deliberative process privilege followed by a footnote identifying – by the Court's count – 63 pages of records withheld in full or in part pursuant to the exemption. (Hardy Decl. ¶ 49.) The sum of the FBI's substantive justification for its withholding of Cox-110–122 pursuant to exemption five is as follows:

> The FBI relied on Exemption 5 and the deliberative process privilege to protect deliberations between FBI employees concerning information that was in draft form (working copies of the SSCI report), and handwritten notes and communications between FBI employees discussing these drafts and discussions, recommendations, and proposals for how FBI equities should be presented and/or protected within the final report.

(*Id.* ¶ 49.)  The FBI does not even provide a basis for the Court to conclude that the "handwritten notes" referred to in this paragraph are Cox-110–122.  The Agencies assure the Court this is the case in their reply brief, but that link is not established in the FBI's *Vaughn* affidavit.  (Reply at 30.)

The FBI not only fails to provide a detailed basis for its exemption five withholdings, but at times wholly fails to justify its decision to withhold documents in full.  The Court is obligated to make specific findings that the Agencies properly segregated and released non-exempt material.  *See Color of Change*, 325 F. Supp. 3d at 455.  In addition to challenging the limited support for Cox-110–122 and other documents being subject to the deliberative process privilege, Cox also challenges the decision to withhold Cox-110–122 in full.  Cox reasonably argues that "such 'handwritten notes' likely contain 'factual material' such as notes on the content of the [SSCI Report] itself."  (Opp. at 32.)  In contrast to this reasonable basis for doubting that these handwritten notes contain no segregable information, Shiner and Hardy provide only rote assurances that they have released all segregable material in the documents withheld.  (Shiner Decl. ¶ 40, Hardy Decl. ¶ 70.)  The Agencies are entitled to a presumption that they have adequately disclosed segregable material, but Cox specifically rebuts that presumption here – and the Agencies present no further basis upon which the Court could conclude they have released all segregable, non-exempt information withheld pursuant to exemption five.  *See Sussman*, 494 F.3d at 1117.

In sum, the Court concludes that the FBI has failed to provide *Vaughn* affidavits of reasonable specificity to support each record withheld pursuant to exemption five, *see Grand Cent. P'ship, Inc.*, 166 F.3d at 478, and has failed to present evidence to support a finding that it has released all segregable, non-exempt information in the records withheld pursuant to

52

exemption five, *see Hopkins*, 929 F.2d at 85.  Accordingly, the FBI's motion for summary

judgment with respect to its exemption five withholdings is denied without prejudice to renewal.

Instead of conducting *in camera* review, the Court orders the FBI and CIA to supplement

their *Vaughn* affidavits consistent with this Order.  *See Seife*, 298 F. Supp. 3d at 630 (explaining

that a "court should first offer the agency the opportunity to demonstrate, through detailed

affidavits and oral testimony, that the withheld information is clearly exempt and contains no

segregable, nonexempt portions.").  The problems identified above are not isolated to the FBI

and CIA's basis for withholding Cox-110–122, or merely to the exemption five withholdings

pursuant to the deliberative process privilege – they are in large part the same problems

identified above with respect to the *Vaughn* affidavits in support of the FBI's exemption one

withholdings.  Accordingly, the FBI and CIA are directed to supplement their *Vaughn*

submissions to adequately support the withholding of each record withheld pursuant to

exemption five, and to support the conclusion that they released all reasonably segregable

information in the records withheld.

### 2.  Exemption Five Withholdings by the Remaining Agencies

Cox presents no argument that any particular record withheld by the remaining four

agencies was not properly withheld pursuant to exemption five.  Instead, Cox challenges the

documents withheld by the Agencies pursuant to exemption five as attorney-client privileged and

seeks *in camera* review of a selection of documents because "publicly available facts suggest

that advice from attorneys led to, and attorneys themselves may have been involved in, the

unlawful disposal of records."  (Opp. at 32.)

All of the Agencies except ODNI withheld documents pursuant to exemption five based

on attorney-client privilege.  "Courts have construed Exemption 5 as covering materials

protected by the attorney-client privilege and, in doing so, have assumed that such a privilege attaches when the attorney is a government lawyer and the client a government entity." *In re Grand Jury Investigation*, 399 F.3d 527, 533 (2d Cir. 2005). Cox argues that because these documents may not be subject to exemption five if the crime-fraud exception applies, the Court should review "some responsive records *in camera* in order for the Court to determine *de novo*, as FOIA provides, whether [exemption five] properly applies or whether the smell of smoke indicates fire." (Opp. at 32.) Cox argues based on "publicly available facts" that this case may "present[] a rare situation" where attorney-client communications may not be properly withheld pursuant to exception five because the communications were made in furtherance a crime or fraud. (Opp. at 32.)

Cox points to two instances where he asserts that attorney-client privileged communications may have been in furtherance of a crime or fraud. First, Cox states that he has reason to believe guidance provided by DOJ attorneys to the CIA in December 2014 may have included advice to improperly dispose of SSCI Report copies during the pendency of *American Civil Liberties Union v. C.I.A.*, 105 F. Supp. 3d 35 (D.D.C. 2015), *aff'd*, 823 F.3d 655 (D.C. Cir. 2016). (Opp. at 33–35.) In support of this claim, he points to, among other documents, emails from SSCI staff to CIA officials stating that *they* have reason to believe that DOJ provided guidance to the CIA Inspector General about disposal of the SSCI Report, (Opp., Ex. S), as well as emails apparently related to the deletion of the SSCI Report, (*id.*, Ex. T), and emails suggesting that counsel for the CIA Inspector General advised deleting a copy of the SSCI Report, (*id.*, Exs. U, V).

Second, Cox claims that DOJ may have provided additional guidance in 2017 to the Agencies that resulted in the Agencies "intentionally alienating" their copies of the SSCI Report

in response to a demand that copies of the SSCI Report to be returned to the SSCI by Senator

Burr, then Chairman of the SSCI.  (Opp. at 35–37, Ex. X.)  Cox argues that this decision by the

Agencies to return their copies of the SSCI Report violated their obligations under FOIA and

federal records laws.  (*Id.* at 36–37.)  In light of his concerns about DOJ's guidance, Cox

requests that the Court review a sample of the records withheld by the Agencies pursuant to

exemption five which appear to relate to the DOJ guidance in question.  (Opp. at 38–39.)  Cox

requests that the Court review particular email chains involving the DOJ, the State Department,

and the CIA that were withheld by the DOD as attorney-client privileged.  (Opp. at 38–39;

Herrington Decl. ¶¶ 13–14.)  Cox also requests that the Court review documents withheld by the

State Department as attorney-client privileged.  (Opp. at 39; Stein Decl., Ex. A ("State

Department Vaughn Index") at 32–36.)

"It is indisputable that communications made in furtherance of an ongoing crime are not

protected by the attorney-client privilege."  *In re John Doe Corp.*, 675 F.2d 482, 491 (2d Cir.

1982).  However, as the Second Circuit has explained,

> [T]he crime-fraud exception does not apply simply because privileged
> communications would provide an adversary with evidence of a crime or fraud. If
> it did, the privilege would be virtually worthless because a client could not freely
> give, or an attorney request, evidence that might support a finding of culpability.
> Instead, the exception applies only when the court determines that the client
> communication or attorney work product in question was itself in furtherance of
> the crime or fraud.

*In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995).  Moreover, as the Agencies note, the law

is unsettled as to whether the crime-fraud exception applies to FOIA exemption five in the first

place.[7]  (Reply at 30–31.)  *See, e.g.*, *Sorin v. U.S. Dep't of Justice*, 280 F. Supp. 3d 550, 563 n.5

---

[7] The Supreme Court has previously held that an exception to a privilege rule did not apply when determining whether documents are subject to FOIA exemption five.  *See F.T.C. v. Grolier Inc.*, 462 U.S. 19 (1983).  In *Grolier*, the Court held that the "substantial need" exception to the work-product doctrine was not applicable in determining whether documents were properly withheld as work product under exemption five.  *Id.* at 28.  The Court reasoned

(S.D.N.Y. 2017) ("To the extent Sorin's brief could be construed as suggesting that the crime/fraud exception should apply, it is unclear whether a court construing FOIA could properly order disclosure based on the applicability of that exception."), *aff'd sub nom. Sorin v. United States Dep't of Justice*, 758 F. App'x 28 (2d Cir. 2018).

The Court need not address whether the crime-fraud exception applies to exemption five because Cox has not met his burden of establishing that review of these documents would reveal evidence that the communications were made in furtherance of criminal or fraudulent activity. The Court is conscious of the fact that its review at this stage of the litigation is *de novo*, and as a result, Cox should not be obliged to make a substantial showing with respect to the application of the crime-fraud exception before the Court reviews the Agencies' documents *in camera*. At the same time, Cox is challenging the propriety of the Agencies' withholdings pursuant to exemption five, and under the Second Circuit's "restrained approach," Cox must make *some* showing of "contrary evidence" or that is "suggestive of bad faith" by the Agencies before the Court

---

that exemption five was meant to apply to "discrete categor[ies]" of documents which are "not 'routinely' or 'normally' available to parties in litigation," and that importing an exception to the work-product doctrine would undercut Congress's intent to create "'workable' rules." *Id.* at 27; *see also Sears, Roebuck & Co.*, 421 U.S. at 149 n.16 ("The ability of a private litigant to override a privilege claim set up by the Government, with respect to an otherwise disclosable document, may itself turn on the extent of the litigant's need in the context of the facts of his particular case; or on the nature of the case. However, it is not sensible to construe the Act to require disclosure of any document which would be disclosed in the hypothetical litigation in which the private party's claim is the most compelling. Indeed, the House Report says that Exemption 5 was intended to permit disclosure of those intra-agency memoranda which would 'routinely be disclosed' in private litigation, and we accept this as the law." (citations omitted)). At least one court in this Circuit has expressed the opinion, without so holding, that the crime-fraud exception would apply to FOIA exemption five. *See Nat'l Immigration Project of Nat. Lawyers Guild v. U.S. Dep't of Homeland Sec.*, No. 11-CV-3235 (JSR), 2014 WL 6850977, at *5 (S.D.N.Y. Dec. 3, 2014) ("Given Congress's intent in enacting FOIA to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny, it is utterly implausible to suppose that Congress intended FOIA Exemption 5 to shield government documents when they were created for the purpose of furthering a crime or a fraud."); *but see Raytheon Aircraft Co. v. U.S. Army Corps of Engineers*, 183 F. Supp. 2d 1280, 1292 (D. Kan. 2001) (stating that it "appears that [the crime-fraud] exception would not apply in the FOIA context because [documents subject to the exception] would not be 'normally' disclosed").

conducts *in camera* review to test that the Agencies properly withheld these documents pursuant to exemption five.[8]  *See Halpern*, 181 F.3d at 292.

Cox fails to make any showing suggesting the existence of a crime or fraud related to 2014 DOJ guidance to the CIA.  In his opposition brief, Cox concedes that "[w]hether DOJ directly advised CIA or Defendants to make such deletions is not clear from the limited information available."  (Opp. at 34.)  Cox provides some evidence – largely based on an unsubstantiated Yahoo News Report – that the DOJ provided legal guidance of some sort to the CIA prior to the deletion of the SSCI Report.  (*See* Opp., Exs. S, W.)  Yet this is not evidence that the DOJ's guidance was related to the CIA's decision to delete these documents – let alone evidence that this guidance was "itself in furtherance of [a] crime or fraud."  *In re Richard Roe, Inc.*, 68 F.3d at 40.  Accordingly, Cox has not made a showing of "contrary evidence" or "bad faith" on the part of the Agencies to support *in camera* review of these documents.  *See Halpern*, 181 F.3d at 292.

With respect to the DOJ's 2017 guidance in response to Senator Burr's request for records, the Court finds that Cox fails to make a showing sufficient to justify *in camera* review.  First, Cox cites to no evidence establishing that the Agencies made this decision based on DOJ guidance – or that DOJ issued guidance in the first place.  (*See* Opp., Ex. X.)  But even if Cox were to establish this fact, he must do more than establish a disagreement about the legality of agency guidance to justify *in camera* review.  Cox and the DOJ plainly disagree about the Agencies' obligations to retain documents under FOIA as well as under federal record-keeping laws when Congress asks for documents to be returned.  (*See* Reply at 34–35; Sur-Reply at 9–

---

[8] To conclude otherwise would permit a FOIA litigant's unsupported claim that agency guidance was contrary to law, or that an agency issued guidance resulting in actions contrary to law, to be sufficient for a Court to conduct *in camera* review of attorney-client privileged documents in any FOIA case.  Such a policy would run contrary Congress's "intent to provide 'workable' rules" for the administration of FOIA.  *Grolier*, 462 U.S. at 27.

11.)  But if there in fact is a crime-fraud exception to exemption five, it must mean more than an entitlement to see legal guidance with which one disagrees.  For the Court to review these documents *in camera* based on a concern that the crime-fraud exception applies, Cox must make some initial showing that an agency's request for guidance, or the guidance provided, was "*itself in furtherance*" of the crime or fraud he claims occurred.  *In re Richard Roe, Inc.*, 68 F.3d at 40 (emphasis added).  Cox makes no such showing here.  Accordingly, his request for *in camera* review is denied.

Upon review of the *Vaughn* submissions from the DOJ, DOD, ODNI, and State Department, the Court finds that the Agencies carry their burden of establishing proper withholding of documents pursuant to FOIA exemption five, including the release of all segregable non-exempt information.  *See* 5 U.S.C. § 552(a)(4)(B).  The affidavits "demonstrate that the information withheld logically falls within the claimed exemption," they "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," and ultimately, appear "logical or plausible."  *Wilner*, 592 F.3d at 70.  Accordingly, DOJ, DOD, ODNI, and the State Department are entitled to summary judgment with respect to their exemption five withholdings.

## CONCLUSION

For the reasons set forth herein, the Agencies' motion to dismiss is denied, and the Agencies' motion for summary judgment is granted in part and denied in part.  Specifically, DOJ is granted summary judgment with respect to their withholding of records in response to Cox's requests numbered five through eight; DOD is granted summary judgment with respect to their withholding of records in response to Cox's requests numbered five through seven; ODNI is granted summary judgment with respect to their withholding of records in response to Cox's

requests numbered four and five; and the State Department is granted summary judgment with respect to their withholding of records in response to Cox's requests numbered four through six. The FBI's motion for summary judgment is denied without prejudice, and it is directed to supplement its *Vaughn* submissions in accordance with this Order.

      This matter is recommitted to Magistrate Judge Roanne L. Mann for all remaining pre-trial matters.

                      SO ORDERED.

Dated: Brooklyn, New York
       November 26, 2020

                          *Roslynn R. Mauskopf*

                          _____
                          ROSLYNN R. MAUSKOPF
                          Chief United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DOUGLAS COX,

               Plaintiff,                              **MEMORANDUM AND ORDER**

          v.                                 17-CV-3329 (RPK) (RLM)

DEPARTMENT OF JUSTICE, FEDERAL
BUREAU OF INVESTIGATION,
DEPARTMENT OF DEFENSE, OFFICE OF
THE DIRECTOR OF NATIONAL
INTELLIGENCE, and DEPARTMENT OF
STATE,

               Defendants.
-----------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

      Plaintiff Douglas Cox brings this suit under the Freedom of Information Act, 5 U.S.C.

§ 552 *et seq*., to compel five federal agencies to disclose a Senate report concerning the Central

Intelligence Agency's post-9/11 detention and interrogation program, as well as associated

documents.  The parties have now filed cross-motions for summary judgment, and Mr. Cox seeks

discovery.  For the reasons that follow, defendants' motion is granted, and Mr. Cox's motions are

denied.

## BACKGROUND

### I.     Factual Background

      The following facts are drawn from the parties' declarations, exhibits, and official

government records amenable to judicial notice.  *See Paskar v. City of New York*, 3 F. Supp. 3d

129, 134 (S.D.N.Y. 2014).

      In the days and weeks following the attacks of September 11, 2001, the Central Intelligence

Agency ("CIA") embarked on a covert detention and interrogation program to collect intelligence.

Press Release, Office of Senator Diane Feinstein (Apr. 3, 2014), Decl. of Vanna Blaine Ex. F (Dkt.

#60-2).  Over the next eight years, the CIA detained over one hundred individuals at clandestine facilities, employing "enhanced interrogation techniques" to obtain information.  *Ibid*.  In January 2009, the government terminated the initiative.  *Ibid*.

In March 2009, the Senate Select Committee on Intelligence ("SSCI" or the "Committee") launched an investigation of this program.  Decl. of Neal Higgins ¶ 10, *in* Decl. of Vanna Blaine (Dkt. #60-2) ("Higgins Decl.").  To facilitate the review, which would involve surveying millions of pages of CIA documents, the CIA and the SSCI negotiated terms of access for the SSCI's staffers.  Higgins Decl. ¶ 11; Letter from Sen. Dianne Feinstein to President Barack Obama (Dec. 14, 2012), Decl. of Douglas Cox Ex. F (Dkt. #60-12) ("Dec. 14, 2012 Letter").  In a letter to the CIA's director, the SSCI "agree[d] that the Committee . . . w[ould] conduct the study of the CIA's detention and interrogation program" under certain "procedures and understandings."  Letter from Sen. Dianne Feinstein to Director Leon Panetta (June 2, 2009), Blaine Decl. Ex. D ("June 2, 2009 Letter").  This letter established access protocols.  The SSCI agreed to conduct its review at a CIA location on a CIA-provided computer network.  *Ibid.*; *see* Higgins Decl. ¶ 11.  The SSCI also agreed to certain redaction rules.  June 2, 2009 Letter ¶ 9.

And especially relevant here, the June 2, 2009 letter stated that the SSCI's report would be the SSCI's property.  In particular, the SSCI specified that "[a]ny documents generated on the network drive . . . as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee."  June 2, 2009 Letter ¶ 6.  These documents, the SSCI stated, would "remain congressional records in their entirety," with "disposition and control over these records, even after the completion of the Committee's review, l[ying] exclusively with the Committee."  *Ibid*.  "As such," the letter added, "these records are not CIA records under the Freedom of Information Act or any other law."

*Ibid.*  "If the CIA receives any request or demand for access to those records from outside the CIA under the Freedom of Information Act or any other authority," the letter continued, "the CIA . . . will respond to the request or demand based upon the understanding that these are congressional, not CIA, records."  *Ibid.*

Parameters established, the SSCI began its review.  By December 2012, the Committee had completed a draft report, which the SSCI then circulated to members of the Executive Branch for comment.  Dec. 14, 2012 Letter, at 1.  After revisions, the SSCI approved the declassification and release of the report's Executive Summary and Findings and Conclusions in April 2014.  Letter from Sen. Dianne Feinstein to President Barack Obama (Apr. 7, 2014), Decl. of Vanessa R. Brinkmann Ex. L (Dkt. #60-3) ("Apr. 7, 2014 Letter").  At the same time, Senator Feinstein, who was then the SSCI's Chair, transmitted the full report to the White House.  The transmittal letter "encourag[ed] and approv[ed] the dissemination of the updated report to all relevant Executive Branch agencies."  *Ibid*.

On December 9, 2014, the SSCI "formally filed the full version of its Study . . . with the Senate and publicly released the declassified Executive Summary and Findings and Conclusions." Letter from Sen. Dianne Feinstein to President Barack Obama (Dec. 10, 2014), Decl. of Vanessa R. Brinkmann Ex. M ("Dec. 10, 2014 Letter").  The SSCI also transmitted the final 6,963-page report to the White House.  *See* Letter from Sen. Dianne Feinstein to President Barack Obama (Jan. 16, 2015), Decl. of Douglas Cox Ex. Z ("Jan. 16, 2015 Letter") (describing report length). The accompanying letter from Senator Feinstein stated that:

> the full report should be made available within the CIA and other components of the Executive Branch for
> use as broadly as appropriate to help make sure that this experience is never repeated.  To help achieve that
> result, I hope you will encourage use of the full report in the future development of CIA training programs,
> as well as future guidelines and procedures for all Executive Branch employees, as you see fit.

Dec. 10, 2014 Letter, at 1.

Senator Richard Burr then replaced Senator Feinstein as SSCI Chair.  Letter from Sen. Richard Burr to President Barack Obama (Jan. 14, 2015), Decl. of Vanessa R. Brinkmann Ex. J (Dkt. #60-3) ("Jan. 14, 2015 Letter"); *see Committee Members 114th Congress (2015-2016)*, U.S. Sen. Select Comm. on Intel., https://www.intelligence.senate.gov/about/committee-members-114th-congress-2015-2016.  On January 14, Senator Burr wrote to President Obama requesting the return of all copies of the report in the Executive Branch's possession.  Jan. 14, 2015 Letter. In his letter, Senator Burr stated that he "consider[ed] the report to be a highly classified and committee sensitive document" that "should not be entered into any Executive Branch system of records."  *Ibid*.  Senator Feinstein replied with a letter of her own two days later disagreeing with Senator Burr's request.  Jan. 16, 2015 Letter.

Over the next two years, Senator Feinstein wrote to various Executive Branch officials asking them to retain and read copies of the report.  *See, e.g.*, Letter from Sen. Dianne Feinstein to Secretary of Defense Ashton B. Carter (Feb. 23, 2015), Decl. of Douglas Cox Ex. J (Dkt. #60-12); Letter from Sens. Dianne Feinstein & Patrick Leahy to Att'y Gen. Loretta Lynch (Jul. 14, 2015), Decl. of Douglas Cox Ex. K (Dkt. #60-12) ("Lynch Letter I");  Letter from Sens. Dianne Feinstein & Patrick Leahy to Att'y Gen. Loretta Lynch & Director James Comey (Nov. 5, 2015), Decl. of Douglas Cox Ex. L; Letter from Sens. Dianne Feinstein & Patrick Leahy to Archivist David S. Ferriero (Apr. 13, 2016), Decl. of Douglas Cox Ex. N ("Ferriero Letter").

On May 16, 2016, the D.C. Circuit determined that the SSCI report was a congressional record not subject to the Freedom of Information Act ("FOIA").  *ACLU v. CIA*, 823 F.3d 655, 667-68 (D.C. Cir. 2016).

After the D.C. Circuit's decision, Senator Feinstein continued to encourage Executive

Branch officials to designate the report as a federal record.  Letter from Sen. Dianne Feinstein to

Att'y Gen. Loretta Lynch (Nov. 21, 2016), Decl. of Douglas Cox Ex. O ("Lynch Letter II").  She

also urged Attorney General Loretta Lynch and then Attorney General Jeff Sessions to "establish[]

[the report] as . . . an agency record pursuant to the Freedom of Information Act." *Ibid*.; Letter

from Sens. Dianne Feinstein, Mark R. Warner, Ron Wyden & Martin Heinrich to Att'y Gen. Jeff

Sessions, at 2 (Mar. 9, 2017), Decl. of Douglas Cox Ex. P ("Sessions Letter").  Meanwhile, Senator

Burr reiterated his request that Executive Branch agencies return all copies of the SSCI report.

Decl. of Eric F. Stein ¶ 12 (Dkt. #60-7) ("Stein Decl."); Email from Amanda J. Wall to Christina

Sanford (May 31, 2017, 8:57 AM), Stein Decl. Ex. I ("Wall Email").  Some agencies did so.  Letter

from Gen. Counsel Bradley A. Booker to Sen. Richard Burr (June 1, 2017), Decl. of Douglas Cox

Ex. Q (describing disposition of several copies); Decl. of Vanessa R. Brinkmann ¶ 13 (Federal

Bureau of Investigation ("FBI") copy returned; Department of Justice ("DOJ") copy with U.S.

district court); Decl. of Mark H. Herrington ¶¶ 6-7 (Dkt. #60-6) (Department of Defense ("DOD")

copies retained); Stein Decl. ¶ 12 (Department of State ("State") copy returned).

## II.      Procedural Background

On December 21, 2016, Mr. Cox submitted FOIA requests to five agencies: the DOJ, the

FBI, DOD, the Office of the Director of National Intelligence ("ODNI"), and State.  *See* Second

Am. Compl. ¶¶ 45, 66, 81, 95, 107 (Dkt. #26).  These requests sought the SSCI report, drafts the

SSCI circulated with the agencies, text of the report excerpted or quoted in other agency records,

and agency records detailing the report's transmission and handling.  *Ibid.*  Arguing that the report

was a congressional record exempt from FOIA, the agencies declined to search for the report,

drafts of the report, or excerpts or quotations from the report.  *See* Mem. & Order 11-22, *Cox v.*

*Dep't of Just.*, No. 17-CV-3329 (RRM) (RLM) (E.D.N.Y. Nov. 30, 2020) (Dkt. #53) ("Mem. &

Order").  The agencies did produce records concerning the report's transmission and handling,

redacting these records pursuant to FOIA's enumerated exemptions. *Ibid*.

Seeking the withheld records, Mr. Cox filed this suit on June 2, 2017. Compl. ¶ 2 (Dkt. #1). Defendants moved to dismiss Mr. Cox's FOIA claims pertaining to the report, drafts, and quotations and moved for summary judgment on Mr. Cox's claims challenging the redactions to the produced documents. Notice of Mot. to Dismiss and for Summ. J. (Dkt. #52); Mem. & Order 23. On November 30, 2020, then-presiding Judge Roslynn R. Mauskopf granted defendants' motion in part and denied it in part. Mem. & Order 1.

Judge Mauskopf denied defendants' motion to dismiss Mr. Cox's requests for the SSCI report, drafts, and excerpts and quotations. *Id*. at 30. Adopting the D.C. Circuit's framework for determining whether a document qualifies as an "agency record" under FOIA, *id.* at 39 (citing *Judicial Watch, Inc. v. U.S. Secret Serv.,* 726 F.3d 208 (D.C. Cir. 2013)), Judge Mauskopf nevertheless determined that she could not take judicial notice of defendants' evidentiary submissions on a motion to dismiss. *Id*. at 33. Therefore, she concluded that Mr. Cox's allegations as to the report's status precluded dismissal of his FOIA claims pertaining to the report, drafts, and quotations. *Id*. at 42.

Judge Mauskopf also granted in part and denied in part defendants' motion for summary judgment on Mr. Cox's FOIA claims challenging the withholding of information from the records the agencies did produce. *Id*. at 58-59. She determined that defendants adequately explained their redactions to all documents save those of the FBI. *Id.* at 53, 58. Therefore, she denied summary judgment as to the FBI documents, granted it as to the others, and invited defendants to renew their motion as to the FBI records after supplementing their submissions. *Id.* at 58-59.

Defendants now move for summary judgment on all of Mr. Cox's surviving FOIA claims. Notice of Second Mot. for Summ. J. (Dkt. #60). The remaining claims seek to vindicate Mr. Cox's

requests for copies and drafts of the final SSCI report held by the defendant agencies, as well as "portions [of these documents] that have been cut and pasted into, or quoted" elsewhere in defendants' records.  DOJ FOIA Request (3), Second Am. Compl. Ex. D (Dkt. #26-4) ("DOJ FOIA Request"); *accord* DOJ FOIA Request (1)-(4); FBI FOIA Request (1)-(4), Second Am. Compl. Ex. E (Dkt. #26-5) ("FBI FOIA Request"); DOD FOIA Request (1)-(4), Second Am. Compl. Ex. F (Dkt. #26-6) ("DOD FOIA Request"); ODNI FOIA Request (1)-(3), Second Am. Compl. Ex. G (Dkt. #26-7) ("ODNI FOIA Request"); State FOIA Request (1)-(3), Second Am. Compl. Ex. H (Dkt. #26-8) ("State FOIA Request"); Second Am. Compl. ¶¶ 12-112.  Mr. Cox's claim for FBI documents pertaining to the handling and transmission of the SSCI report also remains.  FBI Request (5)-(6); Second Am. Compl. ¶¶ 60-72.

Mr. Cox has filed a cross-motion for summary judgment.  Pl's Mem. in Opp'n & Cross-Mot. 1 (Dkt. #60-11) ("Pl.'s Mem. in Opp'n").  In the alternative, he seeks discovery under Federal Rule of Civil Procedure 56(d) and moves the Court to conduct an *in camera* review of one redacted FBI document, referred to as "Cox-30."  *Id.* at 1 & 44.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a factual dispute is material if it "might affect the outcome of the suit under the governing law." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quotations omitted).  In determining whether there is a genuine issue of material fact, a court evaluates the whole record, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant.  *See ibid*.  A nonmoving party can survive summary judgment only if there is

sufficient evidence to permit a rational trier of fact to find in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

In assessing the record, I consider cited "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [and] interrogatory answers." Fed. R. Civ. P. 56(c)(1)(A). I view "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quotations, alterations, and citation omitted).

Finally, *pro se* litigants typically enjoy special solicitude. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). Since Mr. Cox is a practicing lawyer, though, *see* Mem. & Order 30, he is not entitled to this consideration. *Holtz v. Rockefeller & Co. Inc.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) (quoting *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)).

## DISCUSSION

Defendants' motion for summary judgment is granted. The SSCI report, as well as drafts of and excerpts and quotations from that report are congressional records, not "agency records." Therefore, FOIA does not apply to these documents. Accordingly, defendants are entitled to summary judgment on Mr. Cox's requests for those materials under FOIA. In addition, since defendants have now adequately explained the redactions to the FBI records, defendants are also entitled to summary judgment on Mr. Cox's requests for materials that the FBI redacted. Mr. Cox's motion for discovery is denied as unmerited by the record, and the Court declines to conduct

an *in camera* review of Cox-30.

I.      **The Freedom of Information Act and Its Limits**

Congress enacted FOIA in 1967 to "permit access to official information long shielded unnecessarily from public view." *EPA v. Mink*, 410 U.S. 73, 80 (1973), *superseded by statute on other grounds*.   Under its mandate, "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).  District courts, in turn, possess the power to "enjoin" agencies "from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.* § 552(a)(4)(B).

But FOIA strikes a "careful[] balance[]" between transparency and confidentiality. *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980).  First, Congress expressly limited FOIA's application to "*agency* records." 5 U.S.C. § 552(a)(4)(B) (emphasis added).  The records of other components of the federal government—including Congress—are excluded from FOIA's mandate. *Id.* § 551(1)(A).  Such non-agency records need not be produced at all.  *Kissinger*, 445 U.S. at 150; *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 565-66 (2d Cir. 2016).

Second, Congress exempted nine specific categories of information within "agency records" from disclosure.  5 U.S.C. § 552(b).  The subjects these exemptions cover range from classified materials to federal-employee medical records.  5 U.S.C. §§ 552(b)(1)-(9).  When an exclusion applies, the agency typically must produce the document, but may redact exempted information.  5 U.S.C. § 552(b); *FBI v. Abramson*, 456 U.S. 615, 626 (1982).  The agency must justify any redactions it makes.  *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016).  Thus, while a litigant who seeks non-agency records will come away with nothing, a litigant who seeks "agency records" containing exempted information may still obtain a trove of documents, albeit in redacted

form.

## II.        Mr. Cox Is Not Entitled to the SSCI Report, Its Drafts, or Excerpts

Mr. Cox's first set of FOIA requests—for the SSCI report, its drafts, and excerpts—implicates FOIA's distinction between "agency records" and non-agency records.  Mr. Cox argues that he is entitled to redacted copies of those materials because they have become "agency records" within the meaning of Section 552.  But as the D.C. Circuit previously concluded, the SSCI report is a congressional record exempt from FOIA.  So are drafts of, and excerpts from, that report. Accordingly, defendants are entitled to summary judgment on these requests.

### A.        The *Judicial Watch* test properly implements the statutory distinction between "agency records" and congressional records.

I adhere to Judge Mauskopf's ruling that the D.C. Circuit's test in *Judicial Watch, Inc. v. U.S. Secret Serv.,* 726 F.3d 208 (D.C. Cir. 2013), should be used to decide whether the records in this case are "agency records" covered by FOIA.  *See* Mem. & Order 39.  That test determines whether a congressionally created document in the hands of an agency qualifies as an "agency record" based on (i) "the intent of the document's creator to retain or relinquish control over the records" and (ii) "the ability of the agency to use and dispose of the record as it sees fit."  *Judicial Watch, Inc.*, 726 F.3d at 218; *id*. at 221.  A document's status ultimately "turns on whether Congress manifested a clear intent to control the document."  *Id.* at 221 (quotations omitted).

Typically, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *Frommert v. Conkright*, 913 F.3d 101, 109 (2d Cir. 2019) (quoting *DiLaura v. Power Auth*., 982 F.2d 73, 76 (2d Cir. 1992)).  I am not persuaded to depart from that practice here.  The test developed by the D.C. Circuit and adopted by Judge Mauskopf properly accounts for separation-of-powers considerations.  To be sure, as a general matter, "documents may qualify as 'agency records' if they (1) are created or obtained by

an agency, and (2) 'have come into the agency's possession in the legitimate conduct of its official duties.'" *Doyle v. U.S. Dep't of Homeland Sec.*, 959 F.3d 72, 76 (2d Cir. 2020) (quoting *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-45 (1989)).  But when a FOIA request implicates "constitutional prerogative[s]," the doctrine of constitutional avoidance favors giving the term "agency record" a construction that would avoid impinging on those prerogatives. *Id*. at 77.

The *Judicial Watch* test appropriately applies that principle in interpreting the term "agency record" in the context of congressionally created documents.  Mr. Cox seeks a sensitive report that Congress created to supervise Executive Branch activities.  Attempts to discover this report implicate both Congress's "constitutional prerogative of maintaining secrecy" and its oversight function. *Goland v. CIA*, 607 F.2d 339, 346 (D.C. Cir. 1978) (per curiam).  As the D.C. Circuit explained, "Congress has undoubted authority to keep its records secret, authority rooted in the Constitution, longstanding practice, and current congressional rules." *Ibid.*  But Congress also "exercises oversight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress'[s] originating intent." *Ibid.* (citations omitted).  If congressional documents were to become agency records whenever they came into an agency's lawful possession, Congress would be forced "either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role." *Ibid*.

The D.C. Circuit's approach in *Judicial Watch* gives effect to FOIA's disclosure mandate while protecting Congress's constitutional prerogatives.  It allows for the possibility that materials originating with Congress may indeed become agency records subject to FOIA. *See ACLU v. CIA*, 823 F.3d at 661-65 (discussing the development and application of the test).  But it permits Congress to safeguard the secrecy of confidential oversight documents that have been shared with

an agency but remain subject to continuing congressional control.  Because the *Judicial Watch* test implements FOIA while giving due respect to constitutional prerogatives, I apply that test here.

### B.     FOIA does not extend to the SSCI report or to drafts of the report.

The draft and final versions of the SSCI report are not "agency records" subject to FOIA. To demonstrate that the documents in question are congressional documents—rather than agency documents—under the *Judicial Watch* test, defendants must show that (i) Congress intended "to retain . . . control over the records," and (ii) the defendant agencies lacked the ability to "use and dispose of the record[s]" as they "s[aw] fit." *ACLU v. CIA*, 105 F. Supp. 3d 35, 45 (D.D.C. 2015) (quoting *Judicial Watch, Inc.*, 726 F.3d at 218), *aff'd*, 823 F.3d 655 (D.C. Cir. 2016).  As Judge Boasberg has explained, these "two factors represent two sides of the same coin."  *Ibid.*  "[An] agency—by definition—cannot lawfully 'control' . . . documents" once "Congress has manifested its own intent to retain control."  *Ibid.* (quoting *Paisley v. CIA*, 712 F.2d 686, 693 (1983)). Conversely, once Congress has relinquished control, an agency may use the documents as it sees fit.  *Ibid.*  Therefore, the *Judicial Watch* inquiry may be put more succinctly as simply inquiring whether "sufficient indicia of congressional intent to control" exist.  *Ibid.* (quoting *United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 600 (D.C. Cir. 2004)).  If they do, the document remains a congressional record.

An agency may show that Congress manifested its "intent to retain control over documents *either* when the documents [were] created *or* when the documents [were] transmitted to an agency." *ACLU v. CIA*, 823 F.3d at 664 (emphasis in original).  The agency bears the burden of demonstrating that the materials are not agency records.  *Doyle*, 959 F.3d at 76.  Once Congress's intent to control the documents is established, though, that evidence can "only be overcome if the record reveals that Congress subsequently acted to vitiate the intent."  *ACLU v. CIA*, 823 F.3d at 664.

Defendants have shown that the draft and final SSCI report are congressional documents, rather than agency records, under this test.  When Congress began its investigation in 2009, it "manifested a clear intent" to control both draft and final versions of the SSCI report.  *ACLU v. CIA*, 823 F.3d at 664 (quoting *Judicial Watch, Inc*., 726 F.3d at 221)).  The June 2, 2009 letter to the CIA outlining Congress's understanding of those documents unambiguously states that "[a]ny documents generated on the network drive" designated for use in creating the SSCI report, "as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee."  June 2, 2009 Letter ¶ 6.  The letter further specifies that "even after the completion of the Committee's review," these documents are to "remain congressional records."  *Ibid*.  And it specifies that requests for these documents are to be handled "based upon the understanding that these are congressional . . . records."  *Ibid*.  As the D.C. Circuit has explained, that language demonstrates the SSCI's intent to assert control over the SSCI report and its drafts.  *ACLU v. CIA*, 823 F.3d at 664-65.  The terms contain no expiration date.  *See* June 2, 2009 Letter.  And it permits limited disclosure within the Executive Branch only pursuant to "prior written authorization of the Committee."  *Id*. ¶ 6.  Clearer evidence of an "intent to control" these records is hard to imagine.  *ACLU v. CIA*, 823 F.3d at 663 (quoting *Judicial Watch, Inc*., 726 F.3d at 221).

Mr. Cox offers several arguments to explain away this letter, none of which are persuasive.  First, Mr. Cox argues that the letter does not govern the SSCI's final report, but only SSCI work-product located in the CIA Reading Room.  Pl.'s Mem. in Opp'n 32-37.  This claim runs aground on the letter's plain language, which provides that it applies both to "[a]ny documents generated on the network drive" *and* to "any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members."  June 2, 2009 Letter.  This

text "encompass[es] the Final Full Report, which by its own title is a 'final . . . report[] or other material[] generated by Committee staff or members.'" *ACLU v. CIA*, 105 F. Supp. 3d at 46 (quoting the June 2, 2009 Letter) (brackets omitted).

Mr. Cox also suggests that the letter ought to be read as part of an incomplete, unincorporated exchange and does not represent the final position of the SSCI.  Pl.'s Mem. in Opp'n 37, 41.  However, this claim lacks a basis in the record.  While the CIA and SSCI exchanged other communications, none contradicted the intent Congress expressed in its June 2, 2009 letter. *See* Fax from the CIA to the SSCI (June 8, 2009), Decl. of Douglas Cox Ex. T ¶¶ 3, 5.  In fact, the CIA's June 8 fax confirms Congress's control.  In this fax, the CIA refers to the report as "your [i.e., the SSCI's] . . . report," and it asks whether "the SSCI plan[ed] to allow the CIA to review the SSCI final report before publication."  *Id.* ¶ 3.  While the fax discussed a "few issues" that were still to be sorted out between the CIA and SSCI, its language indicates that the matter of who controlled the final SSCI report had already been settled.  *Id.* ¶ 1.  Absent other evidence contradicting the understanding expressed in the June 2, 2009 letter or the June 8, 2009 fax, this argument is speculative, and it is not enough to preclude summary judgment.

Finally, Mr. Cox contends that the June 2, 2009 letter only applies to the CIA.  But while the SSCI drafted the letter in the context of negotiations with the CIA, its language sweeps far more broadly.  In the letter, the SSCI expressly states that the SSCI's "documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee."  June 2, 2009 Letter ¶ 6.  Such language cannot be read to limit the SSCI's assertion of control as against the CIA alone.  In short, Congress "manifested a clear intent to control" the SSCI report and its drafts through its June 2009 letter.  *ACLU v. CIA*, 823 F.3d at 663 (quoting *Judicial Watch, Inc.*, 726

F.3d at 221).

Nor did Congress "subsequently act[] to vitiate" its control of the SSCI Report. *ACLU v. CIA.*, 823 F.3d at 664. On December 14, 2012, the SSCI transmitted a rough draft of the report to President Barack Obama to solicit "suggested edits or comments" from the Executive Branch. *See* Dec. 14, 2012 Letter, at 1. By stipulating that the SSCI would choose which edits to "accept[]" and "consider how to handle any public release of the report," the letter "undeniably reinforced what had already been made clear in the June 2009 Letter, *i.e.*, that the Committee intended to retain control over the Full Report." *ACLU v. CIA*, 823 F.3d at 667. On April 7, 2014, the SSCI transmitted a second version to the President, authorizing its dissemination to "relevant" agencies and explaining that the SSCI intended to release the report's Executive Summary and Findings and Conclusions publicly. Apr. 7, 2014 Letter, at 2. While this letter granted the President discretion in selecting which agencies ought to receive the report, the SSCI's decision to release portions of the report while limiting circulation of other portions underscored its continuing exercise of control.

Finally, on December 10, 2014, the SSCI sent President Obama a final version of the report. Dec. 10, 2014 Letter. In the accompanying letter, Senator Feinstein stated that "the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated." *Id*. at 1. She encouraged the President to use "the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit." *Ibid.* Here again, Congress expanded the President's discretion over use of the report within the Executive Branch. Affording discretion, though, is not the same as surrendering control. Like the earlier letters, this letter gave congressional directions concerning the permissible uses of

the report, by specifying purposes for which the report was to be used and establishing or implying limits to the Executive Branch's ability to dispose of the document as it wished. Without more, these letters do not "vitiate the command of the June 2009 Letter." *ACLU v. CIA*, 823 F.3d at 667.

Mr. Cox also argues that Senator Feinstein's subsequent letters show that Congress abandoned control over the SSCI report. Pl.'s Mem. in Opp'n 25-29. However, the subsequent letters are not probative. After Senator Burr replaced Senator Feinstein as SSCI Chair in 2015, the two senators sent dueling missives to various agencies. *Compare* Jan. 14, 2015 Letter *and* Wall Email *with* Jan. 16, 2015 Letter, Lynch Letter I, Ferriero Letter, Lynch Letter II, *and* Sessions Letter. Describing the report "a highly classified and committee sensitive document," Senator Burr directed that it "should not be entered into any Executive Branch system of records." Jan. 14, 2015 Letter. Senator Feinstein and several others, meanwhile, urged Attorney General Jeff Sessions to "establish the [report] as an agency record pursuant to FOIA." Sessions Letter, at 2. Later, Senator Burr reiterated his request that Executive Branch agencies return all copies of the SSCI report, again indicating that he continued to view the report as a congressional document. Stein Decl. ¶ 12; Wall Email. These contradictory letters do not offer a clear indication of subsequent congressional intent either to assert control over the report or to relinquish it after 2014.

By that same token, Mr. Cox's arguments concerning whether the White House established the report as a "presidential record" or the National Archives established it as a "federal record" are beside the point. Pl.'s Mem. in Opp'n 13, 15-19, 33; Pl.'s Reply 2, 7-8. Whether a document is a presidential record or federal record does not determine whether it is also an "agency record" under FOIA. *Compare* 44 U.S.C. §§ 2201, 2203 (presidential records) *and* 44 U.S.C. § 3303 *et seq.* (federal records) *with* 5 U.S.C. §§ 551, 552 (FOIA).

In sum, as the D.C. Circuit concluded, Congress asserted control over the SSCI report and its drafts in 2009. *ACLU v. CIA*, 823 F.3d at 667-68. The subsequent letters on which plaintiffs relied did not "vitiate the command of the June 2009 Letter." *Id.* at 663. As a result, neither the final SSCI report nor drafts of that report are agency records subject to FOIA.

### C.   Mr. Cox is not entitled to excerpts or quotations of the SSCI report contained in agency records.

Since the sections of the SSCI report and its drafts that are quoted in agency documents also fall outside of FOIA, Mr. Cox's claims for "portions" of the report "that have been cut and pasted into, or quoted in," other agency documents are also denied. DOJ FOIA Request (3); *accord* FBI FOIA Request (3); DOD FOIA Request (3); ODNI FOIA Request (2); State FOIA Request (2). *Judicial Watch* looks to "manifest[ations]" of congressional intent, not the actions of agencies, in determining what qualifies as an "agency record." *ACLU v. CIA*, 823 F.3d at 663. Congress's intent to control a document is not affected by an agency's decision to quote or embed that congressional document within an agency report. Indeed, respect for congressional prerogatives dictates that even a portion of an agency-created document that merely reveals the content of a congressional document becomes a "congressional document[] not subject to FOIA." *United We Stand Am., Inc.*, 359 F.3d at 603. That conclusion comports with the principles of constitutional avoidance that underlie *Judicial Watch*. Permitting an agency to turn any congressional document into an agency record by copying it would hamper Congress's ability to engage in oversight while still maintaining control over its documents. Congress would be "forced either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role." *Goland*, 607 F.2d at 346. As the D.C. Circuit has explained, constitutional avoidance counsels against a construction of the term "agency record" that would put Congress to such a choice.

*Doyle*, 959 F.3d at 77.  Accordingly, Mr. Cox is not entitled to portions of the draft or final SSCI report that are quoted in agency documents.

The same is true of the SSCI report copy that Mr. Cox alleges the DOD uploaded onto its network.  *See* Pl.'s Mem. in Opp'n 20.  Just as an agency cannot convert a portion of a congressional record into an agency record by copying it, neither can it convert it by copying the whole record.  The dispositive question remains Congress's intent to control a document it created, and as explained previously, the record indicates that Congress intended to control the report.  *See* pages 12-17, *supra*.

Finally, insofar as Mr. Cox recasts his FOIA inquiry as a request for agency records quoting the SSCI report rather than for the actual quotations themselves, *see* Second Am. Compl. ¶¶ 45, 66, 81, 95, 107; Pl.'s Mem. in Opp'n 38-40; Pl.'s Reply 3-4, Mr. Cox is not entitled to those materials in this lawsuit.  Mr. Cox's FOIA requests sought "portions of the *SSCI Report on Torture* that have been cut and pasted into, or quoted in," agency records, DOJ FOIA Request (3); *accord* FBI FOIA Request (3); DOD FOIA Request (3); ODNI FOIA Request (2); State FOIA Request (2), but did not seek agency records themselves.  Section 552 only authorizes district courts to order the production of agency records "improperly withheld."  5 U.S.C. § 552(a)(4)(B).  Since Mr. Cox never requested agency records containing these excerpts, the agencies cannot be said to have "improperly withheld" them.  *Ibid*.  Therefore, the Court lacks the power to compel their production.  *See Willis v. U.S. Dep't of Just.*, 581 F. Supp. 2d 57, 68 (D.D.C. 2008).

In sum, I grant defendants summary judgment on all of Mr. Cox's requests for the final report, its drafts, and excerpts.  These include Mr. Cox's DOJ requests (1)-(4), FBI requests (1)-(4), DOD requests (1)-(4), ODNI requests (1)-(3), and State requests (1)-(3).

**III.      Defendants Sufficiently Explain the Withholding of Information in the FBI Records**

Defendants are also entitled to summary judgment on Mr. Cox's challenge to the withholding of information in the requested FBI records.  Mr. Cox initially sought FBI records discussing copies of the SSCI report "previously in Department of Justice possession that were . . . disposed of" and records "regarding how the Department of Justice or . . . other entities should handle or treat copies" of the report.  FBI Requests (5)-(6).  In response, the FBI has produced 154 pages of documents.   The FBI and CIA redacted 144 pages pursuant to FOIA's statutory exemptions.  Seidel Decl. ¶ 17.

Mr. Cox did not contest the adequacy of the FBI's search.  *See* Pl.'s Mem. in Opp'n to Defs.' First Mot. for Summ. J. 24 (Dkt. #52-10) ("Pl.'s First Mem. in Opp'n").  And in response to defendants' first motion for summary judgment, Mr. Cox relinquished his opposition to their assertions of Exemptions 6, 7(C),[1] and 7(E).  *Id.* at 35; Pl.'s Sur-Reply 10 (Dkt. #52-37).  He also dropped his opposition to defendants' redactions pursuant to Exemption 3, except in Cox-30.  Pl.'s First Mem. in Opp'n 27.  However, Judge Mauskopf denied defendants summary judgment on Mr. Cox's fifth and sixth FBI requests because defendants did not explain their redactions pursuant to Exemptions 1 and 5 with sufficient specificity.  Mem. & Order 49 & 52.  Defendants supplemented their filings and also produced one more document, Cox-181.  They now move again for summary judgment.  Mr. Cox focuses his opposition to the redactions to Cox-30, and he does not contest the redactions to Cox-181.  *See* Pl.'s Mem. in Opp'n 42-43 & n.23.

---

[1] While Mr. Cox does not appear to have explicitly abandoned his challenge to the assertions of Exemption 7(C), Judge Mauskopf determined that he had, *see* Mem. & Order 27 ("[I]n his opposition and sur-reply, [Mr.] Cox withdr[e]w any challenges to the Agencies' withholdings pursuant to exemption[] . . . seven."), and Mr. Cox has not challenged her conclusion or renewed his opposition to the exemption's assertion.  Therefore, the Court "adhere[s] to" Judge Mauskopf's ruling and treats this challenge as abandoned.  *Vaughn v. Phoenix House N.Y. Inc*., 957 F.3d 141, 146-47 (2d Cir. 2020) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." (quotations omitted)).

Since Mr. Cox does not oppose the redactions to Cox-181, the Court grants defendants summary judgment on Cox-181 as unopposed.  With their supplement filings, defendants also carry their burden on the remaining contested documents.  Therefore, the Court grants defendants summary judgment on Mr. Cox's FBI requests (5) and (6) and declines to conduct an *in camera* review of Cox-30.

### A.   The FBI and CIA now adequately explain the assertions of FOIA Exemptions 1, 3, and 5.

Mr. Cox's only remaining challenge is to the FBI's and CIA's withholding of FBI materials pursuant to FOIA Exemptions 1 and 5 and the withholding of information in Cox-30 pursuant to Exemption 3.

A court reviews an agency's decision to withhold information *de novo*.  5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989).  The agency bears the burden of justifying its withholding, *U.S. Dep't of State v. Ray*, 502 U.S. 164, 174 (1991), and "[a]ll doubts are resolved in favor of disclosure," *Bloomberg, L.P. v. Bd. of Govs. of the Fed. Rsrv. Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (brackets and quotations omitted).  To meet its burden, an agency may produce "[a]ffidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption." *N.Y. Times v. CIA*, 965 F.3d 109, 114 (2d Cir. 2020) (quotations omitted).  Such affidavits and declarations "are accorded a presumption of good faith," and if "reasonably detailed," "suffic[e] to sustain the agency's burden" at summary judgment.  *Ibid.* (quotations omitted)

"[W]hen the information requested concerns national security," as it does here, "courts must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record."  *Ibid.* (quotations omitted; emphasis in original).  "Ultimately, an

agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Ibid*. (quoting *Wilner v. NSA*, 592 F.3d 60, 75 (2009)).

**B.      Defendants adequately explain their assertions of of Exemption 5.**

Applying these principles, the FBI and CIA have met their burden in explaining their application of Exemption 5 to the FBI materials.  Section 552(b)(5) exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption "withholds from a member of the public documents which a private party could not discover in litigation with the agency." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *NLRB v. Sears, Roebuck & Co*., 421 U.S. 132, 148 (1975)).  Included in this exemption is information that would be shielded by attorney-client privilege, *Tigue v. U.S. Dep't of Just*., 312 F.3d 70, 76 (2d Cir. 2002), and the deliberative-process privilege, *Klamath Water Users Protective Ass'n*, 532 U.S. at 8.

Attorney-client privilege "promote[s] open communication between attorneys and their clients so that fully informed legal advice may be given." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 360 (2d Cir. 2005) (quotations omitted).  It protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. DOJ*, 697 F.3d 184, 207 (2d Cir. 2012) (quotations omitted).  However, while the privilege "protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance," it "may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy." *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L.*, 697 F.3d at 207 (quotations omitted).

The deliberative-process privilege protects those documents that "reflect[] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath Water Users Protective Ass'n*, 532 U.S. at 8. Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," this privilege "enhance[s] the quality of agency decisions by protecting open and frank discussion among those who make them within the [g]overnment." *Id.* at 8-9 (internal quotations omitted).  Documents qualify for this privilege if they are "both predecisional and deliberative." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (quotations omitted).  "Generally, 'documents are predecisional if they were generated before the agency's final decision on a matter, and they are deliberative if they were prepared to help the agency formulate its position.'" *NRDC v. EPA*, 19 F.4th 177, 184 (2d Cir. 2021) (brackets omitted) (quoting *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021)).  Predecisional documents are those created "to assist an agency decisionmaker in arriving at his decision." *ACLU v. NSA*, 925 F.3d 576, 592 (2d Cir. 2019) (quotations omitted). To determine whether a document is deliberative, the court examines "whether the document was prepared to help the agency formulate its position, by analyzing if it reflects the give-and-take of the consultative process." *NRDC v. EPA*, 19 F.4th at 184 (quotations omitted).  The "key question" when evaluating assertions of the deliberative-process privilege is "whether disclosure would tend to diminish candor within an agency." *Id.* at 185 (quotations omitted).

The FBI and CIA have adequately explained the withholding of FBI records pursuant to Exemption 5.  The FBI and CIA withheld information in twenty-four and twenty FBI documents respectively on the basis of this exemption.  *See* Seidel Decl. ¶¶ 18, 19 & n.5; *id*. Ex. A ("FBI *Vaughn* Index"); Blaine Decl. Attachment A ("CIA *Vaughn* Index").  The FBI has categorized the

produced records into four categories: emails, letterhead memoranda, handwritten notes, and a white paper.  Seidel Decl. ¶ 20.  Its *Vaughn* index describes each document produced or withheld and the nature of the exempt information in each document.  *Ibid*.; *see generally* FBI *Vaughn* Index.  The Seidel Declaration also include a detailed explanation of the FBI's redactions pursuant to Exemption 5.  Seidel Decl. ¶¶ 37-62.

The subject matter of the materials withheld under deliberative-process privilege ranges from "suggested language changes, redactions and classification recommendations" for the SSCI report, *id.* ¶ 47, to "how best to address important revisions to a sensitive program run by another intelligence agency," *id.* ¶ 59.  The FBI also withheld information pursuant to the attorney-client privilege on a variety of matters—for example, advice on the legality of "the application of an investigative technique." *Id.* ¶ 44.  These topics are related to each document in the *Vaughn* index.  Through the Seidel Declaration and the FBI *Vaughn* index, the FBI has sufficiently explained its assertions of Exemption 5.

The same is true of the CIA's assertions of Exemption 5.  The Blaine Declaration explains in detail the information withheld under this exemption.  Under attorney-client privilege, the CIA withheld communications offering legal advice that the FBI had solicited.  Blaine Decl. ¶ 33.  The CIA also exempted, for example, information in "inter-agency communications related to the process by which the CIA and other Executive Branch agencies agreed to declassify certain national security information" in the SSCI report's Executive Summary, *id.* ¶ 34, as well as "requests and proposals for the distribution of the final report," *id.* ¶ 36.  As the CIA explains, none of the withheld information reflects "final decisions." *Ibid.*  Furthermore, the CIA describes the withholdings for each document in detail in its *Vaughn* index.  *See generally* CIA *Vaughn* Index.  This index can be cross-referenced with the disclosed documents, which are available as

an attachment to the Seidel Declaration. *See* Seidel Decl. Ex. B. Based on the declarations and the CIA's *Vaughn* index, the CIA has sufficiently explained its assertions of Exemption 5.

Mr. Cox only specifically challenges defendants' application of Exemption 5 to Cox-30, and these fall short. This document, an email chain with the subject line "RE: Hard Bound Copies of the SSCI Reports," contains redactions by both the FBI and CIA. *See* Cox-30, Seidel Decl. Ex. B ("Cox-30"). The FBI explains that it asserted Exemption 5 in connection with Cox-30 because that document contains "deliberations between FBI employees concerning the SSCI report, and communications between FBI employees discussing requests and proposals for distribution of the final report." FBI *Vaughn* Index. The FBI also explains that these deliberations "predate a final decision regarding the handling of the report" and do not reflect any "final decision[]." *Ibid*. Failure to protect these deliberations, the FBI warns, would "make FBI employees much more hesitant to provide their candid opinions when proposing actions or developing new FBI policies or procedures." *Ibid*. The CIA, for its part, asserts Exemption 5 to "protect pre-decisional and deliberative information regarding the handling of and access to the final SSCI report," squaring cleanly with the FBI's statement. CIA *Vaughn* Index.

These "reasonably detailed explanations" are "'logical [and] plausible.'" *N.Y. Times v. CIA*, 965 F.3d at 114 (quoting *Wilner*, 592 F.3d at 75)). The release of predecisional deliberations concerning the appropriate handling of a sensitive, highly classified report might well chill internal agency deliberations. Here, "whether disclosure would tend to diminish candor within an agency" is the "key question," and disclosing deliberations concerning how to handle a sensitive, highly classified report might well "diminish candor" in the future. *NRDC v. EPA*, 19 F.4th at 185 (internal quotations omitted).

Mr. Cox argues that the FBI's and CIA's explanations of their Exemption 5 redactions to Cox-30 conflict, since the CIA describes Cox-30 as discussing "inter-agency deliberations" whereas the FBI states that Cox-30 consists of emails between "FBI employees." Pl.'s Mem. in Opp'n 44-45 (emphasis omitted). He also suggests that the "brevity of this email exchange and the pedestrian nature of the subject line also raise questions about whether this could really constitute deliberative material." *Id.* at 45. These arguments lack merit. First, the CIA's and FBI's descriptions are not contradictory. To begin, the CIA—like the FBI—describes Cox-30 as "[e]mail between FBI employees." CIA *Vaughn* Index. Furthermore, it is entirely "plausible" and "logical," *N.Y. Times v. CIA*, 965 F.3d at 114 (quotations omitted), that FBI employees might discuss "inter-agency deliberations" internally, and that the "distribution of the final report" might implicate "inter-agency deliberations," FBI *Vaughn* Index. And Mr. Cox's argument that the brevity of the exchange and its subject line raise doubts that it "could really constitute deliberative material" is entirely speculative. Pl.'s Mem. in Opp'n 45. Applying the presumption of good faith to which the agencies' declarations are entitled, *N.Y. Times v. CIA*, 965 F.3d at 114, the declarations sufficiently explain the agencies' assertions of Exemption 5.

### C.    The agencies also adequately explain their assertions of Exemption 1.

Further, the agencies have adequately explained their assertions of Exemption 1.

Exemption 1 permits agencies to withhold records "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive Order No. 13,526 permits the classification of information pertaining to "intelligence sources or methods" or "foreign relations or foreign activities of the United States" when an "original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security." Exec.

Order No. 13,526 §§ 1.1(a)(3)-(4), 1.4(c)-(d), 75 Fed. Reg. 707, 707, 709 (Dec. 29, 2009).  Since information classified pursuant to Exemption 1 "concerns national security," the Court "must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record."  *N.Y. Times v. CIA*, 965 F.3d at 114 (quotations omitted; emphasis in original).

The FBI and CIA withheld information in nineteen documents pursuant to Exemption 1. *See* Seidel Decl. ¶¶ 26, 33; FBI *Vaughn* Index; CIA *Vaughn* Index.  The agencies' declarants, FBI Section Chief Michael G. Seidel and CIA Officer Vanna Blaine, are original classification authorities under Executive Order 13,526.  Seidel Decl. ¶ 2; Blaine Decl. ¶ 3.  Both officers reviewed the exempted information and determined that it was appropriately classified pursuant to the executive order.  Seidel Decl. ¶¶ 24-25; Blaine Decl. ¶ 13.  The subject matter of the FBI redactions includes topics ranging from the FBI's "intelligence methods" to information that could identify the "target of foreign counterintelligence/espionage investigation."  Seidel ¶¶ 26, 30.  The FBI's *Vaughn* index identifies the information withheld in each document.  FBI *Vaughn* Index. The FBI has met its burden with respect to its assertions of Exemption 1, because it has offered "reasonably detailed explanations" of why the withheld information "fall[s] within an exemption." *N.Y. Times v. CIA*, 965 F.3d at 114.

So has the CIA.  As the Blaine Declaration explains, "[a]ll classified information for which the CIA has asserted Exemption (b)(1) constitutes intelligence sources and methods information." Blaine Decl. ¶ 14.  FBI documents that the CIA redacted "contain the names of CIA personnel associated with the CIA's former detention and interrogation program," the location of field installations, codewords, and information about intelligence sources, methods, and activities.  *Id.* ¶ 18; *see id*. ¶ 18-31.  The CIA's *Vaughn* index, in turn, identifies the information withheld in each

document with reasonable specificity.  CIA *Vaughn* Index.  In sum, the CIA's submissions offer "plausible" and "logical" explanations of its assertions of the exemption.  *N.Y. Times v. CIA*, 965 F.3d at 114.

Mr. Cox again focuses his opposition on Cox-30 alone.  Pl.'s Mem. in Opp'n 42-43.  The FBI makes no Exemption 1 redactions to this document.  The CIA redacts one paragraph, explaining that it did so:

> to protect classified intelligence activities, sources and methods, and classified foreign activities of the CIA—includ[ing] category (i) information regarding personnel associated with the review of the former detention and interrogation program; and category (iii) information pertaining to specific intelligence activities, methods, and operations, including counterterrorism techniques.

CIA *Vaughn* Index.  This explanation is both "plausible" and "logical," as emails concerning the report might include information about the CIA's foreign intelligence activities.  *N.Y. Times v. CIA*, 965 F.3d at 114.  Furthermore, these claims are entitled to a presumption of good faith, *Grand Cent. P'ship, Inc.*, 166 F.3d at 489, and given the subject matter, must be accorded "substantial weight," *N.Y. Times v. CIA*, 965 F.3d at 114 (quotations and emphasis omitted).  Accordingly, this description adequately justifies the CIA's redaction of the single paragraph in Cox-30.

Mr. Cox presents no persuasive arguments to the contrary.  Mr. Cox first argues that the "inculpatory nature" of the SSCI report "creates an incentive for [d]efendants to conceal its contents," and so the agencies' assertions that materials are classified should be "approach[ed] . . . with caution."  *Id.* at 42.  But an agency's declarations are entitled to a presumption of good faith, rebuttable only when contradicted by evidence on the record or by a showing of bad faith.  *See N.Y. Times v. CIA*, 965 F.3d at 114; *accord Wilner*, 592 F.3d at 69; *Grand Cent. P'ship, Inc.*, 166 F.3d at 489.  The subject matter of the disclosures is not grounds for abandoning the presumption,

and Mr. Cox has not identified evidence contradicting the agencies' assertions or showing bad faith in this litigation.

Mr. Cox also asserts that it is "implausible" that an "exceedingly brief email exchange" could contain "information pertaining to specific intelligence activities, methods, and operations, including counterterrorism techniques" of the CIA.  Pl.'s Mem. in Opp'n 43.  But based on its subject line, this email thread discusses copies of the SSCI report, which itself details the CIA's intelligence activities.  Given the topic of this email thread, it seems entirely plausible that the FBI employees might have referred to the contents of the report, and that the report's contents included "information pertaining to specific intelligence activities . . . including counterterrorism techniques."  CIA *Vaughn* Index.

Finally, based on the subject line and timing of the email, Mr. Cox suggests that the CIA invoked the exemption to conceal misstatements to the D.C. Circuit.  "[I]f," Mr. Cox states, Cox-30 "were, for example, discussing FBI's use of CIA copies" of the SSCI report, it "could" mean that a declaration filed by the DOJ in litigation was "technically true, but grossly misleading."  Pl.'s Mem. in Opp'n 44.  These claims are entirely speculative, and the Court "cannot base [its] judgment on mere speculation."  *Wilner*, 592 F.3d at 75.  Absent evidence of bad faith, the CIA is entitled to a presumption of good faith in its representations.  *Id.* at 69 (citation omitted).

Accordingly, I conclude that defendants have also met their burden as to Exemption 1.

### D.    The Court does not reach the CIA's assertion of Exemption 3 for Cox-30.

Because Exemption 1 and Exemption 5 adequately support all of the CIA's redactions to Cox-30, the Court need not address Mr. Cox's objections to the CIA's assertion of Exemption 3 as an additional ground for certain redactions.  "[E]xemptions 1 and 3 are separate and independent grounds" to justify withholding information, *Wilner*, 592 F.3d at 72, and "courts may uphold agency action under one exemption without considering the applicability of the other," *ibid*.

(quoting *Larson v. Dep't of State*, 565 F.3d 857, 862-63(D.C. Cir. 2009)).   Since the CIA has adequately justified its redactions to Cox-30 based on Exemption 1, the Court need not address the agency's assertion of Exemption 3.

>   **E.   Mr. Cox's request for *in camera* review is denied.**

Mr. Cox's request for an *in camera* review of Cox-30 is denied.   The Second Circuit has adopted a "restrained approach" to such review, *Halpern v. FBI*, 181 F.3d 279, 292 (2d Cir. 1999), directing that "[a] court should only consider information *ex parte* and *in camera* that the agency is unable to make public if questions remain after the relevant issues have been identified by the agency's public affidavits and have been tested by plaintiffs," *Wilner*, 592 F.3d at 75-76.   "When the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate."   *Rutigliano v. U.S. Dep't of Just.*, 847 F. App'x 86, 87 (2d Cir. 2021) (quoting *Larson*, 565 F.3d at 870) (summary order).   Since the defendant agencies have adequately explained their redactions to Cox-30, *see* pages 20-29, *supra*, an *in camera* review of that document would not be "appropriate," *Rutigliano*, 847 F. App'x at 87.

**IV.   Mr. Cox's Motion for Discovery Is Denied**

Finally, Mr. Cox's motion for discovery is denied.   In the context of FOIA, discovery is rarely warranted.   *See, e.g.*, *Immerso v. U.S. Dep't of Lab.*, No. 19-CV-3777 (NGG) (VMS), 2020 WL 8996744, at *3 (E.D.N.Y. Mar. 2, 2020); *Est. of Ghais Abduljaami v. U.S. Dep't of State*, No. 14-CV-7902 (RLE), 2016 WL 94140, at *3 (S.D.N.Y. Jan. 7, 2016); *N.Y. Times Co. v. U.S. Dep't of the Treasury*, No. 15-CV-5740 (ER), 2016 WL 4147223, at *5 (S.D.N.Y. Aug. 2, 2016) (citing *Beltranena v. Clinton*, 770 F. Supp. 2d 175, 187 (D.D.C. 2011)).   To obtain discovery where, as here, the defendant agencies' submissions "are adequate on their face," Mr. Cox "must make a showing of bad faith on the part of the agency sufficient to impugn the agenc[ies'] affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agenc[ies]

should not apply or summary judgment is otherwise inappropriate." *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994) (citations omitted).

Mr. Cox makes no such showing.   He identifies neither "contrary evidence," nor representations or actions or statements "suggestive of bad faith." *Halpern*, 181 F.3d at 292. Instead, his argument turns entirely on the idea that "[d]efendants' heavily-lawyered declarations and cherry-picked documents" are insufficient to support summary judgment.   Pl.'s Mem. in Opp'n 41.   Rhetoric aside, Mr. Cox has the law backward.   FOIA cases are "most appropriately resolved on motions for summary judgment" using precisely these sorts of documents, *not* through discovery. *Robbins Geller Rudman & Dowd LLP v. U.S. Sec. & Exch. Comm'n*, 419 F. Supp. 3d 523, 530 (E.D.N.Y. 2019) (quoting *Platsky v. Food & Drug Admin.*, No. 13-CV-6250 (SLT) (RLM), 2014 WL 7391611, at *3 (E.D.N.Y. Dec. 24, 2014), *aff'd* 642 Fed. Appx. 63 (2d Cir. 2016), *as amended* (Jun. 21, 2016)).   Without more than "purely speculative claims," Mr. Cox is not entitled to discovery. *Grand Cent. P'ship, Inc.*, 166 F.3d at 489 (quotations omitted).

## CONCLUSION

Defendants' motion for summary judgment is granted.   Plaintiff's cross-motion for summary judgment is denied.   Mr. Cox's request for *in camera* review and his motion for discovery under Rule 56(d) are also denied.   The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

/s/ Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated: March 30, 2022
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
DOUGLAS COX,

                 Plaintiff,                       JUDGMENT
                                               17-CV-3329 (RPK) (RLM)

    -against-

DEPARTMENT OF JUSTICE, FEDERAL BUREAU
OF INVESTIGATION, DEPARTMENT OF DEFENSE,
OFFICE OF THE DIRECTOR OF NATIONAL
INTELLIGENCE, and DEPARTMENT OF STATE,

                 Defendants.
------------------------------------------------------------ X
       A Memorandum and Order of Honorable Rachel P. Kovner, United States District Judge,

having been filed on March 30, 2022, granting Defendants' motion for summary judgment;

denying Plaintiff's cross-motion for summary judgment; and denying Mr. Cox's request for *in*

*camera* review and his motion for discovery under Rule 56(d); it is

       ORDERED and ADJUDGED that Defendants' motion for summary judgment is granted;

that Plaintiff's cross-motion for summary judgment is denied; and that Mr. Cox's request for *in*

*camera* review and his motion for discovery under Rule 56(d) are also denied.

Dated: Brooklyn, NY                            Brenna B. Mahoney
       March 31, 2022                     Clerk of Court

                                            By: */s/Jalitza Poveda*_____
                                              Deputy Clerk

SEC. 2. *Revocation of Orders.* Executive Order 13771 of January 30, 2017 (Reducing Regulation and Controlling Regulatory Costs) [former 5 U.S.C. 601 note], Executive Order 13777 of February 24, 2017 (Enforcing the Regulatory Reform Agenda) [former 5 U.S.C. 601 note], Executive Order 13875 of June 14, 2019 (Evaluating and Improving the Utility of Federal Advisory Committees) [former 5 U.S.C. App. note], Executive Order 13891 of October 9, 2019 (Promoting the Rule of Law Through Improved Agency Guidance Documents) [former 5 U.S.C. 601 note], Executive Order 13892 of October 9, 2019 (Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication) [formerly set out above], and Executive Order 13893 of October 10, 2019 (Increasing Government Accountability for Administrative Actions by Reinvigorating Administrative PAYGO) [former 5 U.S.C. 601 note], are hereby revoked.

SEC. 3. *Implementation.* The Director of the Office of Management and Budget and the heads of agencies shall promptly take steps to rescind any orders, rules, regulations, guidelines, or policies, or portions thereof, implementing or enforcing the Executive Orders identified in section 2 of this order, as appropriate and consistent with applicable law, including the Administrative Procedure Act, 5 U.S.C. 551 *et seq.* If in any case such rescission cannot be finalized immediately, the Director and the heads of agencies shall promptly take steps to provide all available exemptions authorized by any such orders, rules, regulations, guidelines, or policies, as appropriate and consistent with applicable law. In addition, any personnel positions, committees, task forces, or other entities established pursuant to the Executive Orders identified in section 2 of this order, including the regulatory reform officer positions and regulatory reform task forces established by sections 2 and 3 of Executive Order 13777 [former 5 U.S.C. 601 note], shall be abolished, as appropriate and consistent with applicable law.

SEC. 4. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN, JR.

## § 552. Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format—

(i) that have been released to any person under paragraph (3); and

(ii)(I) that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; or

(II) that have been requested 3 or more times; or

(E) a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the

record where the deletion was made. Each agency shall also maintain and make available for public inspection in an electronic format current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

(D) For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

(E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)))[1] shall not make any record available under this paragraph to—

(i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

(ii) a representative of a government entity described in clause (i).

(4)(A)(i) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

(ii) Such agency regulations shall provide that—

(I) fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

(II) fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

(III) for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

(iii) Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

(iv) Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only

the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section—

(I) if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

(II) for any request described in clause (II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

(v) No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

(vi) Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

(vii) In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: *Provided,* That the court's review of the matter shall be limited to the record before the agency.

(viii)(I) Except as provided in subclause (II), an agency shall not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) under this subparagraph if the agency has failed to comply with any time limit under paragraph (6).

(II)(aa) If an agency has determined that unusual circumstances apply (as the term is defined in paragraph (6)(B)) and the agency provided a timely written notice to the requester in accordance with paragraph (6)(B), a failure described in subclause (I) is excused for an additional 10 days. If the agency fails to comply with the extended time limit, the agency may not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees).

(bb) If an agency has determined that unusual circumstances apply and more than 5,000 pages are necessary to respond to the request, an agency may charge search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) if the agency has provided a timely written notice to the requester in accordance with paragraph (6)(B) and the agency has discussed with the requester via written mail, electronic mail, or telephone (or made not less than 3 good-faith attempts to do so) how the requester could effectively limit the scope of the request in accordance with paragraph (6)(B)(ii).

(cc) If a court has determined that exceptional circumstances exist (as that term is defined in paragraph (6)(C)), a failure described in subclause (I) shall be excused for the length of time provided by the court order.

(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

(C) Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

[(D) Repealed. Pub. L. 98–620, title IV, §402(2), Nov. 8, 1984, 98 Stat. 3357.]

(E)(i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

(ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either—

(I) a judicial order, or an enforceable written agreement or consent decree; or

(II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

(F)(i) Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

(ii) The Attorney General shall—

(I) notify the Special Counsel of each civil action described under the first sentence of clause (i); and

(II) annually submit a report to Congress on the number of such civil actions in the preceding year.

(iii) The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

(G) In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

(5) Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

(6)(A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall—

(i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of—

(I) such determination and the reasons therefor;

(II) the right of such person to seek assistance from the FOIA Public Liaison of the agency; and

(III) in the case of an adverse determination—

(aa) the right of such person to appeal to the head of the agency, within a period determined by the head of the agency that is not less than 90 days after the date of such adverse determination; and

(bb) the right of such person to seek dispute resolution services from the FOIA Public Liaison of the agency or the Office of Government Information Services; and

(ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except—

(I) that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

(II) if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

(B)(i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency, and notify the requester of the right of the requester to seek dispute resolution services from the Office of Government Information Services. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

(iii) As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests—

(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

(II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

(III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

(iv) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

(C)(i) Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to com-

plete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

(ii) For purposes of this subparagraph, the term ''exceptional circumstances'' does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

(D)(i) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

(E)(i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records—

(I) in cases in which the person requesting the records demonstrates a compelling need; and

(II) in other cases determined by the agency.

(ii) Notwithstanding clause (i), regulations under this subparagraph must ensure—

(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records

after the agency has provided a complete response to the request.

(v) For purposes of this subparagraph, the term ''compelling need'' means—

(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

(vi) A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

(7) Each agency shall—

(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including—

(i) the date on which the agency originally received the request; and

(ii) an estimated date on which the agency will complete action on the request.

(8)(A) An agency shall—

(i) withhold information under this section only if—

(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or

(II) disclosure is prohibited by law; and

(ii)(I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and

(II) take reasonable steps necessary to segregate and release nonexempt information; and

(B) Nothing in this paragraph requires disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under subsection (b)(3).

(b) This section does not apply to matters that are—

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

(c)(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and—

(A) the investigation or proceeding involves a possible violation of criminal law; and

(B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

(2) Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.

(3) Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

(d) This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

(e)(1) On or before February 1 of each year, each agency shall submit to the Attorney General of the United States and to the Director of the Office of Government Information Services a report which shall cover the preceding fiscal year and which shall include—

(A) the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

(B)(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

(C) the number of requests for records pending before the agency as of September 30 of the

preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

(D) the number of requests for records received by the agency and the number of requests which the agency processed;

(E) the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

(G) based on the number of business days that have elapsed since each request was originally received by the agency—

(i) the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

(ii) the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

(iii) the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

(iv) the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

(H) the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

(I) the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest median number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

(J) data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

(K) data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

(L) the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

(M) the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

(N) the total amount of fees collected by the agency for processing requests;

(O) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests;

(P) the number of times the agency denied a request for records under subsection (c); and

(Q) the number of records that were made available for public inspection in an electronic format under subsection (a)(2).

(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

(3) Each agency shall make each such report available for public inspection in an electronic format. In addition, each agency shall make the raw statistical data used in each report available in a timely manner for public inspection in an electronic format, which shall be made available—

(A) without charge, license, or registration requirement;

(B) in an aggregated, searchable format; and

(C) in a format that may be downloaded in bulk.

(4) The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Oversight and Government Reform of the House of Representatives and the Chairman and ranking minority member of the Committees on Homeland Security and Governmental Affairs and the Judiciary of the Senate, no later than March 1 of the year in which each such report is issued, that such reports are available by electronic means.

(5) The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

(6)(A) The Attorney General of the United States shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President a report on or before March 1 of each calendar year, which shall include for the prior calendar year—

(i) a listing of the number of cases arising under this section;

(ii) a listing of—

(I) each subsection, and any exemption, if applicable, involved in each case arising under this section;

(II) the disposition of each case arising under this section; and

(III) the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4); and

(iii) a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

(B) The Attorney General of the United States shall make—

(i) each report submitted under subparagraph (A) available for public inspection in an electronic format; and

(ii) the raw statistical data used in each report submitted under subparagraph (A) available for public inspection in an electronic format, which shall be made available—

(I) without charge, license, or registration requirement;

(II) in an aggregated, searchable format; and

(III) in a format that may be downloaded in bulk.

(f) For purposes of this section, the term—

(1) "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) "record" and any other term used in this section in reference to information includes—

(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

(g) The head of each agency shall prepare and make available for public inspection in an electronic format, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including—

(1) an index of all major information systems of the agency;

(2) a description of major information and record locator systems maintained by the agency; and

(3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

(h)(1) There is established the Office of Government Information Services within the National Archives and Records Administration. The head of the Office shall be the Director of the Office of Government Information Services.

(2) The Office of Government Information Services shall—

(A) review policies and procedures of administrative agencies under this section;

(B) review compliance with this section by administrative agencies; and

(C) identify procedures and methods for improving compliance under this section.

(3) The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a nonexclusive alternative to litigation and may issue advisory opinions at the discretion of the Office or upon request of any party to a dispute.

(4)(A) Not less frequently than annually, the Director of the Office of Government Information Services shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President—

(i) a report on the findings of the information reviewed and identified under paragraph (2);

(ii) a summary of the activities of the Office of Government Information Services under paragraph (3), including—

(I) any advisory opinions issued; and

(II) the number of times each agency engaged in dispute resolution with the assistance of the Office of Government Information Services or the FOIA Public Liaison; and

(iii) legislative and regulatory recommendations, if any, to improve the administration of this section.

(B) The Director of the Office of Government Information Services shall make each report submitted under subparagraph (A) available for public inspection in an electronic format.

(C) The Director of the Office of Government Information Services shall not be required to obtain the prior approval, comment, or review of any officer or agency of the United States, including the Department of Justice, the Archivist of the United States, or the Office of Management and Budget before submitting to Congress, or any committee or subcommittee thereof, any reports, recommendations, testimony, or comments, if such submissions include a statement indicating that the views expressed therein are those of the Director and do not necessarily represent the views of the President.

(5) The Director of the Office of Government Information Services may directly submit additional information to Congress and the President as the Director determines to be appropriate.

(6) Not less frequently than annually, the Office of Government Information Services shall conduct a meeting that is open to the public on the review and reports by the Office and shall allow interested persons to appear and present oral or written statements at the meeting.

(i) The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

(j)(1) Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

(2) The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency—

(A) have agency-wide responsibility for efficient and appropriate compliance with this section;

(B) monitor implementation of this section throughout the agency and keep the head of

the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

(C) recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

(D) review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

(E) facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply;

(F) offer training to agency staff regarding their responsibilities under this section;

(G) serve as the primary agency liaison with the Office of Government Information Services and the Office of Information Policy; and

(H) designate 1 or more FOIA Public Liaisons.

(3) The Chief FOIA Officer of each agency shall review, not less frequently than annually, all aspects of the administration of this section by the agency to ensure compliance with the requirements of this section, including—

(A) agency regulations;

(B) disclosure of records required under paragraphs (2) and (8) of subsection (a);

(C) assessment of fees and determination of eligibility for fee waivers;

(D) the timely processing of requests for information under this section;

(E) the use of exemptions under subsection (b); and

(F) dispute resolution services with the assistance of the Office of Government Information Services or the FOIA Public Liaison.

(k)(1) There is established in the executive branch the Chief FOIA Officers Council (referred to in this subsection as the ''Council'').

(2) The Council shall be comprised of the following members:

(A) The Deputy Director for Management of the Office of Management and Budget.

(B) The Director of the Office of Information Policy at the Department of Justice.

(C) The Director of the Office of Government Information Services.

(D) The Chief FOIA Officer of each agency.

(E) Any other officer or employee of the United States as designated by the Co-Chairs.

(3) The Director of the Office of Information Policy at the Department of Justice and the Director of the Office of Government Information Services shall be the Co-Chairs of the Council.

(4) The Administrator of General Services shall provide administrative and other support for the Council.

(5)(A) The duties of the Council shall include the following:

(i) Develop recommendations for increasing compliance and efficiency under this section.

(ii) Disseminate information about agency experiences, ideas, best practices, and innovative approaches related to this section.

(iii) Identify, develop, and coordinate initiatives to increase transparency and compliance with this section.

(iv) Promote the development and use of common performance measures for agency compliance with this section.

(B) In performing the duties described in subparagraph (A), the Council shall consult on a regular basis with members of the public who make requests under this section.

(6)(A) The Council shall meet regularly and such meetings shall be open to the public unless the Council determines to close the meeting for reasons of national security or to discuss information exempt under subsection (b).

(B) Not less frequently than annually, the Council shall hold a meeting that shall be open to the public and permit interested persons to appear and present oral and written statements to the Council.

(C) Not later than 10 business days before a meeting of the Council, notice of such meeting shall be published in the Federal Register.

(D) Except as provided in subsection (b), the records, reports, transcripts, minutes, appendices, working papers, drafts, studies, agenda, or other documents that were made available to or prepared for or by the Council shall be made publicly available.

(E) Detailed minutes of each meeting of the Council shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the Council. The minutes shall be redacted as necessary and made publicly available.

(l) FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.

(m)(1) The Director of the Office of Management and Budget, in consultation with the Attorney General, shall ensure the operation of a consolidated online request portal that allows a member of the public to submit a request for records under subsection (a) to any agency from a single website. The portal may include any additional tools the Director of the Office of Management and Budget finds will improve the implementation of this section.

(2) This subsection shall not be construed to alter the power of any other agency to create or maintain an independent online portal for the submission of a request for records under this section. The Director of the Office of Management and Budget shall establish standards for interoperability between the portal required under paragraph (1) and other request processing

software used by agencies subject to this section.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 383; Pub. L. 90–23, § 1, June 5, 1967, 81 Stat. 54; Pub. L. 93–502, §§ 1–3, Nov. 21, 1974, 88 Stat. 1561–1564; Pub. L. 94–409, § 5(b), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 95–454, title IX, § 906(a)(10), Oct. 13, 1978, 92 Stat. 1225; Pub. L. 98–620, title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357; Pub. L. 99–570, title I, §§ 1802, 1803, Oct. 27, 1986, 100 Stat. 3207–48, 3207–49; Pub. L. 104–231, §§ 3–11, Oct. 2, 1996, 110 Stat. 3049–3054; Pub. L. 107–306, title III, § 312, Nov. 27, 2002, 116 Stat. 2390; Pub. L. 110–175, §§ 3, 4(a), 5, 6(a)(1), (b)(1), 7(a), 8–10(a), 12, Dec. 31, 2007, 121 Stat. 2525–2530; Pub. L. 111–83, title V, § 564(b), Oct. 28, 2009, 123 Stat. 2184; Pub. L. 114–185, § 2, June 30, 2016, 130 Stat. 538.)

HISTORICAL AND REVISION NOTES

1966 ACT

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1002. | June 11, 1946, ch. 324, § 3, 60 Stat. 238. |

In subsection (b)(3), the words "formulated and" are omitted as surplusage. In the last sentence of subsection (b), the words "in any manner" are omitted as surplusage since the prohibition is all inclusive.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

1967 ACT

Section 1 [of Pub. L. 90–23] amends section 552 of title 5, United States Code, to reflect Public Law 89–487.

In subsection (a)(1)(A), the words "employees (and in the case of a uniformed service, the member)" are substituted for "officer" to retain the coverage of Public Law 89–487 and to conform to the definitions in 5 U.S.C. 2101, 2104, and 2105.

In the last sentence of subsection (a)(2), the words "A final order * * * may be relied on * * * only if" are substituted for "No final order * * * may be relied upon * * * unless"; and the words "a party other than an agency" and "the party" are substituted for "a private party" and "the private party", respectively, on authority of the definition of "private party" in 5 App. U.S.C. 1002(g).

In subsection (a)(3), the words "the responsible employee, and in the case of a uniformed service, the responsible member" are substituted for "the responsible officers" to retain the coverage of Public Law 89–487 and to conform to the definitions in 5 U.S.C. 2101, 2104, and 2105.

In subsection (a)(4), the words "shall maintain and make available for public inspection a record" are substituted for "shall keep a record * * * and that record shall be available for public inspection".

In subsection (b)(5) and (7), the words "a party other than an agency" are substituted for "a private party" on authority of the definition of "private party" in 5 App. U.S.C. 1002(g).

In subsection (c), the words "This section does not authorize" and "This section is not authority" are substituted for "Nothing in this section authorizes" and "nor shall this section be authority", respectively.

5 App. U.S.C. 1002(g), defining "private party" to mean a party other than an agency, is omitted since the words "party other than an agency" are substituted for the words "private party" wherever they appear in revised 5 U.S.C. 552.

5 App. U.S.C. 1002(h), prescribing the effective date, is omitted as unnecessary. That effective date is prescribed by section 4 of this bill.

Editorial Notes

REFERENCES IN TEXT

The National Security Act of 1947, referred to in subsec. (a)(3)(E), is act July 26, 1947, ch. 343, 61 Stat. 495, which was formerly classified principally to chapter 15 (§ 401 et seq.) of Title 50, War and National Defense, prior to editorial reclassification in chapter 44 (§ 3001 et seq.) of Title 50. Section 3 of the Act is now classified to section 3003 of Title 50. For complete classification of this Act to the Code, see Tables.

The date of enactment of the OPEN FOIA Act of 2009, referred to in subsec. (b)(3)(B), is the date of enactment of Pub. L. 111–83, which was approved Oct. 28, 2009.

CODIFICATION

Section 552 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2243 of Title 7, Agriculture.

AMENDMENTS

2016—Subsec. (a)(2). Pub. L. 114–185, § 2(1)(A)(i), in introductory provisions, substituted "for public inspection in an electronic format" for "for public inspection and copying".

Pub. L. 114–185, § 2(1)(A)(iii), in concluding provisions, substituted "public inspection in an electronic format current" for "public inspection and copying current".

Subsec. (a)(2)(D). Pub. L. 114–185, § 2(1)(A)(ii), added subpar. (D) and struck out former subpar. (D) which read as follows: "copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and".

Subsec. (a)(4)(A)(viii). Pub. L. 114–185, § 2(1)(B), added cl. (viii) and struck out former cl. (viii) which read as follows: "An agency shall not assess search fees (or in the case of a requester described under clause (ii)(II), duplication fees) under this subparagraph if the agency fails to comply with any time limit under paragraph (6), if no unusual or exceptional circumstances (as those terms are defined for purposes of paragraphs (6)(B) and (C), respectively) apply to the processing of the request."

Subsec. (a)(6)(A)(i). Pub. L. 114–185, § 2(1)(C)(i), substituted "making such request of—" for "making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and" and added subcls. (I) to (III).

Subsec. (a)(6)(B)(ii). Pub. L. 114–185, § 2(1)(C)(ii), substituted "the agency, and notify the requester of the right of the requester to seek dispute resolution services from the Office of Government Information Services." for "the agency."

Subsec. (a)(8). Pub. L. 114–185, § 2(1)(D), added par. (8).

Subsec. (b)(5). Pub. L. 114–185, § 2(2), amended par. (5) generally. Prior to amendment, par. (5) read as follows: "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;".

Subsec. (e)(1). Pub. L. 114–185, § 2(3)(A)(i), in introductory provisions, inserted "and to the Director of the Office of Government Information Services" after "United States".

Subsec. (e)(1)(P), (Q). Pub. L. 114–185, § 2(3)(A)(ii)–(iv), added subpars. (P) and (Q).

Subsec. (e)(3). Pub. L. 114–185, § 2(3)(B), added par. (3) and struck out former par. (3) which read as follows: "Each agency shall make each such report available to the public including by computer telecommunications, or if computer telecommunications means have not been established by the agency, by other electronic means. In addition, each agency shall make the raw statistical data used in its reports available electronically to the public upon request."

Subsec. (e)(4). Pub. L. 114–185, § 2(3)(C), substituted "Oversight and Government Reform" for "Government