# 22-1202

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

DOUGLAS COX,

*Plaintiff-Appellant,*

v.

DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION,
DEPARTMENT OF DEFENSE, OFFICE OF THE DIRECTOR OF NATIONAL
INTELLIGENCE, DEPARTMENT OF STATE OF THE UNITED STATES,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK, CASE NO. 17-CV-3329

---

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

---

Douglas Cox
City University of New York School of Law
Two Court Square
Long Island City, NY 11101
(718) 340-4241
douglas.cox@law.cuny.edu

*Plaintiff-Appellant*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 1

I.   THE *TORTURE STUDY* WILL BE SUBJECT TO FOIA ............................ 1

II.  DEFENDANTS' REFUSAL TO CONDUCT A FOIA SEARCH
     RENDERS THIS COURT'S REVIEW THEORETICAL ........................... 2

III. DEFENDANTS MISINTERPRET SEN. FEINSTEIN'S
     CORRESPONDENCE WITH NONPARTY CIA ...................................... 4

     A.  Defendants Misinterpret Paragraph 6 of Sen. Feinstein's
         June 2, 2009 to CIA ......................................................................... 5

     B.  Sen. Feinstein's June 2, 2009 Letter to CIA Only
         Relates to CIA ............................................................................... 12

IV.  THE *TORTURE STUDY*'S EXECUTIVE SUMMARY IS NOT A
     "STAND-ALONE" DOCUMENT ........................................................... 14

V.   DEFENDANTS' COPIES OF THE *TORTURE STUDY* REMAIN
     AGENCY RECORDS UNDER MANDATORY SUPREME COURT
     PRECEDENT .......................................................................................... 17

     A.  Mandatory Authority in this Court Remains the Supreme Court's
         Consistent "Agency Record" Jurisprudence ................................... 17

     B.  *Behar* is Contrary to Supreme Court Precedent............................ 18

     C.  Even Under *Behar*, Defendants' Copies of *Torture Study* are
         Still Agency Records Under FOIA ................................................. 19

CONCLUSION .............................................................................................. 20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE & CM/ECF FILING

i

# TABLE OF AUTHORITIES

## CASES

*ACLU v. CIA,* 823 F.3d 655 (D.C. Cir. 2016) .......................................................... 4

*Behar v. DHS*, 39 F.4th 81 (2d Cir. 2022) .................................................18, 19, 20

*Carney v. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) .................................... 3

*Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ..................................... 17,19

*Doyle v. DHS*, 959 F.3d 72, 77 (2d Cir. 2020) ..................................................... 19

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2357 (2019) ......................... 16

*Forsham v. Harris*, 445 U.S. 169 (1980) ......................................................... 2, 17

*Perrin v. United States*, 444 U.S. 37 (1979) ........................................................ 16

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) .................................... 18

*United States v. Smith*, 949 F.3d 60 (2d Cir. 2020)............................................... 19

## STATUTES

5 U.S.C. § 552 ............................................................................................. passim

44 U.S.C. § 2204 ........................................................................................... 1, 2

## OTHER AUTHORITIES

160 Cong. Rec. S4105-06 (Mar. 11, 2014) (statement of Sen. Feinstein) .............. 9

Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte
Decisions by Appellate Courts*, 69 Tenn. L. Rev. 245 (2002) .............................. 18

**INTRODUCTION**

Plaintiff respectfully files this brief Reply in response to Defendants' brief, but otherwise stands on his opening brief.

**ARGUMENT**

## I.    THE *TORTURE STUDY* WILL BE SUBJECT TO FOIA

As an initial matter, and as stated in Plaintiff's opening brief, identical copies of the *Torture Study* that Sen. Dianne Feinstein sent with identical transmittal letters to President Barack Obama are "presidential records" under the Presidential Records Act (PRA) (Br. at 12). Defendants not only accept that those identical copies are presidential records, they highlighted this fact in a filing with the Supreme Court and in internal executive branch communications. *See* Gov't Br. in Opp., *ACLU v. CIA* (U.S. 16-629, Mar. 15, 2017), at 11 n.2; ODNI email, ECF 52-39 (informing intelligence community that the President's copy of the *Torture Study* is a presidential record that will therefore "become subject to public release"). President Obama's copy of records at issue in this case will thus be subject to FOIA, as both expanded and partially modified by the Presidential Records Act.[1]

Thus, the Court should understand that any purported policy-based justification for interpreting FOIA's text in a manner designed to prevent the *Torture*

---

[1] *See* 44 U.S.C. § 2204(c)(1) (stating that presidential records "shall be administered in accordance with" FOIA).

*Study* from becoming subject to FOIA based on a fear that FOIA inadequately protects purported Congressional equities – in addition to being contrary to Supreme Court precedent and the relevant facts – will be ineffectual and illusory. In fact, FOIA processing under PRA arguably provides less protections to any purported Congressional equities.[2]  The horse is leaving the barn one way or the other.

Further, interpreting "agency record" under FOIA and "presidential record" under PRA in inconsistent ways as to the exact same transfers of identical records makes little sense given that the Supreme Court has always read the requirements for the two types of records in the same way, and in fact consulted the "presidential records" definition when fashioning its FOIA "agency record" test. *See, e.g., Forsham v. Harris*, 445 U.S. 169, 183 (1979).

## II. DEFENDANTS' REFUSAL TO CONDUCT ANY FOIA SEARCH RENDERS THIS COURT'S REVIEW THEORETICAL

As Plaintiff highlighted in his opening brief, Defendants have never conducted any FOIA search for records at issue in this appeal (Br. at 2). As illustrated throughout Defendants' brief, therefore, this Court is applying legal standards to unknown and theoretical facts. As Defendants' brief confirms, for example, we do not know whether Defendants possess any copies of the *Torture Study*, whether in

---

[2] Under PRA, for example, FOIA (b)(5) is not applied as an exemption. 44 U.S.C. § 2204(c)(1). None of the categories of information that can be protected for a longer period of time under PRA relate to congressional information. 44 U.S.C. § 2204(a).

print or electronic form, that contain notes or annotations from agency officials (Opp. at 35). Notes from agency officials reviewing a report documenting their agency's role in the torture program would constitute unique agency records of unquestionable historical significance. Defendants' attempt to dismiss their importance as mere "scribbling in the margin" (Opp. at 35) is anti-historical cynicism. This Court, however, must address the legal status of such records on essentially a theoretical basis given that Defendants did not conduct a FOIA search and therefore we do not know whether any such records actually exist or the specific details of any such records, which could affect this Court's legal analysis.

Similarly, we do not know the details of other records that are unquestionably agency records of Defendants (such as internal agency emails, agency memoranda, etc.) that contain quotations or excerpts from different versions of the *Torture Study*, because, again, Defendants did not conduct a search to locate responsive records. If such records exist and depending upon the details, they may implicate unique legal issues of first impression in this Circuit. This Court deciding such issues without knowing the details of what responsive records actually exist, if any, is a waste of judicial resources and violates the principle that a Court should not opine on issues not actually before it. Defendants' failure to conduct a search is reason alone that this Court should reverse and remand this case for proper factual development. *See Carney v. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).

## III. DEFENDANTS MISINTERPRET SEN. FEINSTEIN'S CORRESPONDENCE WITH NONPARTY CIA

As their brief confirms, Defendants' entire argument rests on repeatedly quoting a paragraph from a June 2, 2009 letter from Sen. Feinstein to CIA – which defendants elsewhere highlight "is not a party to this action" (Opp. at 40) – and mischaracterizing this letter as an "agreement" (Opp. at 4) in the hopes this Court will not bother to dig into the details and context. Sen. Feinstein's June 2, 2009 letter to CIA only relates to Sen. Feinstein's attempt (ultimately unsuccessful) to protect SSCI work product in a CIA Reading Room from the CIA and it is not evidence of an intent to control any of the records at issue in this case – it is irrelevant.

Like the CIA in *ACLU v. CIA*, 823 F.3d 655 (D.C. Cir. 2016), Defendants here *only* provided to the court Sen. Feinstein's June 2, 2009 letter to CIA. Unlike in *ACLU v. CIA*, however, the record in this case illustrates that Sen. Feinstein's June 2, 2009 letter to CIA is simply an early communication in a lengthy back-and-forth negotiation with CIA over the limited issue of SSCI reviewing CIA records at a CIA facility. The record reflects that these negotiations went on for months, at least as late as September 2009. All of the additional documentation of these negotiations, which nevertheless remain a clearly incomplete record, were provided by Plaintiff.

Plaintiff will not repeat the factual history of the SSCI-CIA negotiations outlined in his opening brief (Br. 5-8), but will focus on a few crucial points of that history related to Defendants' counterfactual narrative.

## A. Defendants Misinterpret Paragraph 6 of Sen. Feinstein's June 2, 2009 Letter to CIA

Defendants entire argument rests on convincing this Court to misinterpret the text of Paragraph 6 of Sen. Feinstein's June 2, 2009 letter to CIA and ignore all relevant context. Paragraph 6 of Sen. Feinstein's letter to CIA reads in relevant part:

> Any documents generated on the network drive referenced in paragraph 5, as well as any other notes, documents, draft and final recommendations, reports, or other materials generated by the Committee staff or Members, are the property of the Committee and *will be kept at the Reading Room* solely for secure safekeeping and ease of reference. *These documents* remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee. As such *these records* are not CIA records under the Freedom of Information Act or any other law.
>
> JA29 (emphasis added)

Defendants' strategy is to replicate the D.C. Circuit's confusion in *ACLU v. CIA*, when the D.C. Circuit was led to believe that the June 2, 2009 letter was essentially a final contract whose language it needed to carefully parse as though the parole evidence rule applied. Not understanding, or even being aware of, the SSCI and CIA negotiations that both preceded and followed Sen. Feinstein's June 2, 2009 letter to CIA, the D.C. Circuit misreads the initial phrase in Paragraph 6 "documents generated on the network drive referenced in Paragraph 5" as referring to *all* of the SSCI generated material in the CIA Reading Room and then concludes that the next phrase "as well as any other notes, documents, draft and final recommendations" must be referring to SSCI material outside the Reading Room, up to and including

copies of the *Torture Study* sent to CIA years later, even though the second phrase in Paragraph 6 ends with "will be kept at the Reading Room."

When the back and forth negotiations between SSCI and CIA both before and after the June 2, 2009 letter are reviewed, however, even in the incomplete form in which they are publicly available, it becomes even more clear that both portions in Paragraph 6 are attempts by Sen. Feinstein to ensure the protection of *all* of SSCI's work product at the CIA Reading Room from CIA who, in those negotiations, is muddying the waters over what SSCI material CIA may access at the Reading Room with confusing technical loopholes. The debate centers around three different things within the CIA Reading Room that might contain SSCI generated material including, (1) the segregated network drive, (2) the stand-alone computer network, and (3) physical notes. (Plaintiff will use these numbers to identify these different issues within the SSCI-CIA negotiations below).

As Plaintiff describes in his opening brief, paragraph 6 in Sen. Feinstein's letter is directly responding to (and borrowing boilerplate language from) CIA's proposed MOU dated May 28, 2009. JA25-27. CIA's proposed MOU prohibited SSCI from bringing any outside "computer systems or electronics . . . into the Reading Room" and required that for the purposes of SSCI's review of CIA records, "All notes, documents, draft and final recommendations, reports and other materials generated by SSCI must prepared and stored in the Reading Room on the CIA

approved *stand-alone computer system provided*." (emphasis added). JA26. The CIA stated that a "[1] *specially designed share-drive* will be provided on the Agency's [2] *stand-alone network*" and that "*[a]s SSCI requires*, the share-drive can be segregated with only SSCI access and walled-off CIA IT administrators, except as otherwise authorized by SSCI. [3] *CIA will also provide SSCI with lockable cabinet and safes, as required*." JA26 (emphasis and numbers added).

Sen. Feinstein's June 2, 2009 response to CIA then follows up on CIA's MOU reference to "[a]s SSCI requires" and outlines SSCI's requirements for the segregated network drive in paragraph 5. JA29. In paragraph 6, Sen. Feinstein first states that all SSCI material on (1) the network drive in paragraph 5 is SSCI property. JA29. Sen. Feinstein understands, however, that SSCI generated material in the Reading Room would not necessarily be limited to the segregated network drive and therefore uses a catch-all for other SSCI generated material that might be "kept at the Reading Room" which would include SSCI work product on (2) the stand-alone network (referenced in CIA's MOU) and (3) SSCI notes in physical form. JA29. This becomes even more clear from CIA's response to Sen. Feinstein's June 2, 2009 letter and the negotiations and controversy that followed.

Defendants unsupported assertion that Sen. Feinstein's June 2, 2009 letter is the operative "agreement" where the matter ended (Opp. at 4) could not be further from the truth. *See, e.g.*, CIA Memo, ECF 60-12 (Ex. AA) at 5 ("SSCI asserted the

right to complete hegemony over its side of the system, the Agency did not accept that demand."). CIA responded to Sen. Feinstein's June 2, 2009 letter on June 4, 2009 and CIA's response specifically pushed back on the issue in Paragraphs 5 and 6 of Sen. Feinstein's letter, noting that while CIA "recognizes the Committee's need to create work product on a walled-off network share-drive as discussed in paragraph 5 of your letter" and will limit "access to the walled-off network share-drive" to CIA IT staff, this is different than the stand-alone network. CIA Letter to Sen. Feinstein (June 4, 2009) at 2.[3] "CIA would like to clarify, however, that *unlike [1] the walled-off network share drive, [2] the stand-alone network must be accessed by CIA staff* assigned to this effort to perform a variety of tasks, including, for example, loading and organizing the raw responsive data requested by the Committee *and review or redaction of material sought to be removed from the Reading Room*." *Id.* (emphasis and numbers added).

Sen. Feinstein also referenced this distinction later during the 2014 controversy that resulted after SSCI discovered that CIA in fact conducted unauthorized searches on both "the stand-alone" and "the walled-off committee network drive containing the committee's own internal work product and communications." 160 Cong. Rec. S4106 (Mar. 11, 2014) (statement of Sen. Feinstein).

---

[3] Available at https://perma.cc/UX25-D7WD

Further SSCI-CIA negotiations *after* Sen. Feinstein's June 2, 2009 letter also highlight that there were disagreements over the issue of CIA access to physical SSCI notes in the CIA Reading Room. Again, the incomplete record fails to give the full story, but a June 8, 2009 CIA memo to SSCI references a disagreement over the issue of SSCI notes, stating "In regard to the issue of notes leaving the Reading Room, I'm a little puzzled by this. Any notes that you take in the Reading Room are subject to review by our redactors if you want to remove them." JA35.

Defendants try to reject all of these additional, clearly relevant, negotiations that provides necessary context for an accurate interpretation of Paragraph 6 by asserting that "none of this material addresses ownership or control of SSCI work product" (Opp. at 44), but that is also demonstrably untrue. After the CIA's June 4, 2009 response to Sen. Feinstein, a June 8, 2009 CIA memo summarizes subsequent negotiations. It references a conference call (for which no additional documentation is publicly available) and describes a new superseding "agreement" related to SSCI work product that is clearly a continuation of negotiations of the issues referenced in Paragraph 6 of Sen. Feinstein's June 2, 2009 letter. This revised agreement makes it even more clear that what was being discussed was the limited to SSCI material *in the Reading Room*.

> I think we are all in agreement on the computer issue. In a nutshell, you will have a walled off hard drive on our network. No CIA personnel with the exception [sic] IT support will have access to the hard drive. The only reason for IT access to the hard drive is for IT maintenance and support.

> This includes adding material to your hard drive for your review. The SSCI retains ownership of *anything created on this drive*. It is SSCI property and will be handled accordingly vis-à-vis the FOIA.
>
> JA36 (emphasis added)

If this Court finds Defendants' argument persuasive that the SSCI-CIA negotiations are somehow relevant to *Defendants'* copies of the *Torture Study* at issue in this litigation, this language in a June 8, 2009 CIA memo, JA36, is more relevant, because more recent, documentation of any possible "agreement" than the earlier, now superseded, June 2, 2009 letter. Yet even based on the limited record and publicly available information, the negotiations over the issue of SSCI's work product did *not* end there. This is not based on Plaintiff's speculation as Defendants claim (Opp. at 44), but on publicly available evidence, including two internal CIA reviews. Both of these CIA reviews had full access to CIA records documenting these SSCI negotiations (which the district court below did not and the district court denied discovery into) and both ultimately found no "evidence that a final document was [ever] agreed upon by both the SSCI and CIA." Office of Inspector General, *CIA Report of Investigation, Agency Access to the SSCI Shared Drive on RDINet* ¶ 21 (July 2014); CIA, *Final Report of the Rendition, Detention, and Interrogation Network Agency Accountability Board* 7 (Dec. 2014) ("[T]here was no final, clear agreement on access limits to the SSCI" work product); *id.* at 36 ("SSCI work product was often cited as protected but these products were not clearly defined or agreed to by both parties.").

10

In sum, Sen. Feinstein's June 2, 2009 letter to CIA was not an "agreement" in any form, not even between SSCI and non-party CIA (much less Defendants) and it did not "memorialize" anything other than Sen. Feinstein's *initial* response to language in CIA's May 2009 draft MOU, that was then rejected by CIA, leading to further negotiations that led to an uncertain end. The D.C. Circuit, which treated the June 2, 2009 letter as though it was a stand-alone contract misunderstands Paragraph 6 and was misled by DOJ. This Court must reject DOJ's encore performance.

Finally, interpreting Paragraph 6 of Sen. Feinstein's June 2, 2009 letter to CIA as only referring to SSCI material in the CIA Reading Room is also consistent with everything else in the record including Sen. Rockefeller expressly stating that this paragraph "only covered materials that were kept at the SSCI's reading room." JA403-04 and Sen. Feinstein's own letters stating that Defendants' copies of the *Torture Study* are agency records under FOIA. JA353, JA356. And, contrary to Defendants' assertions, there is also no "old, intra-Committee dispute" (Opp. at 41) about whether the June 2, 2009 letter applies to approved copies of the *Torture Study* SSCI transmitted to agencies. There is no evidence in the record that any member of the SSCI has ever asserted that Sen. Feinstein's July 2, 2009 letter applies to such copies of the *Torture Study* sent to Defendants. Not even Sen. Burr made this assertion.

**B.    Sen. Feinstein's June 2, 2009 Letter to CIA Only Relates to CIA**

An even more fundamental issue is that the Sen. Feinstein's June 2, 2009 letter to CIA is, by its very terms, exclusively directed *to CIA*, which "is a not a party to this action" (Opp. at 40).  As stated in Plaintiff's opening brief, SSCI's investigation was not limited to CIA, but examined the role of Defendants and the entire "Intelligence Community" in the torture program. JA201.  Nor was SSCI's documentary review limited to CIA records. SSCI reviewed "more than six million pages of Intelligence Community records," JA201, including reviews of Defendants' records regarding their role in the torture program.  *Torture Stu*dy 9 n.3 (Dec. 2014) (noting Committee reviewing "documents from the Department of Justice, the Department of Defense, and the Department of State").  Yet nowhere do Defendants provide copies of communications or correspondence related to SSCI's review of *Defendants'* records, which might potentially be more relevant, clearly because such records do not support Defendants' misleading narrative.

Defendants nevertheless try to argue that "[i]t does not matter" that Sen. Feinstein's June 2, 2009 letter "was addressed specifically to the CIA," because what matters is "the Committee's intent" (Opp. at 37).  But Sen. Feinstein's June 2, 2009, letter, and Paragraph 6 in particular, is only directing any such "intent" explicitly and exclusively towards the CIA as the text itself makes express. JA29-30 ("these records are not CIA records . . . CIA will return the records . . . CIA will immediately

12

notify the Committee"). Defendants' attempt to expand this purported "intent" beyond the CIA is pure speculation unsupported by the text and unsupported by anything in the record. None of the Defendants' declarants even reference Sen. Feinstein's June 2, 2009 letter to CIA. None of them assert that they understood it to apply to their copies of the *Torture Study*.

Defendants' assertion that Sen. Feinstein nevertheless somehow secretly intended the language in her June 2, 2009 letter to CIA to apply to the rest of the executive branch is also inconsistent with the fact that somehow this same purported "Congressional intent" did not prevent identical copies of the *Torture Study* that went to President Obama from becoming presidential records which, as noted above, will in fact be subject to FOIA. If the Congressional "intent" supposedly documented in Sen. Feinstein's June 2, 2009 letter really applies beyond the CIA, as Defendants urge, President Obama's treatment of the copy he received and treated as a presidential record under the PRA is directly contrary to Sen. Feinstein's letter stating that "these records are not CIA Records under [FOIA] or *any other law*." JA29. As that language makes clear, this provision only applied to CIA, not to the President, and not to Defendants.

## IV. THE *TORTURE STUDY*'S EXECUTIVE SUMMARY IS NOT A "STAND-ALONE" DOCUMENT

Defendants' brief also introduces a new inaccurate narrative: that SSCI created the *Torture Study*'s Executive Summary as a "stand-alone" document (Opp.

at 1, 6) that is separate from the *Torture Study* itself, rather than a portion thereof. This is contrary to what the *Study* itself says, *Torture Study* viii (describing approval of the "full Committee Study" in Dec. 2012), and rebutted by, among other things, CIA's June 2013 CIA Response, a contemporaneous record that refers throughout its text to "the Study," which CIA clearly understood to be a cohesive whole. *See, e.g.*, CIA June 2013 Response, Tab A, p. 3 ("One of the main flaws of the *Study* is that, especially in its Summary and Conclusions, it tars CIA's entire RDI effort."); *see also* JA20 (SSCI sending "for declassification the Findings and Conclusions and Executive Summary of an updated version of the Committee's Study"); ECF 52-18 (ODNI declassifying "*Committee Study of the CIA's Detention and Interrogation Program: Findings and Conclusions and Executive Summary*").

It is not entirely clear how Defendants' believe the inaccurate assertion that the Executive Summary was a "stand-alone" document helps their argument, but Plaintiff presumes it is an attempt to pretend that Defendants' copies of the *Torture Study* at issue in this case do not contain significant, and clearly reasonably segregable portions, that can be released under FOIA because they are not, even under Defendants' incorrect standards, controlled by SSCI because SSCI already publicly released them.

Defendants' "stand-alone" fiction in fact highlights how Defendants various interpretations of "agency record" are internally inconsistent, contradictory, and

undermine any reasonable concept of a record. On the one hand, Defendants (and the district court below) have created a fictional world, in which mere quotations and excerpts from the *Torture Study* within internal agency emails or memoranda of the Defendants must be treated as separate "congressional records," even though they are simply portions of agency records (Opp. at 13).[4]  At the same time, Defendants are simultaneously arguing (Opp. at 35) that an electronic copy of the *Torture Study* created by DOD personnel, on a DOD server, with unique DOD metadata, and used by DOD for DOD business purposes cannot be an agency record even in part and must be treated as a "congressional record" in its entirety, despite the fact that the first 683 pages of this same record is publicly available on the internet with minimal redactions. Defendants cannot have it both ways.

The problem also goes much deeper. The entire methodology of the *Torture Study* was that SSCI was using executive branch records almost exclusively. "We have built a factual record, based on more than six million pages of the Intelligence Community records. Facts detailed in the report are footnoted extensively to CIA and other Intelligence Community documents. Editorial comments are kept to a minimum, clearly marked and included to provide context." JA201. Thus significant

---

[4] Such quotations and excerpts, which are clearly responsive to Plaintiff's FOIA requests, could take many forms including potentially quotations integrated within a paragraph, or even a single sentence, of an agency record. Yet because Defendants conducted no FOIA search, the court must address the issue as mere theoretical possibilities rather than applying law to actual facts.

portions of – in fact most of the *Torture Study* – is information actually "controlled" by the executive branch, which is clear even from a brief review of the public portions of the *Study*. The SSCI-CIA negotiations in fact provide a strong argument that CIA was manifesting a clear intent to control CIA records during SSCI's review, such that – on the theories of Defendants and the district court – portions of the *Torture Study* containing quotations and excerpts from CIA (or Defendants') records could in fact be "agency records" and not "congressional records." Put another way, if Defendants are treating *portions* of records as separate records depending upon who "controls" the information in each portion, a Defendant's copy of the *Torture Study* could be a hybrid document that is an agency record, which contains congressional records, which in turn contain agency records – a documentary Turducken. Such absurd results is an illustration of the effect of lower courts refusing to interpret "agency records" under FOIA using its "common, contemporary, ordinary meaning" as the Supreme Court mandates. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362-63 (2019) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979).

## V. DEFENDANTS' COPIES OF *TORTURE STUDY* REMAIN AGENCY RECORDS REGARDLESS OF THE TEST APPLIED

### A. Mandatory Authority in this Court Remains the Supreme Court's "Agency Record" Jurisprudence

As described at length in Plaintiff's opening brief, the relevant mandatory authority in this Court remains the Supreme Court's jurisprudence on "agency records" under FOIA, which applies the term in a straightforward and consistent manner (Br. at 22-28). The Supreme Court's case law establishes that the requirements for material to qualify as agency records under FOIA are:

> First, an agency must "either create or obtain" the requested materials . . . Second, the agency must be in control of the requested materials at the time the FOIA request is made. By control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties.

> *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989)(quoting *Forsham v. Harris*, 445 U.S. 169, 182 (1980))

The copies of the *Torture Study* at issue in this case clearly satisfy this test and constitute agency records under FOIA, an opinion shared by Sen. Feinstein herself. JA353 (stating that agency copy of *Torture Study* is "agency record pursuant to the [FOIA]"); JA356 (same). Finally, Plaintiff's opening brief explained why any "intent to control" test for agency record status is directly contrary to the Supreme Court's agency record jurisprudence and the normal meaning of agency record, which Plaintiff need not repeat. (Br. at 22-38).

**B.** *Behar* **Is Contrary to Supreme Court Precedent**

Defendants' brief cites the recent decision of the Second Circuit in *Behar v. DHS*, 39 F.4th 81 (2d Cir. 2022), *petition for cert. pending*, No. 22-578 (filed Dec. 20, 2022). At the time Plaintiff filed his opening brief, *Behar* was the subject of a petition for rehearing or *en banc* review which was, unfortunately, denied on Sept. 22, 2022. If there were ever a case deserving of *en banc* review it was *Behar*, in which one panel of this Court *sua sponte* raised an "agency record" issue that was never briefed by the parties. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) "[Courts] do not, or should not, sally forth each day looking for wrongs to right" and instead "normally decide only questions presented by the parties.") (quotation omitted); *see also* Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 Tenn. L. Rev. 245 (2002).

The plaintiff in *Behar* has now filed a petition for the writ of certiorari with the Supreme Court not only on the basis of the substantive decision, but raising the issue of whether the Second Circuit panel in *Behar* violated "the party presentation principle by deciding an appeal primarily on the novel resolution of an issue not presented, briefed, or argued by the parties at any stage of the litigation." Petition for Cert., *Behar v. DHS*, No. 22-578, (Dec. 20, 2022), at 1.

As an initial matter, to preserve appeal rights, if any are necessary, *Behar* was wrongly decided and is inconsistent with Supreme Court's "agency record" jurisprudence in *Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989). *Behar* also misinterprets an earlier Second Circuit decision in *Doyle v. DHS* as adopting the D.C. Circuit's "intent" test, when in fact *Doyle* refers to the D.C. Circuit's test to note that it yielded an "indeterminate" answer. *Doyle v. DHS*, 959 F.3d 72, 77 (2d Cir. 2020). Not even DOJ argued that the Second Circuit had adopted the D.C. Circuit test in *Doyle* but remarkably the first few minutes of oral argument in *Behar* features the Second Circuit panel arguing *to DOJ* that DOJ was not reading *Doyle* broadly enough with DOJ responding: "I wouldn't state the rule as broadly as the court has because I think [*Doyle*] was limited to the context of the President's records and presidential records." Oral argument audio, *Behar v. DHS*, at 2:29-2:46.

## C. Even under *Behar*, Defendants Copies of *Torture Study* are Still Agency Records

Nevertheless, while this Court should limit and narrowly construe, if not overrule,[5] *Behar*, even if this Court nevertheless applies *Behar* as the law of the circuit, Defendants copies of the *Torture Study* still constitute agency records subject to FOIA. *Behar* can be easily distinguished and confined to its facts involving a

---

[5] *See, e.g., United States v. Smith*, 949 F.3d 60 (2d Cir. 2020) (overturning existing Circuit precedent after circulating opinion to all active members of the Court prior to filing).

special situation in which the Trump Presidential transition team was providing materials to the Secret Service for the limited, and nonsubstantive, purpose of coordinating Secret Service protection. Copies of the *Torture Study* sent to Defendants in this case are not even analogous and are more akin to a hypothetical in which Donald Trump decided to separately send copies of the same Presidential transition team material to other federal agencies without any expectations of confidentiality (or special circumstances involving the Secret Service protection) with a transmittal letter from Trump recounting how successful his presidential campaign was and stating that he presumed that federal agencies would be interesting in learning from the success of his campaign so he is providing them copies of this material for them to study and learn from and disseminate throughout their agencies and use as they see fit. Add to that hypothetical that Donald Trump later sent letters expressly confirming that the copies of the records he had sent to those agencies were, in fact, "agency records under FOIA" and then you have a scenario more akin to the case before this Court. Even under *Behar*, Defendants' copies of the *Torture Study* are agency records under FOIA.

## CONCLUSION

For all the foregoing reasons, the Court must reverse the district court below and hold that Defendants' copies of the *Torture Study* are agency records subject to

FOIA or, in the alternative, the Court should reverse and remand this case to allow

Plaintiff to conduct discovery to develop the record further.

                              Respectfully submitted,


                              Douglas Cox
                              City University of New York School of Law
                              Two Court Square
                              Long Island City, NY 11101
                              (718) 340-4241
                              douglas.cox@law.cuny.edu

                              *Plaintiff-Appellant*

 Dated: Jan. 3, 2023

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by Local Rule 32.1(a)(4)(B), because this reply brief, excluding items identified in Fed. R. App. P 32(f) contains 4,992 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief is written using a proportionally spaced typeface, Times New Roman, using Microsoft Word.

Douglas Cox
City University of New York School of Law
Two Court Square
Long Island City, NY 11101
(718) 340-4241
douglas.cox@law.cuny.edu

*Plaintiff-Appellant*

Dated: Jan. 3, 2023

**CERTIFICATE OF FILING AND SERVICE**

I certify that on Jan. 3, 2023, I filed Appellant's Reply Brief electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

I further certify that I have submitted the required number of physical copies of Appellant's Reply Brief to the Clerk's Office via U.S. Mail.

Douglas Cox
City University of New York School of Law
Two Court Square
Long Island City, NY 11101
(718) 340-4241
douglas.cox@law.cuny.edu

*Plaintiff-Appellant*

Dated: Jan. 3, 2023