22-1202
Cox v. Dep't of Justice

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term, 2023
No. 22-1202

DOUGLAS COX,
*Plaintiff-Appellant,*

*v.*

DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION,
DEPARTMENT OF DEFENSE, OFFICE OF THE DIRECTOR OF NATIONAL
INTELLIGENCE, DEPARTMENT OF STATE OF THE UNITED STATES,
*Defendants-Appellees.*

_____

On Appeal from a Judgment of the United States District Court for
the Eastern District of New York.

_____

ARGUED: SEPTEMBER 18, 2023
DECIDED: AUGUST 5, 2024

_____

Before: CHIN, NARDINI, and NATHAN, *Circuit Judges.*

_____

Under the Freedom of Information Act ("FOIA"), a federal
agency is required to produce "an agency record" when a member of

the public requests disclosure, subject to certain exemptions. 5 U.S.C. § 552(f)(2)(A); *see id.* § 552(a)(3), (b). Records belonging to entities not covered by FOIA, such as Congress, are not "agency records" and therefore are not subject to FOIA disclosure requirements. This case presents the issue of whether documents created by Congress that are subsequently transmitted to FOIA-covered agencies constitute "agency records" subject to disclosure under FOIA.

The United States Senate Select Committee on Intelligence generated a report on the Detention and Interrogation Program conducted by the Central Intelligence Agency after September 11th. The Committee transmitted the report to various FOIA-covered federal agencies. Plaintiff-Appellant Douglas Cox submitted FOIA requests to the defendant agencies for their copies of the report. The agencies denied the requests, contending that the report is a congressional record rather than an agency record and is thus not subject to FOIA disclosure. The United States District Court for the Eastern District of New York (Rachel P. Kovner, *District Judge*) agreed with the agencies, granted summary judgment in their favor, and denied Cox's request for discovery. Cox appeals these rulings.

We agree with the district court. Pursuant to the test we articulated in *Behar v. United States Department of Homeland Security*, 39 F.4th 81 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 2431 (2023), the Committee manifested a clear intent to control the report at the time of its creation, and because the Committee's subsequent acts did not vitiate that intent, the report constitutes a congressional record not subject to FOIA. We note that although Cox disputes the proper test for agency records, he did not cite *Behar* in his opening brief even though it had been decided months earlier. At oral argument, Cox explained that he thought the decision might be overturned on rehearing or by the Supreme Court. We join our sister circuits in holding that a published opinion becomes binding precedent when it is decided, regardless of whether the mandate has issued or of any

pending petitions for rehearing or for writ of certiorari. It remains so until it is vacated or overruled. We further conclude that the district court did not abuse its discretion by denying discovery, as Cox failed to make any of the showings necessary to warrant discovery in a FOIA case. We therefore AFFIRM the district court's judgment.

---

DOUGLAS COX, *pro se*, Long Island City, NY.

THOMAS PULHAM (Brian M. Boynton, Principal Deputy Assistant Attorney General, Sharon Swingle, Attorney, Appellate Staff, Civil Division, *on the brief*), Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, D.C., *for Defendants-Appellees*.

---

WILLIAM J. NARDINI, *Circuit Judge*:

Under the Freedom of Information Act ("FOIA"), a federal agency is required to produce "an agency record," subject to enumerated exemptions, when a member of the public requests disclosure. 5 U.S.C. § 552(f)(2)(A); *see id.* § 552(a)(3), (b). Records belonging to entities not covered by FOIA, such as the United States Congress, are not "agency records" and therefore are not subject to FOIA disclosure requirements. This case presents the issue of

3

whether documents created by Congress and subsequently transmitted to FOIA-covered agencies constitute "agency records" subject to disclosure under FOIA.

The United States Senate Select Committee on Intelligence ("SSCI" or the "Committee") generated a report on the Detention and Interrogation Program (the "Program") conducted by the Central Intelligence Agency ("CIA") after September 11th. The Committee transmitted draft and final versions of the report to various federal agencies including the Department of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI"), the Department of Defense ("DOD"), the Office of the Director of National Intelligence ("ODNI"), and the Department of State (collectively, the "Agencies"). Plaintiff-Appellant Douglas Cox submitted FOIA requests for the Agencies' copies of the report as well as other related communications. The Agencies denied the requests for copies of the report, arguing that those documents are congressional records, rather than agency

records, and are therefore not subject to FOIA disclosure requirements.

The United States District Court for the Eastern District of New York (Rachel P. Kovner, *District Judge*) granted summary judgment in favor of the Agencies, concluding, *inter alia*, that the report is a congressional record not subject to the FOIA disclosure requirements. The district court also denied Cox's request for discovery. Cox challenges these two decisions on appeal.

We agree with the district court. "To determine whether an agency exercises control over documents obtained from an entity not covered by the FOIA, we ask whether the non-covered entity has manifested a clear intent to control the documents, such that the agency is not free to use and dispose of the documents as it sees fit." *Behar v. U.S. Dep't of Homeland Sec.*, 39 F.4th 81, 90 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 2431 (2023) (internal quotation marks and alteration marks omitted). If so, then "the document is not an agency record

subject to the FOIA." *Id.* Here, the record shows that the Committee manifested a clear intent to control the report at the time of its creation and that the Committee's subsequent acts did not vitiate that intent. The report therefore constitutes a congressional record not subject to FOIA disclosure requirements.

We note that although Cox disputes the proper test for agency records, he did not cite *Behar* in his opening brief even though it had been decided months earlier. At oral argument, Cox explained that he thought the decision might be overturned on rehearing or by the Supreme Court. We join our sister circuits in holding that a published opinion becomes binding precedent when it is decided, regardless of whether the mandate has issued or of any pending petitions for rehearing or for writ of certiorari. It remains so until it is vacated or overruled.

We further conclude that the district court did not abuse its discretion by denying discovery to Cox, as he failed to make any of the showings necessary to warrant discovery in a FOIA case.

We therefore AFFIRM the district court's judgment.

## I. Background

### A. Facts

The following facts are drawn from the summary judgment record.

In the aftermath of the terrorist attacks of September 11, 2001, the CIA implemented the Detention and Interrogation Program in an effort to gather intelligence for the purpose of preventing future terrorist attacks. Through the Program, which was operational between September 2001 and January 2009, the CIA detained more than 100 people and used "enhanced interrogation techniques" to acquire intelligence. J.A. at 115. In March 2009, the United States Senate Select Committee on Intelligence, chaired by the late Senator Dianne Feinstein, initiated an investigation of the Program.

Pursuant to its investigation, the Committee requested access to millions of highly sensitive and classified documents from the CIA. The investigation could not proceed without the Committee and the CIA first reaching consensus on a set of terms to govern the Committee's review of the documents, given their highly confidential nature. To that end, on May 28, 2009, the CIA sent the Committee a proposed memorandum of understanding, which required the Committee staffers to, among other things, review relevant documents in a designated "Reading Room" and prepare all versions of any reports for the investigation on a "CIA approved stand-alone computer system" in the Reading Room. *Id.* at 26.

The Committee responded to the CIA with a letter dated June 2, 2009, proposing a series of "procedures and understandings" to govern its investigation. *Id.* at 28. The letter required the CIA to, *inter alia*, make available relevant documents, provide the aforementioned stand-alone computer system in the Reading Room "with a network

drive for Committee staff and Members" to conduct their investigation, and restrict access by CIA employees to that computer system. *Id.* at 29. The letter also addressed the issue of the ownership of any materials generated by the Committee staff in connection with the investigation:

> Any documents generated on the network drive . . . , as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee and will be kept at the Reading Room solely for secure safekeeping and ease of reference. These documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee. As such, these records are not CIA records under the Freedom of Information Act or any other law. The CIA may not integrate these records into its records filing systems, and may not disseminate or copy them, or use them for any purpose without the prior written authorization of the Committee. The CIA will return the records to the Committee immediately upon request in a manner consistent with paragraph 9 [of the letter]. If the CIA receives any request or demand for access to these records from outside the CIA under the Freedom of Information Act or any other authority, the CIA will immediately notify the Committee and will respond to

> the request or demand based upon the understanding
> that these are congressional, not CIA, records.

*Id.* at 29–30.

On June 8, 2009, the CIA sent a letter to the Committee that sought clarification regarding some of the procedures described in the June 2, 2009, letter. The CIA agreed with the Committee on the ownership issue, stating that "[t]he SSCI retains ownership of anything created on [the network] drive, it is SSCI property and will be handled accordingly vis-à-vis the FOIA." *Id.* at 36.

After additional negotiations, the CIA and the Committee finally reached agreement on all the procedures governing the investigation, and the Committee began its investigation of the Program. Under the agreed-upon procedures, the Committee staff members drafted a report on the investigation on the segregated network drive in the Reading Room. The Committee, with the help of the CIA, eventually transferred draft versions of the report to the

Committee's secure facilities at the United States Capitol to enable the Committee to complete the drafting process in its own workspace.

In December 2012, the Committee completed its investigation and produced a report totaling over 6,000 pages, which included an executive summary (the "Executive Summary") and a section with the findings and conclusions (the "Findings and Conclusions"). The Committee approved the report by a vote of 9–6 on December 13, 2012. Later the same day, a Committee staff member emailed various executive agencies to notify them of the approval of the report and of the Committee's plan to transmit "a limited number of hard copies of the report for review" to the White House, the ODNI, the CIA, and the DOJ. *Id.* at 204. The staff member noted that the Committee would "only provide copies of the report to specific individuals who are identified in advance to the [Committee] Chairman." *Id.*

On December 14, 2012, Senator Feinstein sent a letter to the White House and then-President Barack Obama to inform them of the

completion of the investigation and the accompanying report. Senator Feinstein indicated that the Committee would provide copies of the report to the White House and appropriate agencies for the purpose of soliciting feedback and, after receiving and considering that feedback, she would "present [the] report with any accepted changes again to the Committee to consider how to handle any public release of the report, in full or otherwise." *Id.* at 201.

The Committee revised the report after considering comments from the CIA and Committee members. On April 3, 2014, the Committee convened in a closed session and approved the updated version of the report. It also voted to declassify the Executive Summary and the Findings and Conclusions. The Committee did not, however, consider declassifying or releasing the full report. In an April 3, 2014, press release, Senator Feinstein declared that the full report "will be held for declassification at a later time." *Id.* at 114. She later explained that she did not seek declassification of the full report

at that time because she believed that the Executive Summary sufficiently described the Program and the study's findings, and that obtaining declassification of the full report would delay the release of the Executive Summary.

On April 7, 2014, Senator Feinstein sent a letter to President Obama and the White House requesting that they declassify the Executive Summary and the Findings and Conclusions "with minimal redactions" necessary for national security concerns. *Id.* at 20. Senator Feinstein also stated that she would transmit copies of the updated full report to the White House and the appropriate agencies. She wrote that she "encourage[d] and approve[d] the dissemination of the updated report to all relevant Executive Branch agencies" and that the report "should be viewed within the U.S. Government as the authoritative report on the CIA's actions." *Id.* at 20–21. After the updated report was transmitted to the agencies, who could review the

report was "[a]t the discretion of the officials in official receipt," according to an email from a Committee staffer to the DOJ. *Id.* at 37.

On August 1, 2014, ODNI produced a declassified and redacted version of the Executive Summary and the Findings and Conclusions. The Committee objected to that version because in its view, the redactions prevented a clear understanding of the study's findings and conclusions.

In the ensuing months, the Committee engaged in negotiations with the CIA and the White House regarding the redactions. As the negotiations progressed, the Committee revised the Executive Summary, as well as the corresponding portions of the full report, to produce a publicly releasable document that clearly conveys the study's findings. After the Committee, the White House, and the CIA reached agreement on the redactions, the ODNI declassified a partially redacted version of the Executive Summary.

On December 9, 2014, the Committee filed with the United States Senate a final version of the classified report and publicly released the declassified version of the Executive Summary and the Findings and Conclusions. Senator Feinstein wrote a Foreword to accompany the declassified version of the Executive Summary and the Findings and Conclusions, which stated that "[d]ecisions will be made later on the declassification and release of the full 6,700 page Study." The Committee, *Committee Study of the Central Intelligence Agency's Detention and Interrogation Program: Foreword*, at 3 (2014), https://perma.cc/3LVM-6HR3.

Senator Feinstein described her plan for the report in a letter to the Senate: "[t]he entire classified report will be provided to the Executive Branch for dissemination to all relevant agencies," and "[t]he full report should be used by the Central Intelligence Agency and other components of the Executive Branch to help make sure that the system of detention and interrogation described in this report is

never repeated." J.A. at 336. Then, in a letter dated December 10, 2014, Senator Feinstein notified President Obama and the White House that the Committee had filed a full version of the report with the Senate and publicly released the declassified version of the Executive Summary and the Findings and Conclusions. Senator Feinstein provided the following guidance on how the Executive Branch should use the report:

> [T]he full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated. To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit.

*Id.* at 22.

Senator Richard Burr replaced Senator Feinstein as the Chairman of the Committee in January 2015. On January 14, 2015, Senator Burr sent a letter to President Obama "request[ing] that all copies of the full and final report in the possession of the Executive

Branch be returned immediately to the Committee." *Id.* at 184. He stated that because the report is a "highly classified and committee sensitive document," "[i]t should not be entered into any Executive Branch system of records." *Id.* Senator Feinstein, who was then the Vice Chairman of the Committee, disagreed with Senator Burr's stance on the report. In a January 16, 2015, letter to the President, Senator Feinstein asked the Executive Branch to retain copies of the classified report "within appropriate Executive branch systems of record . . . so as to ensure the history of the CIA Detention and Interrogation Program is available and appropriate lessons can be learned from it." *Id.* at 385. Senator Feinstein reiterated her desire for the Executive Branch to retain and review copies of the classified report in a February 23, 2015, letter to the Secretary of Defense.

On May 13, 2016, the D.C. Circuit decided an appeal involving FOIA requests that sought disclosure of the draft and final versions of the report. *Am. C.L. Union v. C.I.A.*, 823 F.3d 655, 661 (D.C. Cir.

2016), *cert. denied*, 581 U.S. 938 (2017) ("*ACLU*"). In that case, the district court granted the agency's motion to dismiss for lack of subject matter jurisdiction, finding that the report is a congressional record outside the scope of FOIA. *Id.* at 661. Reviewing the correspondence between the Committee and the Executive Branch up through Senator Feinstein's January 16, 2015, letter to the President, the D.C. Circuit found that the Committee clearly "inten[ded] to retain control of the Full Report." *Id.* at 667. Thus, the D.C. Circuit held that the report qualifies as "a congressional document that is not subject to disclosure under FOIA," and affirmed the district court's judgment. *Id.* at 667–68.

Senator Feinstein's communications to the Executive Branch continued. She wrote several letters to various Executive Branch officials, urging them to retain and review the copies of the classified report. *See* J.A. at 341–42 (July 14, 2015, letter to the U.S. Attorney General); *id.* at 344–45 (November 5, 2015, letter to the U.S. Attorney

General and the Director of the FBI). She also wrote letters to numerous Executive Branch officials regarding the classification of the report, asking them to (1) determine whether the report is a "federal record" under relevant statutes, including the Federal Records Act, 44 U.S.C. § 3301, and the Presidential Records Act, 44 U.S.C. § 2202, (2) deem the report a "federal record" under those statutes, and/or (3) find that the report qualifies as an "agency record" under FOIA. *See* J.A. at 347 (April 13, 2016, letter to the U.S. Attorney General); *id.* at 349–51 (April 13, 2016, letter to the National Archives and Records Administration); *id.* at 353 (November 21, 2016, letter to the U.S. Attorney General); *id.* at 355–56 (March 9, 2017, letter to the U.S. Attorney General). Some of these letters were also signed by other members of the Committee. *See, e.g.*, J.A. 355–56 (letter signed by, in addition to Senator Feinstein, Senators Mark Warner, Ron Wyden, and Martin Heinrich, all minority members of the Committee).

On May 30, 2017, a Committee staffer emailed various agencies, reiterating Senator Burr's request for the agencies to return their copies of the full report that were delivered on December 10, 2014. Some of the agencies returned their copies, but others did not.

## B. Procedural History

### i. Cox's FOIA Requests

On December 21, 2016, Cox filed FOIA requests with the Agencies. Although Cox's FOIA requests varied slightly based on the agency, he generally requested any communications regarding the handling and transmission of the report, any copies of the draft versions of the report in whole or in part, and any copies of the final version of the report in whole or in part (excluding any copies of the publicly released Executive Summary but including any portions of the report quoted in agency documents). The Agencies did not produce any copies of the report based on their position that the report is not an agency record and therefore not subject to FOIA. As

for the remaining requests, some of the Agencies responded that they required additional time to conduct an adequate search, and the other Agencies produced some responsive documents but withheld the rest pursuant to certain exemptions under FOIA.

### ii.   Cox's Lawsuit

Dissatisfied with the Agencies' responses to his FOIA requests, Cox filed suit on June 2, 2017.   Cox's Second Amended Complaint ("SAC"), the operative complaint, asserts claims under FOIA, arguing that the Agencies improperly withheld records responsive to his FOIA requests.   Attached to the SAC are copies of (1) Senator Feinstein's December 14, 2012, Letter to the President; (2) Senator Feinstein's April 7, 2014, Letter to the President; (3) Senator Feinstein's December 10, 2014, Letter to the President; and (4) Cox's FOIA requests.

On November 22, 2019, the Agencies moved to dismiss the SAC with respect to Cox's FOIA requests for the draft and final copies of

the report, and for summary judgment on Cox's remaining FOIA requests. The district court (Roslynn R. Mauskopf, *District Judge*) denied the motion to dismiss and, in doing so, adopted the D.C. Circuit's test for determining whether a document qualifies as an agency record. *See Cox v. Dep't of Just.*, 504 F. Supp. 3d 119, 146–49 (E.D.N.Y. 2020). Applying that test, the district court found that the allegations in and documents appended to the SAC "provide[d] mixed evidence of the SSCI's intent to relinquish control over the SSCI Report," *id.* at 149, and that therefore it could not conclude that the report is not an agency record. The district court declined to consider the June 2, 2009, letter because it was not attached to the SAC. *Id.* at 145.

Additionally, the district court granted in part and denied in part the Agencies' motion for summary judgment. The district court found that DOJ, DOD, ODNI, and the Department of State carried their burden of demonstrating that they properly withheld

documents pursuant to exemptions under FOIA but that the FBI failed to provide an adequate explanation for why it withheld its documents. The district court noted that the FBI could renew its motion for summary judgment after supplementing its submissions in support of the withheld documents.

On May 14, 2021, the Agencies moved for summary judgment on Cox's remaining claims, which include his requests for copies of the draft and final versions of the report, and his request for FBI documents concerning the handling and transmission of the report. Cox filed a cross-motion for summary judgment and, in the alternative, moved for discovery under Federal Rule of Civil Procedure 56(d) and for the district court to conduct an *in camera* review of one redacted FBI document ("Cox-30").

On March 30, 2022, the district court (Rachel P. Kovner, *District Judge*)[1] granted the Agencies' motion for summary judgment and

---

[1] While the cross-motions for summary judgment were pending, the case was reassigned to Judge Kovner.

denied Cox's motion for summary judgment or, in the alternative, for discovery. *See Cox v. Dep't of Just.*, No. 17-CV-3329 (RPK) (RLM), 2022 WL 21304584, at *1 (E.D.N.Y. Mar. 30, 2022). The district court first addressed the draft and final versions of the report. Applying the D.C. Circuit test for agency records, the district court concluded that the draft and final versions of the report are congressional records, rather than agency records subject to FOIA. The district court relied heavily on the June 2, 2009, letter to find that the Committee intended to assert control over the draft and final versions of the report. Additionally, it concluded that portions of the draft and final versions of the report that are quoted in agency documents are not subject to FOIA. As for the FBI documents concerning the handling and transmission of the report, the district court concluded that the FBI sufficiently explained its withholding of those documents. Finally, the district court denied Cox's request for *in camera* review, having found that the FBI adequately explained its redactions to Cox-30, and

for discovery, because Cox failed to proffer evidence that undermines the exemptions claimed by the agencies or to show that the agencies acted in bad faith by withholding the documents.

This appeal followed.

## II.    Discussion

On appeal, Cox challenges the district court's grant of summary judgment on two grounds.  First, he argues that the district court erred by applying the D.C. Circuit's test to determine whether the draft and final versions of the report qualify as agency records. Second, he argues that the district court erred by concluding that the draft and final versions of the report are congressional records and therefore not subject to FOIA, even under the D.C. Circuit's test.  Cox also challenges the district court's denial of his request for discovery. For the reasons below, we affirm the district court's judgment in all respects.

## A. Agency Records

"We review the District Court's grant of summary judgment as to the FOIA claims *de novo*," *Doyle v. U.S. Dep't of Homeland Sec.*, 959 F.3d 72, 76 (2d Cir. 2020), "including the threshold determination of whether the requested records are 'agency records' eligible for disclosure under [FOIA]," *Behar*, 39 F.4th at 88 (citation omitted). "When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration." *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 110 (2d Cir. 2024) (quoting *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011)). "Summary judgment 'is proper only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law.'" *Doyle*, 959 F.3d at 76 (quoting *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016)).

Although Cox is proceeding *pro se*, he does not receive the special solicitude typically owed *pro se* litigants because he "is not a typical pro se litigant; he is an attorney." *Chevron Corp. v. Donziger*, 990 F.3d 191, 203 (2d Cir. 2021); *see also Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010).

### i.    Test for Agency Records

"Subject to certain statutory exemptions, FOIA requires federal agencies to make agency records available to the public upon request." *Doyle*, 959 F.3d at 76; *see also* 5 U.S.C. § 552(a)(3)(A), (b). FOIA authorizes federal courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). "When there is a dispute about what qualifies as an agency record, '[t]he burden is on the agency to demonstrate, not the

requester to disprove, that the materials sought are not agency records.'"  *Doyle*, 959 F.3d at 76 (quoting *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)).

Neither FOIA nor its legislative history defines the term "agency record."  *Id.*  But FOIA does offer some insight into the scope of an "agency record" through its definition of "agency," which is "'each authority of the Government of the United States' *except* 'the Congress,' 'the courts of the United States,' and other bodies including 'courts martial and military commissions.'"  *Behar*, 39 F.4th at 89 (emphasis added) (quoting 5 U.S.C. § 551(1)).  By excluding those governmental entities from the definition of "agency," it follows that records belonging to those entities do not constitute "agency records" for the purposes of FOIA.  As such, "congressional documents are not subject to FOIA's disclosure requirements."  *ACLU*, 823 F.3d at 662 (citation omitted).

The Supreme Court has provided further guidance on the definition of "agency records."  In *United States Department of Justice v. Tax Analysts*, the Court explained that agency records are documents that an agency (1) "either create[s] or obtain[s]" and (2) "control[s] . . . at the time the FOIA request is made."  492 U.S. at 144–45 (citation omitted).

At issue here are documents created by Congress and subsequently transmitted to various agencies.  There is no dispute that the agencies obtained the draft and final versions of the report, satisfying the first prong of the *Tax Analysts* test.  The central question before us, then, is whether the agencies controlled the draft and final versions of the report under the second prong of the *Tax Analyst* test, transforming those documents from congressional records into agency records.

To determine whether such control existed in this case, the district court applied the D.C. Circuit's test for control.  The D.C.

Circuit has set forth a four-factor test "to determine whether an agency has sufficient control over a document to make it an agency record," which requires courts to assess:

> [1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

*Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 218 (D.C. Cir. 2013) (internal quotation marks and citation omitted).  In cases involving documents that an agency has either obtained from or prepared in response to a request from Congress, the D.C. Circuit applies a modified version of the four-factor test, wherein the first two factors of the test are "effectively dispositive."  *Id.* at 221.  The key inquiry in those cases is this: "whether an agency's 'response is subject to FOIA turns on whether Congress manifested a clear intent to control the document.'"  *Id.* (quoting *United We Stand Am., Inc. v. I.R.S.*, 359 F.3d

595, 597 (D.C. Cir. 2004)).  Cox refers to the D.C. Circuit's test for records originating from Congress as the "intent" test, Appellant's Br. at 29, and for convenience, we will do the same.

Cox argues that the district court erred by applying the D.C. Circuit's intent test to decide whether the Agencies controlled the draft and final versions of the report.  He argues that under the *Tax Analysts* test, control simply means "that the materials have come into the agency's possession in the legitimate conduct of its official duties."  Appellant's Br. at 24 (quoting *Tax Analysts*, 492 U.S. at 145). This argument is squarely foreclosed by our precedent.  In *Behar*, this Court rejected the contention that mere possession of documents is sufficient to show control over them and adopted the D.C. Circuit's intent test.  We made clear:  "To determine whether an agency exercises control over documents obtained from an entity not covered by the FOIA, we ask whether 'the non-covered entity . . . has manifested a clear intent to control the documents, such that the

agency is not free to use and dispose of the documents as it sees fit.'"

*Id*. at 90 (internal quotation marks omitted) (quoting *Doyle*, 959 F.3d

at 77–78).

We note with some perplexity that Cox did not cite *Behar* at all

in his opening brief, even though this Court had issued the decision

in that case months earlier.  At the time that Cox filed his opening

brief, the mandate had not yet issued in *Behar* because of a pending

petition for panel rehearing or rehearing *en banc*.  Cox first mentioned

*Behar* in his reply brief, after the Agencies raised the case in their brief

in opposition.  When asked at oral argument why he did not address

*Behar* from the outset, Cox explained that he thought that the case

might be overturned, or otherwise altered, as a result of the pending

petitions before this Court, or through a later-filed petition for writ of

certiorari with the Supreme Court.  *See* Oral Arg. Audio Recording at

01:33–3:24.

Let us be clear: A published opinion, such as *Behar*, becomes binding precedent when it is decided. The fact that a mandate has not yet issued means only that jurisdiction over the case has not yet shifted back to the district court; it does not undermine the immediate precedential weight of our decision. We join our sister circuits in articulating this rule. *See In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th Cir. 2017) ("[A] stay of the mandate does not destroy the finality of an appellate court's judgment, and . . . a published decision is final for such purposes as stare decisis, and full faith and credit, unless it is withdrawn by the court." (internal quotation marks and citations omitted)); *Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992) ("Although the mandate in [the case] has not yet issued, [the published opinion] is nonetheless the law in this circuit. A mandate is the official means of communicating our judgment to the district court and of returning jurisdiction in a case to the district court."); *see also Collado v. N.Y.C. Dep't of Educ.*, No. 19-CV-2943 (AJN), 2021 WL

918292, at *2 (S.D.N.Y. Mar. 10, 2021) ("The mere fact that a mandate has not yet issued or that the non-prevailing party intends to petition for a rehearing does not render the panel decision any less binding."). And nothing was changed when the appellee in *Behar* filed a petition for rehearing with this Court and later a petition for writ of certiorari with the Supreme Court.  *See United States v. Afriyie*, 27 F.4th 161, 168 (2d Cir. 2022) ("Published panel decisions . . . are binding on future panels unless they are 'reversed *en banc* or by the Supreme Court.'" (quoting *United States v. Jass*, 569 F.3d 47, 58 (2d Cir. 2009))), *cert. denied*, 143 S. Ct. 326 (2022).

There is always a chance that a governing precedent might be vacated or overruled in the future.  But until it is, no matter the pendency of any petitions for rehearing or for writ of certiorari, a party must address such an opinion in its briefing.  *See* N.Y. R. Prof'l Conduct 3.3(a)(2) (laying out an attorney's ethical obligation "to disclose to the tribunal controlling legal authority known to the

lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel"); Model Rules of Pro. Conduct r. 3.3(a)(2) (Am. Bar Ass'n) (same).

### ii. Application

Cox next contends that, even under the intent test, the district court erred by finding that the draft and final versions of the report constitute congressional records not subject to FOIA. We disagree.

The D.C. Circuit has had an opportunity to determine whether the draft and final versions of the report are agency records under FOIA. In *ACLU*, the D.C. Circuit reviewed a record similar to the one on appeal today, except that the record in the *ACLU* case ended with Senator Feinstein's January 16, 2015, letter to the President and therefore did not include Senator Feinstein's communications to the Executive Branch following the *ACLU* decision and another of Senator Burr's requests to agencies for the return of their copies of the report. *Compare ACLU*, 823 F.3d at 659–61, *with supra* Section I.A.

After setting forth the intent test, the D.C. Circuit recognized a few principles from its past decisions involving documents that agencies obtained from entities not covered by FOIA.  *ACLU*, 823 F.3d at 663–64.  First, the court explained that "Congress may manifest an intent to retain control over documents either when the documents are created or when the documents are transmitted to an agency."  *Id.* at 664 (emphases omitted).  Conversely, "a 'post-hoc objection[ ] to disclosure,' . . . 'cannot manifest the clear assertion of congressional control.'"  *Id.* (quoting *United We Stand*, 359 F.3d at 602).  Second, the court stated that "if Congress initiates the creation of documents with a clear statement" of its "intent to maintain exclusive control of the documents," then that "congressional intent can only be overcome if the record reveals that Congress subsequently acted to vitiate the intent to maintain exclusive control over the documents that was manifested at the time of the documents' creation."  *Id.*  Finally, the court explained that "if 'Congress has manifested its own intent to

retain control, then the agency—by definition—cannot lawfully "control" the documents.'" *Id.* (quoting *Paisley v. C.I.A.*, 712 F.2d 686, 693 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984)). But "if Congress intends to relinquish its control over documents, then the agency may use them as the agency sees fit." *Id.*

Applying the intent test with those principles in mind, the D.C. Circuit concluded that the Committee intended to retain control of the report and therefore that the copies of the report were congressional records not subject to disclosure under FOIA. *Id.* at 667–68. The court found that the June 2, 2009, letter "makes it plain that the Senate Committee intended to control any and all of its work product, including the Full Report." *Id.* at 665. Rejecting the argument that the June 2, 2009, letter was intended to govern only those documents stored on the CIA's segregated network drive or kept in the CIA's Reading Room, the court observed that the letter explicitly applies to all documents as well as any materials generated by Committee staff.

*See id.* Additionally, the court found that Senator Feinstein's transmittal letters did not vitiate congressional intent to control the report established by the June 2, 2009, letter. *See id.* at 666–67.

We are persuaded by our sister circuit's reasoning, which should come as no surprise given that we are applying the same test to a nearly identical set of facts. Specifically, we apply the test set forth in *Behar*, which requires us to "ask whether the non-covered entity . . . has manifested a clear intent to control the documents, such that the agency is not free to use and dispose of the documents as it sees fit." 39 F.4th at 90 (internal quotation marks and citation omitted).

Like the D.C. Circuit, we conclude that the Committee "manifested a clear intent to control," *id.*, the draft and final versions of the report through its June 2, 2009, letter. The letter provides that "[a]ny documents generated on the network drive . . . as well as any other notes, documents, draft and final recommendations, reports or

other materials generated by Committee staff or Members, are the property of the Committee." J.A. at 29. The letter contains no temporal limitations on the Committee's control over the documents, stating that "[t]hese documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee." *Id.* And if it was not clear already, the letter explicitly states that these documents are "not CIA records" under FOIA. *Id.* It is difficult to imagine a clearer manifestation of an intent to control documents than the one expressed in the June 2, 2009, letter.

Cox argues, however, that the June 2, 2009, letter is irrelevant because the letter governs only the Committee's work product in the Reading Room and applies only to the CIA. Cox's argument is belied by the explicit language of the June 2, 2009, letter. As stated above, the letter covers *any* documents generated on the network drive as well as *any* materials generated by the Committee staff. The letter's

provision is expansive—it contains no limitation to work product in the Reading Room or to documents exchanged with the CIA.

Cox further argues that there was "no factual nexus" between the June 2, 2009, letter and the draft and final versions of the report sent to the Agencies. Appellant's Br. at 47. This argument is unpersuasive. Again, the letter clearly subjects the draft and final versions of the report to its protections. *See* J.A. at 29 ("[A]ny other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee . . . ."). There is no requirement that the Committee's subsequent letters reference the June 2, 2009, letter for the Committee to maintain control over the report.

Having found that the Committee "manifested a clear intent to control," *Behar*, 39 F.4th at 90 (citation omitted), the report, we turn to the question of whether the Committee "subsequently acted to vitiate the intent to maintain exclusive control over the documents that was

manifested at the time of the documents' creation," *ACLU*, 823 F.3d at 664. To answer this question, we look to evidence concerning the report's transmittal. *See id.* ("Congress may manifest an intent to retain control over documents either when the documents are created or when the documents are transmitted to an agency." (emphases omitted)). There are three transmittal letters accompanying the various versions of the report: (1) Senator Feinstein's December 14, 2012, letter to the President notifying him that the Committee completed a draft of the report; (2) Senator Feinstein's April 7, 2014, letter to the President notifying him that the Committee updated a draft of the report with comments from the Executive Branch; and (3) Senator Feinstein's December 10, 2014, letter to the President notifying him that the Committee completed a final version of the report.

None of the transmittal letters effectively retract the strong congressional intent to control the draft and final versions of the

report expressed in the June 2, 2009, letter.  In the December 14, 2012,

letter, Senator Feinstein stated that she would send copies of the draft

report to "appropriate" agencies and asked the White House to solicit

comments from those agencies.  J.A. 201.  She further stated that after

receiving comments, she "intend[ed] to present this report with any

accepted changes again to the Committee to consider how to handle

any public release of the report, in full or otherwise."  *Id.*  This letter

clearly demonstrates that the Committee maintained control over the

report.  Through the letter, the Committee dictated which agencies

received the report, the Executive Branch's use of the report, and the

contents and disposition of the report.

In the April 7, 2014, letter, Senator Feinstein explained that the

Committee voted to declassify the Executive Summary and the

Findings and Conclusions.  Senator Feinstein also wrote that she

"encourage[d] and approve[d] the dissemination of the updated

report to all relevant Executive Branch agencies."  *Id.* at 20–21.

Although this letter gives the Executive Branch some ability to make use of the report, it nevertheless does not vitiate the Committee's intent to control it. The letter granted discretion to the President to disseminate the report to relevant agencies. But "[a]ffording discretion . . . is not the same as surrendering control." *Cox*, 2022 WL 21304584, at *8. The fact that the Committee decided to declassify certain portions of the report for publication but not others demonstrates that it still maintained control over the report.

The December 10, 2014, letter is the closest the Committee came to relinquishing its control over the report. In that letter, Senator Feinstein wrote that "the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated." *Id.* at 22. Additionally, Senator Feinstein encouraged the President to use the report to inform the training and procedures for Executive Branch employees, as the President "see[s] fit." *Id.* at 22.

Although broad, the discretion afforded to the President is not clearly unfettered. The letter allows the report to be circulated and used as the President sees fit within the Executive Branch, but does not clearly address whether the report may be disseminated outside of the Executive Branch to, for example, the public. To the extent the letter is ambiguous over who retains full power over the ultimate disposition of the report, it is not strong enough evidence to vitiate the unambiguous expression of congressional intent from the June 2, 2009, letter. So again, we cannot conclude that this letter vitiated the Committee's intent to control the report.

Cox argues that letters following the *ACLU* decision sent by Senator Feinstein, as well as several other minority members of the Committee, confirm that the Committee did not intend to retain control over the copies of the report. But these letters do not represent the Committee's official position on the ownership of the report. Rather, they merely convey the opinions of less than a majority of

individual members of the Committee.  Thus, it hardly can be said that the Committee acted through these letters to vitiate its initial intent to exercise control over the report.

To the extent that Cox argues that Senator Feinstein clarified the Committee's intent at the time of creation and transmission of the report through those letters, that argument is unpersuasive.  The Committee's contemporaneous communications during the creation and transmission of the draft and final versions of the report speak for themselves.  And post-hoc elaborations on what is said in those communications cannot usurp the Committee's clear assertion of congressional control at the time of creation and transmission.  *Cf. ACLU*, 823 F.3d at 664 ("[A] 'post-hoc objection[] to disclosure,' . . . 'cannot manifest the clear assertion of congressional control.'" (quoting *United We Stand*, 359 F.3d at 602)).

In sum, the record shows that Congress "manifested a clear intent to control the [draft and final versions of the report], such that

the agenc[ies] [are] not free to use and dispose of the documents as [they] see[] fit." *Behar*, 39 F.4th at 88 (citation omitted). Nothing in the record demonstrates that the Committee ever acted to vitiate that clear intent. Thus, the district court properly found that the draft and final versions of the report are congressional records not subject to FOIA disclosure requirements.

### B. Cox's Request for Discovery

Cox also contends that the district court improperly denied his request for discovery because he did not make a showing of bad faith. He argues that such a showing is unnecessary under the Federal Rules of Civil Procedure or FOIA. We review the denial of Rule 56(d) discovery for abuse of discretion. *See Elliott v. Cartagena*, 84 F.4th 481, 493 (2d Cir. 2023).

Cox misconstrues the district court's holding. The district court did not deny discovery solely on the basis that Cox failed to demonstrate the Agencies' bad faith. Rather, the district court set

forth the proper standard for determining whether discovery is

warranted in FOIA cases:

> In order to justify discovery once the agency has satisfied
> its burden, the plaintiff must make a showing of bad faith
> on the part of the agency sufficient to impugn the
> agency's affidavits or declarations, or provide some
> tangible evidence that an exemption claimed by the
> agency should not apply or summary judgment is
> otherwise inappropriate.

*Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994) (citations

omitted).  The district court held that Cox failed to satisfy that

standard because he did not identify "contrary evidence" or evidence

"suggestive of bad faith."  *Cox*, 2022 WL 21304584, at *14 (citation

omitted).  Additionally, the district court had already found that Cox

failed to demonstrate that summary judgment was inappropriate.

Cox maintains that he did present evidence demonstrating bad

faith, citing letters from Senator Feinstein that, in his view,

contradicted the district court's interpretation of the June 2, 2009,

Letter.  This contention merely repackages Cox's arguments

concerning the district court's summary judgment ruling on the draft

and final versions of the report.  And for the reasons set forth above, we find those arguments to be without merit.

## III.   Conclusion

Our holding today reaffirms the appropriate test for determining whether documents in an agency's possession that were obtained from an entity not covered by FOIA constitute agency records.  It also sets the framework for analyzing whether an agency exercises control over documents originating from Congress in particular.

In sum, we hold as follows:

(1) A published opinion becomes binding precedent when it is decided, regardless of whether the mandate has issued or of any pending petitions for rehearing or for writ of certiorari. It remains so until it is vacated or overruled.

(2) As stated in *Behar*, to determine whether an agency exercises control over documents obtained from an entity not covered by FOIA, courts must ask whether the non-covered entity

has manifested a clear intent to control the documents, such that the agency is not free to use and dispose of the documents as it sees fit.

(3) Under *Behar*, an entity not covered by FOIA may manifest an intent to retain control over documents either when the documents are created or when the documents are transmitted to a covered agency. We first look to whether the non-covered entity initiated the creation of documents with a clear statement of its intent to maintain exclusive control of the documents. If it did, then that intent can only be overcome if the record reveals that the entity subsequently acted to vitiate the intent to maintain exclusive control over the documents that was manifested at the time of the documents' creation.

(4) The Committee manifested a clear intent to control the draft and final versions of the report through its June 2, 2009,

letter, and Senator Feinstein's transmittal letters did not vitiate that strong congressional intent.

(5) The district court did not abuse its discretion by denying discovery because Cox did not adduce evidence of bad faith on the part of the Agencies, that a FOIA exemption claimed was improper, or that summary judgment was inappropriate.

We therefore AFFIRM the district court's judgment.